IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

WHITE OAK POWER
CONSTRUCTORS,
                    Plaintiff,

v.

MITSUBISHI HITACHI POWER
SYSTEMS AMERICAS, INC.,
                    Defendant.
_____/                    Civil Action No. 3:17-cv-00355-JAG

OLD DOMINION ELECTRIC
COOPERATIVE,
                    Plaintiff,

v.

WHITE OAK POWER
CONSTRUCTORS, et al.
                    Defendants.
_____/

WHITE OAK POWER
CONSTRUCTORS,
                    Plaintiff,

v.

ALSTOM POWER, INC., and
OLD DOMINION ELECTRIC
COOPERATIVE
                    Defendants.
_____/

## WHITE OAK POWER CONSTRUCTORS' SECOND AMENDED COMPLAINT

Plaintiff, White Oak Power Constructors ("WOPC"), a contractual joint venture, by and

through its undersigned counsel, files this Second Amended Complaint against Defendants,

Alstom Power, Inc. ("Alstom") and Old Dominion Electric Cooperative ("ODEC"), and alleges:

## I.     <u>PARTIES, JURISDICTION AND VENUE</u>

1.     This is an action for damages in excess of $75,000.00, exclusive of attorneys' fees, costs and interest.

2.     Plaintiff, WOPC, is a partnership of PCL Industrial Construction Company ("PCL") and Sargent & Lundy, LLC ("S&L").

3.     WOPC is engaged in the business of designing and constructing power generation facilities, including the Maryland facility at issue in this action.

4.     WOPC is authorized to do business in Virginia and WOPC has its principal place of business in Maryland.

5.     WOPC's citizenship is determined by the citizenship of each of its partners. PCL is a citizen of Colorado, the state of its incorporation. It is also a citizen of Texas, which serves as PCL's nerve center. S&L, as a limited liability company, has the citizenship of each of its members. Therefore, S&L is a citizen of Illinois, Tennessee, Maryland, New York, New Jersey, and Pennsylvania. Accordingly, WOPC is a citizen of Colorado, Texas, Illinois, Tennessee, Maryland, New York, New Jersey, and Pennsylvania.

6.     Defendant, Alstom, is a Delaware corporation engaged in the business of designing, manufacturing and/or supplying power generating equipment and providing services for the design, installation, erection, and operation of power generating equipment. Alstom's principal place of business is in Windsor, Connecticut.

7.     Alstom is a citizen of Delaware, the state of its incorporation, and Connecticut, as Alstom's nerve center is located in Windsor, Connecticut. Specifically, Alstom's principal corporate offices, Senior Vice President, Treasurer, Assistant Secretary, and several Directors are all located in Connecticut.

8.     Defendant, ODEC, is a Virginia corporation engaged in the business of manufacturing and distributing electricity.  ODEC's principal place of business is in Glen Allen, Virginia.

9.     ODEC is a citizen of Virginia, because Virginia is the state of ODEC's incorporation and the location of ODEC's nerve center.

10.     As has been judicially determined in this case, venue is appropriate in the Eastern District of Virginia per contractual agreements between WOPC, ODEC, and Alstom.

11.     This Court properly has subject matter jurisdiction over this controversy as complete diversity of citizenship exists between the parties and the amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

12.     All conditions precedent to maintain this action have been satisfied or have been waived.  To the extent such provisions are applicable to the claims asserted in this Second Amended Complaint, WOPC has complied with and satisfied the requirements of any dispute resolution procedures contained in any applicable contracts between the parties or the Defendants have waived the requirements of such dispute resolution procedures.

## II.     GENERAL ALLEGATIONS

### A.     The Wildcat Project

13.     This action arises from the development of the Wildcat Point Generation Facility in Rising Sun, Maryland (the "Wildcat Project" or the "Project").  The Wildcat Project is a nominal 1,000-megawatt gas-fired combined cycle power generating facility.

14.     The Project is owned by ODEC.

15.     The development of the Project includes: (i) two (2) combustion turbine units (each unit is comprised of a gas combustion turbine and a combustion turbine generator), (ii) two (2)

heat recovery steam generators ("HRSG"), (iii) one (1) steam turbine generator ("STG"), (iv) a switchyard, and (v) common facilities to support the power generation operations.

16.     The Wildcat Project will generate electricity in multiple ways.  First, the Wildcat Project burns natural gas to power the two (2) combustion turbines which, in turn, generate electricity.  Burning the natural gas generates significant amounts of heat.  Instead of simply exhausting this heat, the heat is captured for re-use by the HRSGs.  The heat passes over the equivalent of large coils in the HRSGs.  The HRSGs use this heat to turn water within the HRSGs to steam.  The resulting steam is then piped to the STG and used to power the STG.  The STG, powered by the resulting steam, produces a secondary source of electricity. Collectively, this process results in a highly efficient, two-step means of power generation.

17.     The Project is estimated to generate enough electricity to supply 390,000 homes annually.

18.     The total development cost of the Wildcat Project is estimated to be over $800 million.

B.      **Development of the Wildcat Project**

19.     The development of a project the size of the Wildcat Project is a substantial undertaking.

20.     ODEC engaged the engineering firm of Burns & McDonnell, Inc. ("B&M") to serve as ODEC's engineer for the Project.

21.     B&M's responsibilities included, without limitation, providing permitting support; preliminary engineering; preparing the Project's initial design; evaluating potential power generation technologies (including the gas turbines, the HRSGs, and the STG) to be employed in the Project; evaluating various plant configurations; evaluating the work required to erect and

install the various potential power generation technologies; preparing Project specifications and drawings; conducting the bidding processes for work on the Project, including the selection of the Engineering, Procurement and Construction ("EPC") contractor; preparation of bidding materials; contract negotiation support; and management and review of the original equipment manufacturers' ("OEM") designs (including Alstom's designs) in the period after award of the OEM contracts and through the execution of the EPC contract.

22.     B&M worked with ODEC to develop the Project requirements and to consider the various power generating technologies available in the market for use with the Project.

23.     ODEC, in cooperation with B&M, made the final decision as to the types of power generation technologies to be utilized on the Project.  ODEC chose an approach that included a single STG and two HRSGs.

24.     B&M developed a preliminary design for the Project based upon the selected technologies, including a general arrangement for the Project. ODEC approved the preliminary design, including the general arrangement, and distributed it to the EPC contract bidders as a basis for their proposals for the EPC contract.

25.     After ODEC chose the power generating technologies to be used on the Project, it implemented a two-phase approach to procuring the Project's major vendors.  ODEC conducted the procurement of the major vendors through B&M.

26.     In the first phase of the procurement, ODEC conducted a competitive procurement for the vendors for the major project systems, including the STG and HRSGs.  In the second phase of the procurement, ODEC conducted a competitive procurement for the Project's EPC Contractor.

27.     ODEC's two-phase procurement was designed to allow ODEC to advance the start of procurement of the Project's major systems so that the long-lead time associated with designing,

manufacturing, and supplying the Project's major systems, like the STG and HRSGs, could start before, and then proceed in parallel with, ODEC's selection of its EPC contractor. ODEC's two-phase procurement also enabled the bidders for the EPC contract to receive information from the major system vendors regarding the scopes of work that would have to be performed by the EPC contractor to erect and install the major system vendors' equipment. The bidders for the EPC contract needed this information from ODEC and the major system vendors to develop their proposals for the EPC contract, including their price and schedule. As compared to a single-phase approach, ODEC's two-phase approach denied the EPC contractor an opportunity to participate in scoping decisions.

28.     ODEC informed the major system vendors and the EPC Bidders of ODEC's two-phase approach. The major system vendors knew, at all material times, that their equipment procurement contracts would be assigned to the EPC contractor after ODEC selected the EPC contractor. Thus, the STG and HRSG vendors knew, at all material times, that they would have a contractual relationship and privity with ODEC's selected EPC contractor. The major system vendors also knew, at all material times, that their designs and other engineering information would be provided to the bidders for the EPC contract as a basis for the EPC bidders' proposals relating to that vendor's scope of work, and that the EPC Bidders would be relying upon the material representations of the major system vendors who had superior knowledge of their own designs and other engineering information.

C.     **Alstom's Selection to the Wildcat Project**

29.     Alstom was among the STG and HRSG vendors who competed for the Project's STG and HRSG contracts.

30.     Alstom represents and holds itself out as a world leader in the design, engineering, manufacturing, supply, and support of power producing equipment, including STGs and HRSGs, specifically.  Alstom's proprietary systems are designed and manufactured by Alstom and Alstom therefore had superior knowledge of its proprietary systems which were material to the EPC bids.

31.     Alstom competed in ODEC's competitive selection process for the STG and HRSGs for the Wildcat Project.  Based on Alstom's representations regarding its experience, skills, qualifications, price, and equipment design and performance, including representations by Alstom about the scope of work that ODEC's EPC contractor would have to perform to install and erect the Alstom STG and HRSGs, ODEC chose Alstom to design, manufacture, and supply Alstom's STG and HRSGs for the Project, and to provide services to ODEC and its EPC contractor, including, without limitation, services for supporting the installation, erection, and commissioning and testing of Alstom's STG and HRSGs.  Alstom's services were an integral part of Alstom's scope of work.

32.     On or about November 27, 2013, ODEC and Alstom entered into an Equipment Purchase Agreement (the "Alstom Purchase Agreement") for the design, manufacture, supply, and support of the Project's STG, two (2) HRSGs and associated components.  As used hereinafter, the term STG shall refer to the steam turbine and associated generator, along with related components, equipment and parts to be supplied by Alstom for the Project, as further described in Exhibit A to the Alstom Purchase Agreement, unless specifically stated otherwise.  As used hereinafter, the term HRSG shall refer to a heat recovery steam generator, along with related components, equipment and parts to be supplied by Alstom for the Project, as further described in Exhibit A to the Alstom Purchase Agreement, unless specifically stated otherwise.  As used hereinafter, the term HRSGs shall refer to the two (2) heat recovery steam generators, along with

7

their related components, equipment and parts to be supplied by Alstom for the Project, as further described in Exhibit A to the Alstom Purchase Agreement, unless specifically stated otherwise.

33.     The Alstom Purchase Agreement is voluminous.  Exhibit "A" to this Amended Complaint is a true and correct copy of the relevant portions of the Alstom Purchase Agreement.

34.     When Alstom entered into the Alstom Purchase Agreement, Alstom knew the Alstom Purchase Agreement would be assigned to the EPC contractor selected by ODEC and that Alstom would therefore become a party to, and in privity with, the EPC contractor.

35.     At all relevant times, Alstom knew that it possessed superior knowledge and that its representations would be relied on by the EPC contractors.  Alstom knew its equipment needed to be designed to integrate with other Project systems, like the balance of plant ("BOP") facilities that would be designed by the EPC contractor.  Alstom also knew that it would be delivering its equipment to the Project for erection and installation by the ODEC selected EPC contractor.

36.     Additionally, Alstom knew that its representations regarding the Project's STG and HRSGs, like its information regarding the STG and HRSG design or instructions for the STG and HRSG installation and erection, would be provided to the EPC contract bidders for use as the basis of their bids to ODEC, and that the EPC contract bidders would, given Alstom's superior knowledge, reasonably and justifiably rely upon Alstom's superior knowledge and representations. Additionally, as Alstom knew its information would be provided to the EPC Bidders, it knew that any information that was not provided to the EPC Bidders would have a direct, material effect on the EPC contractor's price and schedule for the performance of the EPC contractor's work. Alstom knew that its design, manufacture, supply, and support of its equipment was material to, and would have a direct effect on the EPC contractor's price and schedule for the performance of the EPC contractor's work.  Alstom also knew that its failure to properly perform its scope of work or to

supply the STG and HRSGs in accordance with Alstom's representations to the EPC contract bidders would directly impact the EPC contractor, including potentially delaying the EPC contractor's performance and increasing the EPC contractor's cost of performance.

**D.      ODEC Acknowledged WOPC's EPC Contractor Experience and Qualifications**

37.      After it selected Alstom for the Project's STG and HRSGs, ODEC conducted a competitive procurement to retain its EPC contractor.

38.      ODEC, together with B&M, solicited bids from EPC contractors.

39.      The first step in the process of selecting the EPC contractor was to identify a pool of candidates that had sufficient experience and qualifications to serve as the Project's EPC contractor.  Accordingly, on or about August 2, 2013, B&M issued a "Request for Qualifications for Engineering, Procurement, and Construction prepared for" the Wildcat Project (the "RFQ") to a number of potential EPC contractors, including WOPC.

40.      The RFQ provided that "The EPC Contractor [would] be responsible for designing and building the Project in accordance with the requirements set forth in the [Request for Proposal to be issued at a later date] …."

41.      The RFQ also provided that "The Owner will supply the gas turbine generators, heat recovery steam generators [HRSGs], and steam turbine generator [STG] …."

42.      WOPC responded to the RFQ.  WOPC's experience and qualifications were thoroughly evaluated.  At the conclusion of the vetting process, ODEC recognized that WOPC (PCL and S&L) was qualified to serve as the Project's EPC contractor.  As a result, WOPC was included on the short list of potential companies qualified to bid on and complete the design and construction of the Wildcat Project (collectively the "EPC Bidders").

43.     Only five entities were prequalified to bid for the EPC contract.  At all times material hereto, the Defendants knew the identities of the five entities that were prequalified to bid for the EPC contract.

**E.     Selection of the Project's EPC Contractor**

44.     On or about October 25, 2013, ODEC and B&M issued a Request for Proposals ("RFP") to the shortlisted EPC Bidders.

45.     The RFP required the EPC Bidders to propose a firm, lump-sum price to perform the engineering, procurement and construction of the Project in accordance with, and as further defined in, the RFP.  The RFP required, among other things, that the EPC contractor achieve substantial completion not later than May 1, 2017.

46.     The RFP indicated the EPC Bidders would not be providing the STG and HRSGs. The RFP provided, "The Owner [would] furnish the following major equipment (Owner-Furnished Equipment) consisting of the gas turbine generators ("GTG's"), HRSG's, STG and Generator Step-Up Transformers (GSU's)."  The RFP told the EPC Bidders that the EPC contractor's scope of work and firm, lump-sum proposal would include, among other things, all costs to receive, assemble, install, commission, and test the Alstom provided STG and HRSGs.

47.     On or about November 8, 2013, Addendum No. 1 to the RFP was issued. Addendum No. 1 provided the EPC Bidders, among other things, an Exhibit A2 - STG Scope of Supply.  Exhibit A2 - STG Scope of Supply depicted the initial design of the STG for the Project. The initial STG design included requirements for a concrete pedestal on which the STG was to be installed.  This concrete pedestal was to be engineered and constructed by the EPC contractor according to Alstom's requirements.  The EPC contractor's firm, lump-sum proposal was required

to include, among other things, the cost of constructing the STG concrete pedestal as represented in Exhibit A2 – STG Scope of Supply.

48.     The information contained within Addendum No. 1, including Exhibit A2 – STG Scope of Supply, was for the guidance and use of the EPC Bidders in preparing their firm, lump-sum proposals to ODEC, including their price and schedule.  The Defendants understood that the representations in Exhibit A2 – STG Scope of Supply were being provided to, and used by, the EPC Bidders to determine, without limitation, the EPC Bidders' price, schedule, and terms in the executed EPC Contract and the Alstom Assignment, Assumption and Consent Agreement ("Alstom Assignment Agreement") (and its underlying Alstom Purchase Agreement).

49.     On or about November 13, 2013, Addendum No. 2 to the RFP was issued. Addendum No. 2 provided the EPC Bidders, among other things, Exhibit A1 Scope of Supply. Exhibit A1 Scope of Supply depicted Alstom's initial design for the Project's HRSGs reflecting Alstom's superior knowledge of the components thereof.

50.     The initial design for the HRSGs included in Addendum No. 2 contained material and essential information about the quantity of work that the EPC contractor would have to perform to erect and install the HRSGs.  Addendum No. 2 included a document titled "5.1215 HRSG Vendor Quantity Breakdown."  The HRSG Vendor Quantity Breakdown provided the EPC Bidders, including WOPC, three (3) pages of information regarding the "FIELD INSTALLED QUANTITIES."  In the "FIELD INSTALLED QUANTITIES", the Defendants made material representations to the EPC Bidders, including WOPC, regarding, among other things, the quantities and types of pipe, welds, steel, and insulation that the EPC Bidders should reasonably expect to erect and install as part of the erection and installation of the Alstom supplied HRSGs. Addendum No. 2 also included representations regarding the size of the ammonia skid that Alstom

would supply for the HRSGs.  The Defendants made these material representations for the guidance and use of the EPC Bidders, including WOPC, to determine, without limitation, the EPC Bidders' price, schedule, and terms in the executed EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).  The Defendants knew these representations were provided to the EPC Bidders and would be used by them for these purposes.

51.     Finally, on or about December 4, 2013, Addendum No. 3 to the RFP was issued. Addendum No. 3 superseded Addendum Nos. 1 and 2 to the extent the earlier Addenda provided different or conflicting information.

52.     Addendum No. 3 included, among other things, the fully executed Alstom Purchase Agreement.

53.     Addendum No. 3, and the executed Alstom Purchase Agreement within Addendum No. 3, included the same, or substantially the same, material representations by the Defendants to the EPC Bidders regarding the STG and HRSGs that had been attached to Addendum Nos. 1 and 2.   More specifically, Addendum No. 3 continued to include, among other things, the representations as to the concrete pedestal on which the STG was to be installed, the proposed size of an ammonia skid associated with the HRSGs, and the document titled "5.1215 HRSG Vendor Quantity Breakdown" providing three (3) pages of representations as to quantities of work the EPC Bidders should expect to perform in erecting and installing the HRSGs.

54.     Although Addendum Nos. 1, 2 and 3 were issued by ODEC and B&M, the representations contained therein, with respect to the STG and HRSG scopes of work for the EPC contractor, were representations by ODEC and Alstom to the EPC Bidders, including WOPC.  The Defendants made these representations regarding the STG and HRSGs for the guidance and use of

the EPC Bidders, including WOPC, in preparing their firm, lump-sum proposals to ODEC, including their price and schedule.

55.    In fact, ODEC specifically directed the EPC Bidders to use the Defendants' representations in, without limitation, entering into the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).  Section 01C130 of Addendum No. 3, titled "OWNER-FURNISHED EQUIPMENT ENGINEERING DOCUMENTS," is the Section of the RFP that contained the STG and HRSG representations to the EPC Bidders.  Section 01C130 of Addendum No. 3 specifically directed the EPC Bidders to "incorporate the attached Owner-Furnished Equipment engineering documents into their Work." By affirmatively directing the EPC Bidders to use and incorporate the information contained in the Addendums, ODEC directly vouched for the veracity and completeness of the information contained therein.

56.    WOPC (and the other EPC Bidders) justifiably used the representations made by the Defendants in Addendum Nos. 1, 2, and 3.  The EPC Bidders use of the representations was justifiable because these representations were made by the Defendants as to Alstom's proprietary equipment and were based on Alstom's superior knowledge and experience in designing, manufacturing, supplying, and supporting such equipment.   Alstom was designing and manufacturing the STG and HRSGs specifically for the Project.   As a result, the Alstom representations, whether provided by ODEC or Alstom, were credible, material, and essential to the transaction such that the Defendants knew these representations would be used by the EPC Bidders, including WOPC, to determine, without limitation, the EPC Bidders' price, schedule, and terms in the executed EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).  In making these representations, the Defendants owed the EPC Bidders, including WOPC, the duty to provide correct, complete, and accurate information.  The

Defendants, who held superior knowledge, owed the EPC Bidders a duty to disclose all information necessary to prevent its representations from being incorrect or misleading. By providing these representations and instructing the EPC Bidders to use these representations, ODEC and Alstom represented that they had provided the information needed by the EPC Bidders.

57.     Addendum No. 3 demonstrates that the Defendants knew, at all relevant times, that the Defendants' representations were being made for the use and guidance of the EPC Bidders in developing their firm, lump-sum proposals.

58.     Addendum No. 3 included the fully executed Alstom Purchase Agreement.  The Alstom Purchase Agreement contains numerous provisions that demonstrate the Defendants knew the EPC Bidders would use the Defendants' representations in, without limitation, entering into the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).  The Defendants' knowledge of the EPC Bidders' use of their representations is evident from the following Alstom Purchase Agreement provisions:

a.      "'EPC Contractor' means the entity designated by [ODEC] to provide engineering, procurement and construction services for the [Wildcat Project], *including installation of the Steam Tail Equipment* [which includes the HRSGs and STG]." Alstom Purchase Agreement § 1.1 (emphasis added).

b.      "Cooperation with the EPC Contractor. *[Alstom] acknowledges that the Steam Tail Equipment is being purchased for installation at the Site as part of the Facility, and that the EPC Contractor will be engaged to undertake management of the overall construction of the Facility, including managing such installation and other activities relating to the Steam Tail Equipment*. [Alstom] will reasonably cooperate with Owner and the EPC Contractor and transparently

and proactively coordinate its activities with those of the EPC Contractor. . . . [Alstom] will promptly respond to all reasonable requests of Owner or the EPC Contractor for information about the Steam Tail Equipment or regarding the status of the Work." Alstom Purchase Agreement § 2.6 (bolding and italicized emphasis added).

c.      "Any and all reviews or approvals by or on behalf of [ODEC] that are required by or referenced in this Agreement or are otherwise undertaken by or on behalf of [ODEC] in connection with this Agreement are for the sole purpose of concept review only. Any such reviews, approvals or related actions of or for [ODEC] *shall not in any way be, or be deemed to be, an indication of any knowledge or expertise by [ODEC] or its Personnel in any area of the Work* or an approval of any aspects, requirements or specifications of the Steam Tail Equipment, *all of which are, and shall remain, the responsibility of [Alstom]*. Notwithstanding any provision of this Agreement to the contrary, [ODEC] shall not be deemed to have assumed any responsibilities of [Alstom], *nor shall [Alstom] presume that [ODEC, B&M,] or the EPC Contractor (or their respective Personnel) have any knowledge or expertise in any area of the Work*." Alstom Purchase Agreement § 3.3 (emphasis added). "Work" is defined as "the provision by [Alstom] of the Steam Tail Equipment [including the STG and HRSGs] and the Services." Alstom Purchase Agreement §§1.1, 3.3.

d.      Section 6.1.1 of the Alstom Purchase Agreement provides specified delivery dates of STG and HRSG components for "EPC Contractor to be able to erect/install the same."

e.      "<u>Assignment to EPC Contractor</u>. [ODEC] may also assign its rights (or any part thereof) under this Agreement and transfer its obligations (or any part thereof) under this Agreement to the EPC Contractor. **The prior consent of Supplier is not required if (a) such EPC Contractor is** Zachry, **PCL**, Kiewit, CH2M Hill or Fluor."  Alstom Purchase Agreement § 15.2.2 (emphasis added).  PCL is a member of the WOPC joint venture.

f.      "<u>Disclosure of Confidential Information</u>. The Receiving Party agrees to keep confidential all Confidential Information disclosed to it by the Disclosing Party . . . .  As regards [ODEC] as the Receiving Party, [ODEC] may, without prior written authorization of [Alstom], disclose Confidential Information other than Guarantor Financial Information to: . . . . (c) **to the EPC Contractor (and any other bidder or prospective bidder that may become the EPC Contractor)** ...."  Alstom Purchase Agreement § 17.2 (emphasis added).

59.      The Alstom Purchase Agreement demonstrates the Defendants knew their representations were material statements being supplied to the EPC Bidders, including WOPC, for use in, without limitation, entering into the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement); and that WOPC (through PCL) was one of the parties that would use the Defendants' representations.

60.      ODEC had direct discussions with WOPC regarding the EPC Contractor's work, including the discussions regarding the work required to erect and install the STG and HRSGs. Additionally, Alstom, with ODEC's approval, also made material, direct, and specific statements of fact to WOPC about the STG and HRSGs that Alstom was supplying for the Project.  For

example, shortly after the issuance of Addendum No. 3, on or about December 17, 2013, Alstom made a presentation directly to WOPC entitled "Wildcat Point- HRSG Constructability."

61.     In Alstom's "Wildcat Point- HRSG Constructability" presentation, Alstom gave additional information to WOPC.  Alstom also made additional material representations as to WOPC's obligations and responsibilities in erecting and installing the Alstom supplied HRSGs.

62.     The Defendants' supplying of documents and information, and direct discussions and contact with WOPC during the EPC proposal process, further demonstrates that the Defendants knew the EPC Bidders, including WOPC, were using the Defendants' representations.

63.     The Defendants' statements to WOPC (and the other EPC Bidders) were made in the context of a business transaction between the Defendants and the EPC Bidders, including WOPC, where the Defendants were supplying information based upon the Defendants' superior knowledge for the guidance and use of the EPC Bidders with full knowledge and the expectation that the EPC Bidders would use the Defendants' information.

64.     Given their participation in the EPC contractor procurement process and the intended contracting arrangement that included an EPC contract and an assignment of the Alstom Purchase Agreement to the EPC contractor, the Defendants were aware that they would be responsible to the EPC Bidders, including WOPC, for their false representations and non-disclosures of material facts to the EPC Bidders, including WOPC.

65.     WOPC used the Defendants' superior knowledge and representations in, without limitation, entering into the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).  In entering into the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), WOPC used, without limitation, the Defendants' representations regarding, among other things, the requirements for the

concrete pedestal for the STG, the quantities of work for the STG and HRSGs, and the size of the ammonia skid. Defendants knew that changes, non-disclosures, or errors in the Defendants' representations would have a direct and substantial effect on WOPC's ability to complete the Project for the price and schedule in its proposal.

66.     The Defendants' representations in the Addenda, and the direct representations made during, and after, December of 2013, predated the EPC Bidders' submission of their firm, lump-sum EPC proposals to ODEC.

67.     WOPC presented its firm, lump-sum proposal for the EPC Contract for the Wildcat Project on January 31, 2014.  WOPC developed its proposal, including its price and schedule, using the Defendants' representations to the EPC Bidders, including WOPC.

68.     Although the Defendants knew their representations had been made to the EPC Bidders and would be used for, without limitation, entering into the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), the Defendants failed to advise the EPC Bidders of any changes in the Defendants' representations or to provide any additional information necessary to prevent the Defendants' representations from being incorrect or misleading.  The Defendants allowed the EPC Bidders, including WOPC, to proceed forward with entering into the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) without knowing whether or how the EPC Bidders' (WOPC's) scopes of work had changed and whether or how the assumptions underlying the EPC Bidders' (WOPC's) firm, lump-sum proposals had been invalidated in material respects by the Defendants' misrepresentations and/or nondisclosures.

69.     The Defendants knew the EPC Bidders would be entering into the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) in

reliance upon the Defendants' material misstatements and/or non-disclosures as to the amount of work that would actually need to be done to erect and install the STG and HRSGs. Despite superior knowledge and a duty to correct the representations and non-disclosures, the Defendants did not inform the EPC Bidders of the Defendants' misstatements, misrepresentations, and non-disclosures. The Defendants made these misrepresentations and did not correct these misrepresentations and non-disclosures because these misrepresentations and non-disclosures understated the scope of the STG and HRSG erection and installation work and Defendants benefitted from the understatement.

70.     Although the Defendants knew that (i) WOPC would be entering into the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) using the Defendants' false and misleading representations and non-disclosures; and that (ii) WOPC and Alstom would become parties to the Alstom Purchase Agreement (through the Alstom Assignment Agreement) using the Defendants' false and misleading representations and non-disclosures, the Defendants did not ensure that WOPC had accurate and correct information. The Defendants knew that the EPC Bidders, including WOPC, would reasonably expect that the information provided was correct, and would reasonably expect disclosure of alterations or changes to those facts which only the Defendants possessed due to their superior knowledge. The Defendants had a duty to correct their false and misleading representations and to disclose information necessary to prevent their representations from being false or misleading, but failed to do so.

71.     WOPC and ODEC executed the EPC contract for the Wildcat Project on or about June 2, 2014 (the "EPC Contract"). The EPC Contract is voluminous. Exhibit "B" to this Amended Complaint is a true and correct copy of the relevant portions of the EPC Contract.

72.     Contemporaneously, as indicated in the RFP and the Alstom Purchase Agreement, ODEC, Alstom, and WOPC entered into the Alstom Assignment Agreement on or about June 2, 2014.  In the Alstom Assignment Agreement, ODEC transferred most of its obligations and rights under the Alstom Purchase Agreement to WOPC, as is more specifically provided in the Alstom Assignment Agreement.  The Alstom Assignment Agreement includes Alstom's consent to, and approval of, the assignment of the Alstom Purchase Agreement to WOPC in accordance with the terms and conditions of the Alstom Assignment Agreement.

73.     A true and correct copy of the Alstom Assignment Agreement is attached to this Amended Complaint as Exhibit "C."

74.     While the Alstom Assignment Agreement provides that ODEC retained certain obligations and rights that ODEC had under the Alstom Purchase Agreement, all obligations and rights related to and necessary to the present action were assigned to WOPC or were shared with WOPC.

**F.      Dramatic Growth of STG and HRSG Requirements**

75.     The quantity of work WOPC has actually had to perform to erect and install the STG and HRSGs has been significantly greater than the quantity of work represented by the Defendants to the EPC Bidders and used by WOPC to determine, without limitation, the price, schedule, and terms in the executed EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).

76.     As compared to the representations by the Defendants in Addendum No. 3, the growth in the quantity of EPC contractor work required to erect and install the STG and HRSGs has included, but has not been limited to:

      a.      WOPC was required to install 1,000% more 8" to 12" large bore chrome pipe;

   b.  Total amount of piping WOPC was required to install grew 250%;

   c.  The amount of welding of small bore pipes doubled;

   d.  The represented size of the ammonia skid grew to 2.7 times causing the size of HRSG portions of the Project to grow;

   e.  The number and size of ancillary pieces of equipment grew requiring larger buildings to house them;

   f.  More space for the STG and HRSG equipment and piping causing the overall size of the Project to grow; and

   g.  The concrete pedestal on which the STG was to be placed grew 30% wider.

77. The Defendants' representations prior to the submission of WOPC's proposal, including in Addendum No. 3, showed the quantities of work purportedly required to erect and install **two (2)** HRSGs.  **WOPC has, however, based on the quantities represented by the Defendants, actually installed enough HRSG piping and made enough welds to erect and install the equivalent of <u>four (4)</u> HRSGs**.  The Defendants' pre-bid representations failed to disclose the work truly required to erect and install the HRSGs.

78. Starting in March 2016, WOPC informed the Defendants that WOPC discovered significant growth in the planned piping and weld quantities for the HRSGs.  As WOPC was required to complete the Project, it could not stop installation of the HRSG piping.  WOPC told Alstom that WOPC intended to provide an assessment of additional quantities and reserved its rights against Alstom.  WOPC separately informed ODEC of WOPC's intentions.

79. At the time WOPC informed the Defendants of the growth in the planned piping and weld quantities, WOPC did not know the additional quantities resulted from false and intentionally misleading information provided by the Defendants.

80.     In December 2016, WOPC provided Alstom, and in January of 2017 WOPC provided ODEC, with additional information about the increases in the quantities of HRSG piping related work as actually installed.  Although WOPC was not yet done with the HRSG erection and installation and could not fully assess its damages, WOPC gave the Defendants additional information about the impacts WOPC was experiencing as a result of the Defendants' misrepresentations and non-disclosures.  WOPC informed the Defendants of the dramatic nature of the growth in weld quantities and piping quantities to that point in the Project.  WOPC also advised the Defendants of the corresponding increases in insulation quantity and the number of pipe hangers and supports that WOPC had to install to erect and install the HRSGs.

81.     In December 2016, WOPC also told Alstom that Alstom's failure to fabricate and deliver Alstom's pipe supports and hangers in accordance with the Alstom Purchase Agreement exacerbated the impacts of the additional pipe support and hanger quantity.  Alstom failed to fabricate the pipe supports and hangers in its shops as required by the Alstom Purchase Agreement.  Alstom also failed to deliver the pipe supports and hangers in an organized manner as required by the Alstom Purchase Agreement.  The disorganized deliveries required WOPC to perform extensive additional work to catalog, store, and organize the pipe support and hanger components before WOPC could even start to assemble them.

82.     WOPC advised Alstom, in December of 2016, and ODEC, in January of 2017, that the increases in quantities were causing WOPC to incur additional costs of pipe installation, welding, insulation, interior welding, and for additional platforms, and instrumentation.  WOPC also informed the Defendants that the additional quantities caused inefficiencies in WOPC's piping installation work.  The added quantities, in the relatively confined spaces on the Project, prevented WOPC from achieving its planned piping productivity.   WOPC also suffered diminished

productivity due to the increased difficulty of the piping related work.  These impacts were felt in the additional piping and the base piping work.  The loss of efficiency caused WOPC to incur additional costs and made the work take longer.  WOPC informed the Defendants of its intent to hold the Defendants responsible for all of the damages that their misrepresentations and non-disclosures caused WOPC including, among other things, the damages and delays resulting from loss of efficiency.

83.     In January 2017, WOPC, ODEC, and Alstom discussed the dramatic growth in the quantity of the HRSG piping related work that resulted from the Defendants' misrepresentations and non-disclosures.  In these discussions, Alstom admitted it knew, well before WOPC executed the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), that the EPC Bidders used Alstom's false and misleading representations to determine the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).  Alstom also admitted it failed to make disclosures required to prevent its representations from being false and misleading.  Additionally, Alstom admitted that although it knew the EPC Bidders were using Alstom's false and misleading representations for, among other things, determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), Alstom failed to inform the EPC Bidders, including WOPC, of its false and misleading representations and non-disclosures.  Alstom failed to disclose and inform the EPC Bidders even though it owed them a duty of disclosure and candor.  WOPC's additional costs of labor, material, equipment, and supervision for erecting and installing additional quantities of HRSG piping, additional HRSG piping welds, additional insulation, additional pipe supports and

hangers, and to mitigate the impacts of the additional quantities of work relating to the STG and HRSGs resulted from fraud, deceit, misrepresentations, and non-disclosures by Alstom.

84.     Additionally, in these same January 2017 e-mail exchanges between ODEC, Alstom, and WOPC, ODEC admitted that it knew, well before the execution of the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), that ODEC's representations to the EPC Bidders, which ODEC knew WOPC used in, without limitation, determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), were false and misleading and that ODEC made the deliberate, intentional decision not to make disclosures to WOPC that were necessary to prevent ODEC's representations from being false and misleading. ODEC also admitted that although it knew the EPC Bidders were using ODEC's false and misleading representations, and non-disclosures, for, among other things, determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), ODEC failed to disclose and inform the EPC Bidders even though it owed them a duty of disclosure and candor.

85.     WOPC would not have entered the EPC Contract or the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) for the price, schedule, and other terms in the executed EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) had WOPC known that the Defendants' representations, which WOPC used in entering into the EPC Contract and the Alstom Assignment Agreement (and the underlying Alstom Purchase Agreement), were false and misleading and that the Defendants failed and deliberately and intentionally chose not to disclose material information necessary to make their representations not misleading or untrue. Defendants had a duty to make such disclosure

based upon (i) knowledge of the falsity of that information at the time it was made, and/or (ii) based upon subsequently acquired information that Defendants knew rendered their prior representations untrue or misleading.

86.     WOPC incurred the damages caused by the Defendants' false statements, misrepresentations, and non-disclosures in and around Rising Sun, Maryland.

**G.     Understating the Requirements for the STG and HRSGs, Including the HRSG Quantities of Work, Made Alstom More Competitive**

87.     Alstom was in a competitive process to be selected by ODEC as the supplier of the Wildcat Project's STG and HRSGs.

88.     Upon information and belief, ODEC considered the total cost of engineering, supplying, erecting and installing the STG and HRSGs, including the cost of the EPC Bidders' erection and installation of the STG and HRSGs, in determining which supplier would supply the STG and HRSGs for the Wildcat Project.

89.     Alstom had a pecuniary interest in making the total cost of the engineering, supplying, erecting and installing the STG and HRSGs as low as possible to increase Alstom's chance of being the selected supplier of the Project's STG and HRSGs.

90.     One way Alstom could show that the total cost of engineering, supplying, erecting and installing the Alstom STG and HRSGs was the lowest compared to other bidders was to misrepresent and materially understate the essential requirements for the work that the EPC contractor would have to perform to erect and install Alstom's STG and HRSGs, including the quantities of work required to erect and install the STG and HRSGs.  Misrepresenting the erection and installation scope would reduce the price of the proposals ODEC received from the EPC Bidders (as less work would be required for the erection and installation of the Alstom supplied STG and HRSGs), creating the appearance of a lower total cost for the Alstom STG and HRSGs.

By misrepresenting the scope of EPC contractor work, Alstom sought to increase the likelihood that Alstom would be selected as the STG and HRSGs supplier for the Wildcat Project.

**H.**    **The Defendants' Superior Knowledge, Deliberate Concealment and Non-Disclosures**

91.    Alstom's STG and HRSGs are proprietary technology.  Alstom is the exclusive designer and manufacturer of its STG and HRSGs.  As a result, Alstom has full and superior knowledge of the requirements to erect and install its STG and HRSGs.  For example, Alstom had complete and reliable knowledge and information as to the quantity of large bore carbon steel pipe that was to be erected and installed as part of one of its HRSGs.  Similarly, Alstom had complete and reliable knowledge and information as to the arrangement, type, and performance characteristics of the equipment that was to be used for its STG.  Consequently, at all times material hereto, Alstom had complete, superior and reliable knowledge and information to determine the design specifications for the concrete pedestal on which its STG is placed.

92.    Upon information and belief, Alstom supplied similar STGs and HRSGs for other projects.  Upon information and belief, Alstom had at all times material a collection of data and information regarding the work required to erect and install its STGs and HRSGs.  Upon information and belief, Alstom had information regarding the design for, and means and methods used to construct, the pedestals on which other Alstom STGs have been installed.  Alstom used, should have used, or misused such information in developing the representations it made to the EPC Bidders regarding the work to be performed to erect and install the STG on the Wildcat Project.

93.    For example, upon information and belief, in the winter of 2014, prior to the execution of the EPC Contract, Alstom knew the dimensions for the concrete pedestal for a similar STG at one or more other projects.  Alstom knew the STG pedestal on one or more other projects

for a similar STG was 30% wider than the STG pedestal for the Wildcat Project as represented by Alstom to the EPC Bidders.  Although Alstom knew that it was providing critical minimum dimensioning information to the Wildcat Project EPC Bidders, and that one or more projects' similar STGs required the construction of a pedestal that was 30% wider than what Alstom was representing to the Wildcat Project's EPC Bidders, Alstom failed to disclose the material information regarding the dimensions of the other STG pedestals to the Wildcat Project's EPC Bidders, including WOPC.  Alstom also failed to inform the Wildcat Project's EPC Bidders that the STG pedestal would need to be wider than the pedestal that was being shown to the EPC Bidders in the information that Alstom actually provided to the Wildcat Project's EPC Bidders.

94.     Alstom withheld this critical information from the EPC Bidders, including WOPC, and instead provided misleading information, despite the fact this information was available to Alstom well before June 2, 2014 when WOPC executed the EPC Contract and the Alstom Assignment Agreement (and the underlying Alstom Purchase Agreement).  Alstom knew the EPC Bidders were relying on Alstom's dimensioning information, had superior knowledge regarding the dimensions, and owed the EPC Bidders a duty to disclose accurate dimensioning information, but failed to disclose it.

95.     After WOPC executed the EPC Contract and the Alstom Assignment Agreement (and the underlying Alstom Purchase Agreement) on June 2, 2014, Alstom increased the size of the Wildcat Project's STG concrete pedestal to be a similar size to one or more other similar projects' STG pedestals.  The change in STG pedestal size benefitted Alstom by making the total cost associated with procuring the Alstom STG (including the installation and erection of the STG with its pedestal) initially appear lower.  The total project cost of using the Alstom STG appeared lower because the information Alstom provided to the EPC Bidders showed the EPC Bidders

(including WOPC) a smaller STG pedestal.  The smaller STG pedestal shown to the EPC Bidders induced the EPC Bidders to bid a lower cost for the erection and installation of a smaller STG pedestal.  Moreover, the increase in the STG pedestal size for the Wildcat Project allowed for an equipment arrangement on the pedestal that saved Alstom significant costs of manufacturing and design.

96.     ODEC also knew, or should have known, that the size of the STG concrete pedestal as represented to the EPC Bidders was material and was false, misleading, or was incorrectly stated. After the submission of the EPC proposals and before the execution of EPC Contract, Alstom and ODEC knew or should have known that there would be a requirement for a larger STG concrete pedestal for the Wildcat Project. Despite their superior knowledge and duty to disclose and correct the representations, Defendants chose not to inform WOPC despite knowing that WOPC was relying on the Defendants' representations and superior knowledge as to the size of the STG concrete pedestal.

97.     Although the Defendants had an affirmative obligation to correct their misleading representations regarding the work to erect and install the STG, including their representations regarding the STG pedestal size, the Defendants withheld this critical, superior knowledge. WOPC used, to its detriment, the Defendants' misrepresentations regarding the STG pedestal work.  WOPC would not have entered the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) for the terms and conditions in the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) had (i) WOPC known that the Defendants' representations were false and misleading, and/or (ii) that the Defendants' failed to disclose material information necessary to make their representations not misleading despite a duty to make such disclosure.

98.     Alstom was also aware as late as May of 2014 that the size of the ammonia skid for the HRSGs would increase to 2.7 times the size of the ammonia skid that Alstom represented to the EPC Bidders in the RFP documents. The increase in the size of the ammonia skid would necessarily cause the footprint of the HRSG portion of the Project to grow at substantial cost to WOPC. Nevertheless, Alstom allowed WOPC to continue to use Alstom's previously represented size of the ammonia skid for, among other things, determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement). ODEC was also aware of the growth of the ammonia skid, but allowed WOPC to continue to use Alstom's previously represented size of the ammonia skid for, among other things, determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).

99.     Although the Defendants had an affirmative obligation to correct their misleading representation regarding the ammonia skid, the Defendants withheld this critical, superior knowledge. WOPC used the Defendants' prior misrepresentations of the ammonia skid size. WOPC would not have entered the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) for the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) had (i) WOPC known that the Defendants' representations were false and misleading, and/or (ii) that the Defendants failed to disclose material information necessary to make their representations not misleading despite a duty to make such disclosure.

100.     Similarly, Alstom was also the supplier of HRSGs for a power generation facility in Warren County, Virginia owned by Dominion Virginia Power (the "Warren County Project"). The HRSGs that Alstom supplied for the Warren County Project were similar to the HRSGs that

Alstom supplied for the Wildcat Project.  B&M, who is ODEC's engineer on the Wildcat Project, is a member of the EPC joint venture that engineered, procured and constructed the Warren County Project, including the Alstom HRSGs on the Warren County Project.

101.    The Warren County Project went into service in December 2014.  Given this in-service date, the design and substantially all of the erection and installation of the HRSGs at Warren County must have been complete well before June 2014 when WOPC executed the EPC Contract and the Alstom Assignment Agreement (including the underlying Alstom Purchase Agreement).  As a member of the EPC joint venture that engineered, procured, and constructed the Warren County Project, ODEC's engineer, B&M, had detailed knowledge of the quantities of work that the EPC contractor actually performed to erect and install the HRSGs on the Warren County Project.

102.    Upon information and belief, the quantities and requirements of the work required for the Warren County Project's EPC contractor to erect and install the Alstom supplied HRSGs increased substantially from Alstom's pre-bid representations on the Warren County Project in a similar manner as has occurred on the Wildcat Project.  As a member of the EPC joint venture that engineered, procured, and constructed the Warren County Project, ODEC's engineer, B&M, possesses detailed knowledge of the growth in the quantities of work that the EPC contractor actually performed to erect and install the HRSGs on the Warren County Project as compared to the quantities of work that Alstom represented pre-bid on the Warren County Project.

103.    Alstom's prior experience on the Warren County Project provided Alstom with superior knowledge of the quantities and requirements of the work that Alstom knew, or should have known, were in fact required for the erection and installation of the HRSGs at the Wildcat Project.  Despite this superior knowledge, Alstom intentionally disregarded and/or did not

reasonably use the information it gained from the Warren County Project (or its other similar HRSG projects) to develop its representations regarding the quantities and requirements to erect and install its HRSGs at the Wildcat Project, or to correct its misrepresentations regarding the quantities and requirements to erect and install its HRSGs at the Wildcat Project.  As it knew the EPC Bidders, including WOPC, were using the information supplied by Alstom to determine the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), Alstom had an obligation to use the Warren County Project information (and information from other similar projects) in developing its representations regarding its Wildcat Project HRSG quantities and requirements.

104.    ODEC and B&M knew, or should have known, of the growth in the HRSG quantities on the Warren County Project and of Alstom's propensity to misrepresent the requirements of the work required to erect and install the HRSGs on its projects.  Accordingly, B&M and ODEC knew, or should have known, of the likelihood that Alstom misrepresented the requirements of the work required to erect and install the HRSGs at the Wildcat Project, including the likelihood that Alstom's quantities of work for the erection and installation of the HRSGs were materially false, misleading, understated and incorrect.  Despite this superior knowledge, ODEC did not use the information it possessed regarding the growth in the quantities of the Alstom HRSG related work on the Warren County Project to correct the Defendants' misrepresentations regarding the quantities and requirements to erect and install the HRSGs at the Wildcat Project. As it knew the EPC Bidders, including WOPC, were using the information supplied by ODEC to determine, among other things, the price, schedule, and terms of the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), ODEC had an obligation to use its superior knowledge, including without limitation its superior knowledge

derived from the Warren County Project information, to correct the Defendants' misrepresentations regarding the requirements for the work to erect and install the HRSGs at the Wildcat Project or to warn WOPC of the potential for Alstom's requirements for the work to erect and install the HRSGs to be misrepresented.

105.    After WOPC submitted its firm, lump-sum proposal for the EPC Contract to ODEC and prior to the execution of the EPC Contract, ODEC's chosen OEM vendors continued to design and engineer their equipment, including the STG and HRSGs.   During this period, the OEM suppliers made changes, alterations, and revisions to, among other things, the design of their equipment and the requirements for erecting and installing their equipment.   Many of these changes, alterations, and revisions directly and materially impacted the representations made to the EPC Bidders that were used by WOPC for determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).

106.    After WOPC submitted its firm, lump-sum proposal for the EPC Contract to ODEC and prior to the execution of the EPC Contract, ODEC and B&M managed the OEM vendors' work on the Project.   ODEC and B&M received the OEM suppliers' information reflecting their changes, alterations, and revisions to, among other things, the design of their equipment and the requirements for erecting and installing their equipment.

107.    ODEC made a deliberate, intentional decision to provide WOPC with some, **but not all**, of the OEM supplier information showing the OEM suppliers' changes, alterations, and revisions to, among other things, the design of their equipment and the requirements for erecting and installing their equipment, which information was material.  ODEC recognized that the OEM suppliers' changes, alterations, and revisions materially changed some of the representations that

were previously made to, and were being used by, the EPC Bidders in determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).  As a result, ODEC made an intentional choice to give WOPC **some** (but not all) of the OEM suppliers' changes, alterations, and revisions and asked WOPC to evaluate them to determine the impacts, if any, that the changes, alterations, and revisions might have on determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).  Although ODEC recognized that the OEM suppliers' post-bid changes, alterations, and revisions were material and might affect the representations previously made and used by WOPC in determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), ODEC made a deliberate decision to withhold certain OEM supplier changes, alterations, and revisions, including Alstom changes, alterations, and revisions to, without limitation, the "FIELD INSTALLED QUANTITIES", from WOPC.  The information ODEC withheld included changes, alterations, and revisions by Alstom.

108.     Although ODEC owed a duty of disclosure to WOPC, it failed to disclose all of the material changes, alterations, and revisions, including the changes, alterations, and revisions by Alstom, to WOPC, with full knowledge that WOPC would reasonably expect a disclosure of those changes.

109.     Alstom also failed to advise WOPC of Alstom's changes, alterations, and revisions to its representations regarding the requirements for the work to erect and install the STG and HRSGs, even though Alstom had a duty to disclose to WOPC and Alstom knew WOPC was using the prior representations to, without limitation, determine the price, schedule, and terms in the

executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).

110.    The Defendants ultimately induced WOPC to enter into the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) based upon the prior, material representations by the Defendants even though the Defendants knew of these changes, alterations, and revisions and their potential effect on the prior representations.  WOPC would not have entered the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) for the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) had WOPC known that the Defendants' failed to disclose certain material changes, alterations, and revisions in the previously made representations despite a duty to make such disclosure.

111.    The Defendants use of fraud and misrepresentation in inducing WOPC to enter into the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) renders any limitations on damages and exculpatory clauses in the EPC Contract and the Alstom Assignment Agreement (and in the underlying Alstom Purchase Agreement) unenforceable by the Defendants.

**I.      ODEC's Misrepresentations Benefitted ODEC By Allowing ODEC to Develop the Project for a Lower Cost**

112.    Defendants' misrepresentations included material misrepresentations regarding the requirements for the work to erect and install the STG and the HRSGs.  Some of the Defendants' misrepresentations understated the requirements for the work to erect and install the STG and the HRSGs, including the quantities of work required to erect and install the STG and the HRSGs. Defendants' understatements of the requirements for the work to erect and install the STG and the HRSGs benefitted ODEC because the understated scope reduced the total project cost, including

the cost of the work to erect and install the STG and HRSGs.  The reduction in the prices for the work to erect and install the STG and HRSGs reduced the price ODEC paid for its EPC Contractor. The reduced price of the EPC Contractor benefitted ODEC by reducing ODEC's total cost to develop the Wildcat Project.

113.    ODEC also benefited from its intentional failure to disclose to WOPC all of the changes, alterations, and revisions that the OEM suppliers made to their pre-proposal representations in the period after the submission of WOPC's proposal and before WOPC executed the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).  By failing to disclose all of these changes, alterations, and revisions to WOPC, ODEC prevented WOPC from changing the price, schedule, or terms of the EPC Contract or the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) in consideration of the OEM suppliers' changes, alterations, and revisions to their representations.  As WOPC could not change its price, schedule, or terms, ODEC paid less for the EPC Contract, and less, overall, for the Wildcat Project.

114.    ODEC's deliberate strategy of withholding certain changes, alterations, and revisions and suppressing potential changes to the price, schedule, and terms in the EPC Contract or Alstom Assignment Agreement relating to those changes, alterations, and revisions benefitted ODEC because the strategy prevented changes to the price, schedule, and terms in the EPC Contract or Alstom Assignment Agreement from hindering ODEC in its pursuit of financing for the Wildcat Project.  ODEC believed, or knew, that its ability to obtain financing could be jeopardized if there were material changes in the price, schedule, or terms of the EPC Contract or the Alstom Assignment Agreement.

**J.    Alstom's Late Delivery of Design and Engineering Documents**

115. WOPC's ability to perform its portion of the design of the Project in accordance with the EPC Contract and construction of the Project was significantly predicated on the timely receipt of certain design and engineering information from Alstom.

116. Alstom's design and engineering of the STG and HRSGs necessarily impacted WOPC's balance of plant design and the coordination of design and construction of Alstom's STG and HRSGs with the rest of the Project's equipment and systems.

117. As a result, WOPC's ability to meet its design and engineering obligations to ODEC under the EPC Contract were dependent on Alstom timely and properly performing its design and engineering obligations under the Alstom Purchase Agreement.

118. Section 3.1 of the Alstom Purchase Agreement provided that Alstom "will, in accordance with the Document Delivery Schedule, furnish to [WOPC] the Documents as stated therein."

119. Section 1 of the Alstom Purchase Agreement defines the "Document Delivery Schedule" as "the schedule set forth in Exhibit A-4."

120. The Document Delivery Schedule, in Appendix 013301-A of Exhibit A, included two drawing schedules labeled "STEAM TURB. SCOPE" and "HRSG SCOPE" that required Alstom to deliver certain drawings and engineering packages to WOPC within a certain specified time.

121. Alstom failed to deliver certain required drawings and engineering packages by the dates required by the Alstom Purchase Agreement.  Alstom breached its contractual obligations and the duty of good faith and fair dealing in failing to properly prepare and timely submit its drawings and engineering packages to WOPC.

122.    Under Section 3.2 of the Alstom Purchase Agreement, Alstom's failure to timely deliver all of the required drawings and engineering packages obligates Alstom to pay WOPC Late Document Delivery Liquidated Damages in the amount of $500 per day for the first fifteen (15) days and then $1,000 per day for each day that each of the required drawings and engineering packages was delivered beyond the specified delivery date.

123.    WOPC advised Alstom of Alstom's liability for the applicable Late Document Delivery Liquidated Damages for STG Key Documents on February 17, 2017 and for HRSG Key Documents on January 28, 2017.   WOPC also advised Alstom that it continues to evaluate Alstom's delivery of the required drawings and engineering packages and that Alstom may be responsible for additional Late Document Delivery Liquidated Damages.

124.    WOPC demanded payment of the Late Document Delivery Liquidated Damages.

125.    Despite Alstom's contractual obligation to pay WOPC the agreed Late Document Delivery Liquidated Damages and waiver of any right to dispute or contest the Purchase Agreement's Late Document Delivery Liquidated Damages provisions, Alstom unjustifiably failed and refused to pay WOPC the applicable Late Document Delivery Liquidated Damages. Alstom breached its contractual obligations and the duty of good faith and fair dealing by failing to timely and properly pay the Late Document Delivery Liquidated Damages.

**K.    Alstom's Late Delivery of Equipment**

126.    The Alstom Purchase Agreement required Alstom to deliver all components of the HRSGs and the STG by the Guaranteed Delivery Dates set forth in the Alstom Purchase Agreement.

127.    Alstom failed to timely deliver the STG and HRSGs, including components of the STG and HRSGs, by the contractually required delivery dates.  Alstom was late in delivering some

6,400 components of the STGs and HRSGs.  Alstom breached its contractual obligations and the duty of good faith and fair dealing in failing to properly and timely deliver the STG and HRSG components to WOPC.

128.    Alstom's late deliveries of Minor HRSG Unit Components and of Minor STG Unit Components caused delays to the progress of the installation of the STG and HRSGs.

129.    Alstom also failed to cooperate with WOPC, including failing to cooperate with WOPC in scheduling Alstom's deliveries of its components and coordinating its supply and design activities with WOPC, as required by Section 2.6 of the Alstom Purchase Agreement.

130.    Under Section 6.2.1 of the Alstom Purchase Agreement, Alstom's failure to timely deliver the STG and HRSGs, including all components of the STG and HRSGS by the contractually required dates, obligates Alstom to pay WOPC Late Equipment Delivery Liquidated Damages in the amounts specified in the Alstom Purchase Agreement.

131.    Alstom contractually agreed that the Late Equipment Delivery Liquidated Damages are reasonable liquidated damages and are not a penalty.  It also contractually agreed that the liquidated damages are a fair and reasonable estimate of the losses that might be reasonably anticipated from Alstom's failure to timely deliver the STG and HRSGs, including the components of the STG and HRSGs.

132.    Alstom contractually agreed that the Late Equipment Delivery Liquidated Damages will be applicable without regard to the actual losses sustained in the event of delayed delivery of such equipment.  Therefore, Alstom waived any ability to dispute or contest the enforceability of the liquidated damages assessable under the Alstom Purchase Agreement for Alstom's late equipment delivery.

133.    During the course of the Project, WOPC provided Alstom with multiple notices of Alstom's failures to timely deliver the STG and HRSGs, including the components of the STG and HRSGs.

134.    WOPC demanded payment of the Late Equipment Delivery Liquidated Damages.

135.    Despite Alstom's contractual obligation to pay WOPC the agreed Late Equipment Delivery Liquidated Damages, and waiver of any right to contest the Alstom Purchase Agreement's liquidated damages provisions, Alstom has unjustifiably failed and refused to pay WOPC the properly assessed Late Equipment Delivery Liquidated Damages.  Alstom breached its contractual obligations and the duty of good faith and fair dealing by failing to timely and properly pay the Late Equipment Delivery Liquidated Damages.

**L.      Alstom's Failure to Timely Achieve Alstom's Substantial Completion**

136.    The Alstom Purchase Agreement required Alstom to achieve Substantial Completion of Alstom's work by the Scheduled Substantial Completion Date, May 1, 2017.

137.    Alstom did not request an extension of time to perform its work.

138.    Alstom failed to achieve Substantial Completion of Alstom's work by May 1, 2017. As of December 7, 2017, Alstom still had not achieved Substantial Completion of Alstom's work.

139.    Alstom's failure to achieve Substantial Completion of its work by May 1, 2017 is Alstom's fault, in whole or in part.  Alstom's failure to achieve Substantial Completion of its work by May 1, 2017 results from defects, faults or deficiencies in the Steam Tail Equipment or Alstom's acts or omissions.

140.    Under Section 8.2.1 of the Alstom Purchase Agreement, Alstom's failure to timely achieve Alstom's Substantial Completion due to Alstom's fault obligates Alstom to pay WOPC

Late Substantial Completion Liquidated Damages in the amounts stated in the Alstom Purchase Agreement.

141.    Although WOPC has made demand on Alstom for payment of the Late Substantial Completion Liquidated Damages, Alstom has not paid WOPC the Late Substantial Completion Liquidated Damages due to WOPC for Alstom's failure to timely achieve its Substantial Completion.  Alstom breached its contractual obligations and the duty of good faith and fair dealing by failing to timely and properly pay the Late Substantial Completion Liquidated Damages.

142.    Alstom contractually agreed that the Late Substantial Completion Liquidated Damages are reasonable liquidated damages and are not a penalty.  It also contractually agreed that the liquidated damages are a fair and reasonable estimate of certain losses that might be reasonably anticipated from Alstom's failure to timely achieve Alstom's Substantial Completion.

143.    Alstom contractually agreed that the Late Equipment Delivery Liquidated Damages will be applicable without regard to the actual losses sustained due to Alstom's failure to achieve Alstom's Substantial Completion.  Therefore, Alstom waived any ability to dispute or contest the enforceability of the liquidated damages assessable under the Alstom Purchase Agreement for Alstom's failure to timely achieve Alstom's Substantial Completion.

144.    The acts and omissions for which Alstom is responsible, including Alstom's breaches of contract and/or its fraud, concealment, and or misrepresentation have delayed WOPC in WOPC's achievement of Substantial Completion of WOPC's work under the EPC Contract. Alstom is responsible for all losses or damages incurred by WOPC as a result of Alstom's acts and omissions, including all of WOPC's losses and damages caused by the delay in WOPC's achievement of Substantial Completion of WOPC's work under the EPC Contract that was caused

by Alstom's acts and omissions.  The losses and damages for which Alstom is responsible includes, without limitation, liquidated damages that may be assessed against WOPC by ODEC and other damages incurred by WOPC due to Alstom caused delay in WOPC's achievement of Substantial Completion under the EPC Contract.

**M.**     **Alstom's Defective Equipment Deliveries and other Failures to Perform Its Work In Accordance with Contract Requirements**

145.     The Alstom Purchase Agreement required Alstom to design and manufacture its equipment, including the HRSGs, so that the actual quantities of piping and welds to be installed would be commensurate with the represented quantities as shown in the pre-bid representations, including Addendum No. 3.

146.     Section 2.3.1 of the Alstom Purchase Agreement states, "The components comprising the Steam Tail Equipment **will be delivered and packaged as further described in the Scope of Supply**." (Emphasis Added).  Section 2.3.2 of the Alstom Purchase Agreement additionally provided that "When this Agreement, including Scope of Supply and any Documents describes certain specific materials, processes or products of manufacture, **then the same shall be required** unless … approved in writing in advance by [WOPC]."  (Emphasis added).  The "Scope of Supply" is defined to include the "FIELD INSTALLED QUANTITIES."  Accordingly, Alstom was obligated to manufacture, deliver and package its equipment, including the components of the HRSGs, to comply with the piping and weld quantities as provided in the "FIELD INSTALLED QUANTITIES."

147.     In addition to the obligations to timely submit certain design and engineering information to WOPC and to timely deliver the STG and HRSGs, including the components of the STG and HRSGs, Alstom had the obligation to provide all equipment and materials to the Project free from defects, undamaged, and in accordance with all requirements of the Purchase Agreement.

148.    More specifically, Section 9.1.1 of the Alstom Purchase Agreement provided that: "[Alstom] warrants that the equipment constituting the Steam Tail Equipment [which includes the STG and HRSGs] will be (a) new, unused and undamaged … when first delivered, (b) free from defects in materials or workmanship, and (c) provided in accordance with the requirements of this Agreement …."

149.    Section 4.1 of the Alstom Purchase Agreement also required Alstom to "provide and maintain a quality control system during the performance of Work under this Agreement."

150.    Alstom failed to supply its Work free from defects and in accordance with the requirements of the Alstom Purchase Agreement.  It also failed to maintain a sufficient quality control system to ensure compliance of its work with the Alstom Purchase Agreement.

151.    For example, Alstom delivered the steam turbine with an extraordinary amount of metal shavings inside the steam turbine.  These metal shavings rendered the steam turbine damaged, unfit for the purpose of generating electric power, defective, and not in compliance with the requirements of the Alstom Purchase Agreement.

152.    WOPC notified Alstom of the metal shavings.  Alstom did not remove them.  As a result, WOPC was forced to clean the metal shavings out of the steam turbine for Alstom.

153.    WOPC corrected the metal shavings for Alstom, incurring additional costs, including, without limitation, the cost to remove the metal shavings, the costs of mitigating the impacts of the metal shavings, and additional costs of disruption due to the work to correct the metal shavings.

154.    WOPC issued Alstom a Field Change Notice ("FCN") documenting Alstom's responsibility for the metal shavings.  Alstom accepted the FCN, acknowledging and admitting its

responsibility for the metal shavings, but Alstom failed and refused to pay WOPC the additional costs that WOPC incurred due to the metal shavings.

155.    As another example, Alstom delivered the wrong size grating for the HRSG main platform.  The grating Alstom delivered was incompatible with the framing Alstom delivered.  The error in the grating size rendered the grating unfit for the purpose of forming the required platform, and not in compliance with the requirements of the Alstom Purchase Agreement.

156.    WOPC notified Alstom of Alstom's defective grating, but Alstom failed to correct the defectively sized grating, forcing WOPC to make the necessary corrections on Alstom's behalf. WOPC incurred additional costs, including, without limitation, the cost to correct the grating size, the costs of mitigating the impacts of the defective grating, and additional costs of disruption due to the work to correct the defective grating.

157.    Other examples of Alstom equipment and materials that were not delivered in new, unused and undamaged condition, free from defects in materials or workmanship, and in accordance with the requirements of the Purchase Agreement include, without limitation, the Unit 1 HRSG tube fins that corroded, the Steam Turbine IP control valve that failed, the steam turbine control software that malfunctions, and the low-pressure drum piping and components.  Correcting these conditions caused WOPC to incur additional costs and caused delays and disruption in completing the work.

158.    Alstom had a contractual obligation to perform all of its services in accordance with its standard of care and the requirements of the Alstom Purchase Agreement.  In this regard, Section 9.3.1 of the Alstom Purchase Agreement provided that:

> [Alstom] warrants that the Services performed by [Alstom] or its Personnel, and any installation, repair or replacement work performed by or on behalf of [Alstom] in fulfilling its warranty obligations under Section 9.1.3 or under this Section 9.3, will be (a)

> performed in a professional, prudent and workmanlike manner that
> is free from material defects, errors and omissions, and with the
> degree of skill and care that is utilized by nationally-recognized
> professionals in the United States in the same field under the same
> or similar circumstances, and (b) performed strictly in accordance
> with the terms of this Agreement and all Applicable Laws . . . .

159.    Alstom failed to perform it services in accordance with the contractual standard of care.  Alstom's services were not performed in a professional, prudent, and workmanlike manner; they were not free from defects, errors, and omissions, and they were not performed with the degree of skill and care used by nationally-recognized professionals.  For example, Alstom failed to properly design the low-pressure drum piping and components causing excessive pressure drops in the system which caused the water in the feedwater system to vaporize.  Correcting this condition caused WOPC to incur additional costs and caused delays and disruption in completing the work.

160.    Further, Alstom warranted that all of the software it provided would operate in accordance with Alstom's documentation regarding the software and would not cause errors.  Section 9.4 of the Alstom Purchase Agreement provided, in relevant part that:

> [Alstom] warrants to Purchaser that, during the Warranty Period, all
> software provided as part of, or in connection with, this Agreement
> shall: (a) operate as described in any documentation provided by
> Supplier regarding the software . . . and (c) not experience an Error
> (where "Error" is defined as a problem caused by an incorrect
> operation of the unmodified computer code in the software or an
> incorrect statement or diagram in the documentation that produces
> incorrect results, or a software failure).

161.    Alstom failed to provide computer software that did not experience errors.  As but one example, the steam turbine control software experienced errors.  Correcting this condition caused WOPC to incur additional costs and caused delays and disruption in completing the work.

162.    Although the Alstom Purchase Agreement contractually required Alstom to repair or correct its defective or deficient equipment, services, and software, Alstom failed and refused to acknowledge its responsibility for defects and deficiencies in its equipment, services, and software.  Instead, Alstom frequently failed and refused to correct the defects and deficiencies in its equipment, services, and software.   Alstom repeatedly tried to avoid its contractual responsibility to correct its defects and deficiencies by blaming WOPC (or others) for the defects and deficiencies and lack of performance of Alstom supplied equipment, services, and software. By failing to timely and properly acknowledging responsibility for its defective and deficient equipment, services, and software and seeking to avoid responsibility by blaming others, Alstom breached the Alstom Purchase Agreement and failed to deal with WOPC fairly and in in good faith.

163.    Alstom's performance has been, and continues to be, defective, deficient, and not in accordance with the applicable contract requirements causing WOPC other damages, delays, and disruption.

164.    Alstom's active interference, including its failure to timely and properly perform its work, forcing WOPC to perform extra work and changes to the work, requiring WOPC to perform substantial additional quantities of work without additional time or compensation, delaying WOPC in performing its work, forcing WOPC to accelerate its work to overcome delays caused by Alstom, failure to compensate WOPC for liquidated damages owed by Alstom, and Alstom's knowing and willful delays render any limitations on damages in the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) unenforceable.   The delays, disruptions, and damages Alstom caused were not the type of delays, disruptions, and damages, and/or the delays were of such unreasonable duration, that any limitations on damages in the

Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) are not enforceable.  Further, as Alstom's bad faith, misrepresentation, and/or fraud caused the delays, disruption, and damages incurred by WOPC, any limitations on damages in the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) are unenforceable.

165.    The unconscionable and/or fraudulently procured provisions in the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) are unenforceable.

**N.      Improper Charges for Technical Field Assistance Due to Alstom's Performance Failures**

166.    Under Section 2.5 of the Alstom Purchase Agreement, Alstom agreed to provide "Technical Field Advisory Services.".  Alstom's contract price included a certain base number of Technical Field Advisory ("TFA") hours and entitled Alstom to payment for additional TFA services if Alstom provided TFA services in addition to the base TFA hours.

167.    Alstom could not earn base TFA hours or claim additional TFA hours for its TFA's work on issues attributable to Alstom, such as TFA hours incurred fixing Alstom's own errors, omissions, defects, and deficiencies in its work.

168.    Although many of the hours Alstom's TFAs have worked on the Project have been attributable to Alstom because the hours were expended to resolve or address Alstom's own errors, omissions, defects, and deficiencies, including the software defects, HRSG fin corrosion, the low-pressure drum piping design errors, and the many other Alstom performance issues, Alstom has improperly demanded payment from WOPC for those hours.  Alstom has also improperly charged WOPC for TFA hours worked on Access Days - days spent correcting problems with Alstom's equipment, services, and software.

169.    Moreover, some or all of Alstom's claim for additional TFA hours are the results of delays. Section 10.3.2 of the Alstom Purchase Agreement provides that a Change Orders Due

to Purchaser-Caused Delay "shall be [Alstom's] sole and exclusive remedy for any delays or additional costs resulting from Purchaser-Caused Delays, and [Alstom] will not be entitled to any other remedy, payment, damages or other compensation in connection with any such delays." Alstom has not been granted any Change Orders Due to Purchaser-Caused Delays nor is Alstom entitled to any Change Orders Due to Purchaser-Caused Delays. Accordingly, Alstom is not entitled to any other remedy, payment, damages or compensation as the result of any claim for additional TFA hours.

170.    WOPC has paid for certain disputed Alstom TFA hours under a reservation of rights. WOPC has also declined to pay certain other disputed Alstom TFA hours. Alstom's demand for payment of TFA hours for which Alstom is not entitled to payment is a breach of the Alstom Purchase Agreement and its duty to deal with WOPC fairly and in good faith.

**O.    ODEC's Refusal to Issue Required Change Orders**

171.    The EPC Contract required ODEC to issue Change Orders to WOPC under certain circumstances. ODEC owed an implied duty and covenant of good faith and fair dealing to WOPC in exercising its contractual discretion to issue the Change Orders. ODEC has unjustifiably and repeatedly failed and refused to issue the required Change Orders. ODEC's failure to issue a Change Order for the differing site conditions encountered in constructing the STG building foundations, failure to timely and properly issue a Change Order for ODEC's failure to provide a critical safety valve, and a failure to timely and properly issue a Change Order for Winter Storm Jonas are just three examples of ODEC's unjustified failure to issue Change Orders due to WOPC under the EPC Contract.

172.    EPC Contract Section 8.2(A) provides that WOPC is entitled to a Change Order for, among other things, the events and conditions described in Section 4.2 of the EPC Contract.

EPC Contract Section 4.2(B) entitles WOPC to a Change Order for differing site conditions. More specifically, EPC Contract Section 4.2(B) provides that "Contractor shall not be entitled to an adjustment in the Contract Price and/or the Scheduled Substantial Completion Date due to any subsurface condition, ***except for (i) subsurface conditions which materially differ from those identified in the preliminary geotechnical study and site survey* ….**" (Emphasis added). It further states, "If any of the foregoing is proven . . . to cause a demonstrable and material increase in the Contractor's Direct Cost of, or a material delay in the performance of the Work, **Contractor shall be entitled to an adjustment in the Contract Price and/or an extension in the Schedule Substantial Completion Date pursuant to a Change Order processed pursuant to Section 8 hereof**." (Emphasis added).

173.    In installing foundations for the STG building, WOPC encountered subsurface conditions that materially differed from the subsurface conditions identified in the preliminary geotechnical study and site survey provided by ODEC.

174.    WOPC timely and properly provided all required notices and claim submissions regarding these differing site conditions.

175.    WOPC's submissions to ODEC demonstrated that the materially different subsurface conditions that WOPC encountered materially increased WOPC's costs of performing its work and materially delayed WOPC in performing its work. Under these circumstances, ODEC was contractually obligated to give WOPC a Change Order increasing the EPC Contract price and extending WOPC's time for performance of its work.

176.    Despite its contractual obligation to provide WOPC a Change Order for the differing site conditions and WOPC's proper demand for the Change Order, ODEC has failed and refused to issue WOPC a Section 4.2 Change Order as required by the EPC Contract.

177.     As another example, EPC Contract Section 8.2(A) provides, ". . . Contractor shall . . . be entitled to a Change Order pursuant to section 8.1 hereof to the extent any Change in the Work is required . . . because of the failure of Owner to perform its obligations under this Agreement . . . ."

178.     Late in the construction phase, WOPC discovered that ODEC failed to procure and install a specified fail close emergency shut down ("ESD") valve at the site boundary for the gas supply line to the Project.  The ESD ODEC failed to install was intended to stop the flow of natural gas to the Project in the event of an emergency.  Given this role, the missing ESD was a critical safety component.

179.     WOPC notified ODEC of its failure to provide the ESD and sought a Change Order. Although ODEC's failure to provide the ESD was a "failure of the Owner to perform its obligations under [the EPC Contract]", and ODEC's failure caused WOPC to incur additional costs and delayed WOPC in performing its work, ODEC has failed and refused to issue WOPC an appropriate Change Order.

180.     ODEC also failed to timely and properly issue required Change Orders (and/or provide risk of loss relief) in regard to the procurement of the replacement transformer.

181.     EPC Contract Section 8.2(B) provides that "where Contractor demonstrates . . . that a Force Majeure event will materially delay the schedule of the Work, **Contractor shall be entitled to a Change Order that provides for an extension of the Scheduled Substantial Completion Date** . . .   Where Contractor demonstrates to the reasonable satisfaction of Owner that a Force Majeure event has resulted in an increase in Direct Costs, Contractor will be entitled to a Change Order to reimburse Contractor for such increase . . . ." (Emphasis added).

182.     Section 3.18 of the EPC Contract regarding Force Majeure Adjustment states that:

> **Contractor shall be entitled** to a suspension of its performance of a particular task or a portion of the Work **and/or an equitable adjustment in the Scheduled Substantial Completion Date pursuant to Section 8 hereof**, in the event that Contractor can demonstrate that a Force Majeure event has a material adverse effect on Contractor's time for performance of the Work . . . .

(Emphasis added).

183.    In January of 2016, Winter Storm Jonas buried the Project in unprecedented snowfall shutting down the entire Project for seven days.

184.    Winter Storm Jonas constituted a Force Majeure event under the EPC Contract.

185.    WOPC timely and properly provided all required notices and claim submissions regarding Winter Storm Jonas.

186.    WOPC's submissions to ODEC demonstrated that Winter Storm Jonas materially delayed WOPC's performance of its work when it shut down the Project for seven days. WOPC's submissions to ODEC also showed that Winter Storm Jonas increased WOPC's costs. Under these circumstances, ODEC was contractually obligated to give WOPC a Change Order increasing the EPC Contract price and extending WOPC's time for performance of its work in consideration of Winter Storm Jonas.

187.    Despite its contractual obligation to provide WOPC a Change Order for the impacts of Winter Storm Jonas and WOPC's proper demand for the Change Order, ODEC has failed and refused to issue WOPC a Change Order as required by the EPC Contract.

188.    These are just a few examples of ODEC's unjustified failure to issue WOPC required Change Orders. ODEC repeatedly failed to issue Change Orders even though WOPC was contractually entitled to receive them. ODEC's failure to grant Change Orders, including time extensions, led to other delays and acceleration and increases in costs. ODEC is responsible for

all of the damages resulting from its failure to grant Change Orders, including any additional WOPC costs of delay, disruption, acceleration, and/or mitigation.

189.    The Contract Documents, including the Exhibits to the EPC Contract, defined the conditions and the requirements of WOPC's work.  Throughout WOPC's design and construction of the Project, WOPC was actually required to make changes to work or to perform the work in accordance with conditions and requirements that differed from the conditions and requirements in the EPC Contract.  Although WOPC made timely and proper demand for Change Orders and other relief for these changes, ODEC unjustifiably and improperly failed to provide WOPC relief due under the EPC Contract and/or applicable law.

190.    As just one example, many of the conditions and requirements in Exhibit VI-C to Steam Tail Equipment Purchase Agreement were changed from execution of the EPC Contract through the performance of the EPC Contract.  ODEC failed to prevent WOPC from being required to perform these changes and/or required WOPC to perform these changes, and failed to issue WOPC Change Orders for these issues.

## P.     ODEC's Failure to Perform Its Risk of Loss Responsibilities

191.    The EPC Contract is unusual in that ODEC bears the risk of loss rather than the EPC Contractor.  Upon information and belief, ODEC allocated itself the risk of loss to incentivize the EPC Bidders to propose lower prices that did not include contingency for risk of loss events.  ODEC's risk of loss included the risk of uninsured losses and damages.

192.    ODEC assumed risk of loss responsibility in Section 9.2.4.3 of the EPC Contract. It provides that:

> **Owner shall be accountable and responsible for any loss or damage to any part of the Facility, the Site, or Work**, including property of any kind including, but not limited to, uninsured Losses and deductibles.  (Emphasis added).

193.    The plain language of this provision allocates ODEC the contractual responsibility for, among other things, any loss or damage to any part of WOPC's work, including "uninsured Losses" and "deductibles".

194.    The EPC Contract defines "Losses" broadly.  In Section 2 of the EPC Contract, "Losses" are defined as: "any claims, causes of action, demands, suits, proceedings, fines, penalties, liabilities, judgments, awards, losses, damages, interest, costs or expenses (including attorneys' fees, expert fees, consultant fees, other litigation costs, and court costs)."

195.    Read together, the risk of loss section and the definition of Losses expressly provide that ODEC is responsible for, among other things: (i) WOPC's costs of labor, material, equipment, and staff used in remediating a risk of loss event; (ii) WOPC's costs of labor, material, equipment, and staff incurred to accelerate construction to mitigate the schedule impact of a risk of loss event (if no extension of time was granted); (iii) WOPC's costs of labor, material, equipment, and staff due to disruption caused by risk of loss events and mitigation of risk of loss events; and (iv) other WOPC costs, losses, or damages associated with delay in completion as a result of a risk of loss event, like additional time-related costs and/or liquidated damages.

196.    ODEC's responsibility under the risk of loss provision is not limited to damage to property or financial loss.  Under Section 9.2.4.3 of the EPC Contract, ODEC's responsibility includes "any loss or damage to **any part of the . . . Work**."  (Emphasis added).  As ODEC's scope of responsibility is for "any loss or damage to any part of the . . . Work", ODEC's responsibility for risk of loss under the EPC Contract includes responsibility for schedule impacts of risk of loss events.

197.    Prior to May 1, 2017, WOPC provided ODEC notice of at least four (4) risk of loss events including the transformer incident, the STG anchor pockets event, the circulating water pipe

event, and the STG column collapse event.  Each of these events lead to "loss or damage to any part of the . . . Work", including significant increases in WOPC's costs of performing the work and material delays to WOPC's performance of its work.  Since May 1, 2017, WOPC has continued to notify ODEC of additional risk of loss events and of the impacts of those risk of loss events.

198.    WOPC timely and properly asked ODEC to provide WOPC relief for these events under the risk of loss provision, including paying WOPC's increased costs caused by the risk of loss events and issuing an extension of the time for certain of these events.

199.    In derogation of its contractual obligations under the risk of loss provision, EPC Contract Section 9.2.4.3, ODEC has failed and refused to provide WOPC full and complete relief for the risk of loss events that have occurred on the Project.  ODEC has not, without limitation, granted WOPC a time extension for the delay in the procurement of the replacement transformer, compensated WOPC for certain costs associated with the transformer incident, and has not compensated WOPC for its additional costs due to the STG anchor pockets event, the circulating water pipe event, or the STG column collapse.  ODEC has also failed and refused to issue WOPC extensions of time as requested for risk of loss events. ODEC owed WOPC an implied duty of good faith and fair dealing in exercising any discretion it may have had under the risk of loss provisions and ODEC breached its duty by improperly refusing to provide WOPC the relief due to WOPC under the express terms of the risk of loss provisions.

**Q.    ODEC's Improper Assessment of Liquidated Damages, Offsets Against Amounts Due to WOPC, and Improper Demands for Payment of Liquidated Damages**

200.    On May 1, 2017, ODEC notified WOPC that it would begin assessing liquidated damages of $50,000 per day because WOPC did not achieve Substantial Completion on or before the Scheduled Substantial Completion Date, May 1, 2017.

201.    Per the EPC Contract, the liquidated damage amount increased to $100,000 per day on May 16, 2017, and increased to $300,000 per day on June 1, 2017 (collectively these amounts are the "Substantial Completion Liquidated Damages").

202.    ODEC's assessment of Substantial Completion Liquidated Damages is improper because WOPC is entitled to extensions of time.  ODEC has unjustifiably failed and refused to grant WOPC a single day of time extension to achieve Substantial Completion even though WOPC is contractually and legally entitled to a time extension for, without limitation, the delays caused by, without limitation, changes to the work and extra work required by Defendants' fraudulent misrepresentations and non-disclosure, other changes to the work and extra work required by ODEC, Winter Storm Jonas, the differing site conditions encountered in constructing the STG building foundations, the risk of loss events, and ODEC's failure to install the gas line ESDs.

203.    ODEC's assessment of Substantial Completion Liquidated Damages was particularly indefensible because ODEC was assessing Substantial Completion Liquidated Damages in a period when WOPC was being delayed by ODEC's own failure to provide the gas line ESD and ODEC's requirement for WOPC to perform changes to the work and/or extra work to correct ODEC's failure to provide the gas line ESD.

204.    On May 22, 2017, WOPC protested ODEC's improper assessment of Substantial Completion Liquidated Damages.  WOPC protested that ODEC's assessment of Substantial Completion Liquidated Damages was improper because: (i) ODEC procured the EPC Contract, including Scheduled Substantial Completion Date, by fraud and misrepresentation; (ii) ODEC wrongly failed and refused to grant WOPC time extensions that were due to WOPC for, without limitation, the differing site conditions, Winter Storm Jonas, the additional quantities of HRSG piping and welds, and the risk of loss issues; and (iii) ODEC was requiring WOPC to perform

changes to the work and/or extra work on the gas line valves after the Scheduled Substantial Completion Date without providing WOPC an extension of time for the performance of the changed and/or extra work.

205.    If ODEC properly administered the contract and granted WOPC the time extensions that WOPC had long been due, ODEC could not have assessed the Substantial Completion Liquidated Damages.  Instead, ODEC paired its improper refusal to grant WOPC time extensions with its improper assessment of Substantial Completion Liquidated Damages as part of a coercive strategy to force WOPC to accelerate completion of the Project.  This was just another acceleration requirement by ODEC.  ODEC's failure to grant time extensions and other refusals to provide WOPC relief due WOPC under the contract had already been accelerating WOPC's performance.

206.    On May 22, 2017, WOPC also reminded ODEC that ODEC's assessment of Substantial Completion Liquidated Damages was improper because ODEC was contractually responsible for paying any Substantial Completion Liquidated Damages attributable to delays caused by risk of loss events.  WOPC informed ODEC that it expected ODEC to pay such Substantial Completion Liquidated Damages as part of the compensation due WOPC for risk of loss events that caused delays.

207.    Despite WOPC's protest, ODEC failed and refused to rescind its improper assessments of Substantial Completion Liquidated Damages.  Instead, it actually embarked on an even more oppressive course of conduct.

208.    On June 9, 2017, ODEC unilaterally announced that it would withhold $2,350,000 from the amounts undisputedly owed to WOPC for its May 10, 2017 pay application.  ODEC withheld the $2,350,000 as an offset against the improperly assessed Substantial Completion Liquidated Damages.  ODEC also took the extraordinary step of demanding that WOPC pay

ODEC $2,700,000 for the Substantial Completion Liquidated Damages that ODEC improperly assessed for the period of June 1 through June 9, 2017.  ODEC demanded payment of the $2,700,000 within ten days.

209.   ODEC issued similar demands for payment every week, on a weekly basis, thereafter.  As of the filing of this Second Amended Complaint, ODEC has withheld or forced WOPC to pay ODEC more than $23,345,000 for improperly assessed Substantial Completion Liquidated Damages, and ODEC continues its improper assessment of Substantial Completion Liquidated Damages and demands for payment of those liquidated damages.  ODEC's set-off and demands for payment of improperly assessed Substantial Completion Liquidated Damages are calculated to force WOPC to breach the EPC Contract.  They are also imposing extreme financial hardship on WOPC.  WOPC is being forced to finance the construction of ODEC's Project under threat of termination.

210.   On July 10, 2017, WOPC wrote ODEC regarding ODEC's June 30 demand for WOPC to pay Substantial Completion Liquidated Damages.  WOPC protested ODEC's coercive, improper practice of demanding that WOPC pay Substantial Completion Liquidated Damages on a week-by-week basis.  WOPC reiterated that WOPC was due **more than 140 days of time extension** for the delays caused by the differing site conditions, Winter Storm Jonas, and risk of loss events.  WOPC noted that ODEC's assessment (at that time) of 47 days of Substantial Completion Liquidated Damages even though WOPC was due more than 140 days of time extension was a breach of the EPC Contract.  WOPC also reminded ODEC that it was improperly assessing the Substantial Completion Liquidated Damages based on a contract (and a Scheduled Substantial Completion Date) that ODEC procured through fraud and misrepresentation.  WOPC challenged ODEC to justify its actions and noted that ODEC was holding more than adequate

security to ensure payment of the Substantial Completion Liquidated Damages.  ODEC has been demanding payment of the improperly assessed Substantial Completion Liquidated Damages even though it is holding more than $33,000,000 of retainage.  ODEC's demands for payment on weekly basis despite holding more than $33,000,000 of retainage (an amount which is in violation of Maryland law) is a clear indication that ODEC is trying to force WOPC to breach the EPC Contract.

211.    On August 7, 2017, WOPC responded to ODEC's July 21, 2017 and July 28, 2017 demands for WOPC to pay Substantial Completion Liquidated Damages.  WOPC again protested ODEC's coercive, improper practice of demanding that WOPC pay Substantial Completion Liquidated Damages on a week-by-week basis.  WOPC reminded ODEC that WOPC was due **more than 189 days of time extension** for the delays caused by the substantial growth in the misrepresented quantities of work that WOPC was required perform due to Defendants' fraud and concealment, including substantial growth in the HRSG quantities, the STG Pedestal size, and the size of the general arrangement of the Project.  WOPC reiterated that ODEC's assessment Substantial Completion Liquidated Damages was a breach of the EPC Contract because WOPC had requested, and was due, time extensions.  If ODEC had complied with its contractual duties and timely and properly reviewed WOPC's time extension requests, the Scheduled Substantial Completion Date would have been extended by these time extension requests alone through, at least, November 6, 2017.  The November 6, 2017 date would be extended even further by the previously requested 140 days.

212.    Nevertheless, ODEC continued to improperly assess Substantial Completion Liquidated Damages even though the properly extended Scheduled Substantial Completion Date had not yet expired. WOPC again requested ODEC to justify its actions, but ODEC failed to

provide any proper justification for failing to administer the EPC Contract and for failing to properly grant the required time extensions. ODEC continued to fail to act in good faith and to deal with WOPC fairly.

213.    Despite WOPC's protests and the lack of a contractual basis for assessing Substantial Completion Liquidated Damages, ODEC continues to improperly assess Substantial Completion Liquidated Damages and to improperly demand payment of the improperly assessed Substantial Completion Liquidated Damages each week.

214.    ODEC's active interference in WOPC's performance of its work, including ODEC's failure to issue required Change Orders, failure to provide relief for risk of loss events, improper assessment of Substantial Completion Liquidated Damages, improper demands for payment of Substantial Completion Liquidated Damages, failure to issue timely and appropriate time extensions, failure to timely and properly pay for issues for which ODEC is responsible, changes to WOPC's work, requirement to perform substantial additional quantities of work without additional time or compensation, acceleration of WOPC's work, and ODEC's knowing and willful delays render any limitations on damages in the EPC Contract unenforceable. The delays, disruptions, and damages ODEC caused were not the type of delays, disruptions, and damages, and/or the delays were of such unreasonable duration, that any limitations on damages in the EPC Contract are not enforceable. Further, as ODEC's bad faith, misrepresentation, and/or fraud caused the delays, disruption, and damages incurred by WOPC, any limitations on damages in the EPC Contract are unenforceable.

215.    The unconscionable provisions in the EPC Contract are unenforceable.

**R.**     **Defendants' Refusal to Resolve the Disputes**

216.     Throughout the course of the Project, WOPC has timely notified the Defendants of WOPC's claims against the Defendants in accordance with the applicable contracts and asked the Defendants for relief.   Both Defendants have, invariably, refused to acknowledge WOPC's entitlement to its requested relief.   When Defendants have refused to provide requested relief, WOPC has met with ODEC and/or Alstom (as applicable to the dispute) in a timely manner and in a good-faith effort to resolve the disputes.

217.     Despite these efforts at dispute resolution, Alstom has been unwilling to resolve Project disputes.   As but one example, and without limitation, WOPC notified Alstom of WOPC's assessment of liquidated damages for Alstom's late delivery of equipment.   Alstom refused to satisfy its obligation to pay WOPC the required liquidated damages.   WOPC's and Alstom's Project team representatives met and discussed the liquidated damages dispute, but they could not resolve the dispute.   Although the Project team meeting satisfied the dispute resolution provisions in the Alstom Purchase Agreement and the Alstom Assignment Agreement, WOPC took the extra step of arranging a meeting of WOPC's executives and Alstom's executives to see whether a different group could resolve the liquidated damages dispute and other Project disputes including disputes about quantities.   The executive meeting failed to produce a resolution.   Alstom stated, among other things, that they would refuse to pay the liquidated damages without litigation.   This pattern has persisted throughout the Project with Alstom.   Alstom's unwillingness to acknowledge its responsibility for damages and delays caused by Alstom has prevented disputes from being resolved despite WOPC's satisfaction of the dispute resolution process.

218.     ODEC's obstinacy has similarly stymied dispute resolution.   WOPC has met, in good faith, in a timely manner, with ODEC to discuss disputes regarding WOPC's claims.   These

meetings have failed to produce resolution of Project disputes.  Instead of resolving disputes, ODEC has allowed the disputes to linger unresolved.  For example, ODEC and WOPC met and discussed the differing site condition claim repeatedly throughout the Project.  In those meetings, ODEC failed and refused to resolve the dispute relating to the differing site conditions claim.

219.    ODEC appears to have adopted a strategy of failing and refusing to timely and properly resolve Project disputes in order to force WOPC to accelerate its work to overcome the impacts of issues for which ODEC is responsible under the EPC Contract.  ODEC's strategy is a breach of the EPC Contract and a failure to act fairly and to deal in good faith.

220.    As ODEC and WOPC have been unable to resolve Project disputes, ODEC and WOPC have referred the disputes to their senior executives for resolution.  ODEC's and WOPC's senior executives have met and discussed the Project disputes without reaching resolution.  In, without limitation, November 2016, March 2017, April 2017, and May 2017, WOPC's and ODEC's senior executives met and discussed Project disputes, including the disputes in this Amended Complaint.  Those meetings failed to yield a resolution of the Project disputes.

221.    On June 21, 2017, WOPC's and ODEC's senior executives met.  Although not required by the EPC Contract, ODEC and WOPC expressly agreed the meeting was a meeting of the senior executives pursuant to Section 13.1(A) of the EPC Contract.  In the meeting, WOPC's and ODEC's senior executives discussed, again, the Project disputes, including the disputes in this Second Amended Complaint.  They were unable to resolve the disputes.

### COUNT I
### FRAUD IN THE INDUCEMENT
(Against Alstom)

222.    WOPC re-alleges and incorporates by reference Paragraphs 1 through 221 above as if fully stated herein.

223.    Alstom made false, material representations to WOPC regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to erect and install the STG and HRSGs.

224.    Although Alstom had superior knowledge regarding the work required to erect and install the STG and HRSGs, Alstom concealed material facts about such work from WOPC, and/or failed to disclose information necessary to make Alstom's representations regarding the work required to erect and install the STG and HRSGs not false or misleading.

225.    Alstom made its false representations, concealment, and non-disclosures relating to the work required to erect and install the STG and HRSGs throughout the solicitation of proposals for the EPC Contract, prior to the execution of the EPC Contract, and prior to the execution of the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).  Alstom made the same or substantially similar false representations, concealed the same or substantially similar material facts, and made the same or substantially similar non-disclosures prior to the execution of the Alstom Purchase Agreement.

226.    Alstom made these representations knowing them to be false or it made them with a reckless indifference to the truth of the representations.  Alstom concealed material facts regarding the work required to erect and install the STG and HRSGs and failed to disclose information regarding the work to erect and install the STG and HRSGs even though it had a duty to disclose and/or correct those facts.  As the exclusive designer and manufacturer of the STG and HRSGs for the Project, the designer and manufacturer of the same or substantially similar STGs and HRSGs installed on other projects, and the self-professed industry leader in STGs and HRSGs, Alstom possessed the necessary knowledge and experience to know its representations were false and/or materially misleading or were made with a reckless indifference to the truth of the

representations.  Alstom also possessed the knowledge and experience to know what information should be disclosed to prevent its representations from being misleading or false.

227.   Alstom made these false representations, concealed information, and failed to disclose information with the intent, and for the purpose of, defrauding WOPC, including, without limitation, inducing WOPC to enter into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) for the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).

228.   WOPC, as an EPC Bidder, had the right to rely on, and did rely on, Alstom's representations, in the full belief of their truth in entering into the EPC Contract and Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement) for the terms in those agreements, including the price and schedule terms.

229.   WOPC justifiably relied on Alstom's representations in entering into the EPC Contract and Alstom Assignment Agreement, and has a right to rely on them because of Alstom's superior knowledge.  Alstom was the source of information related to the Alstom supplied STG and HRSGs, including information regarding the requirements for the work to erect and install the STG and HRSGs and the quantities of work required to erect and install the STG and HRSGs; and Alstom knew that its information was being provided to and used by the EPC Bidders to determine the price, schedule, and terms in the executed EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).

230.   Alstom's false representations were made, without limitation, through the Addenda to the RFP for the EPC Contract (including Addendum No. 3) and in the direct meetings and

communications between Alstom and WOPC prior to WOPC's execution of the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).

231.    As a direct result of Alstom's fraudulent inducement, WOPC has suffered damage. WOPC was induced to enter into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) having reasonably and justifiably relied upon the Alstom representations of material fact to determine, without limitation, the price, schedule, and terms of those agreements; with a schedule and price that did not reflect all of the requirements for, or the full scope of the work required to, erect and install the STG and HRSGs and to perform WOPC's other work on the Project; and with other contract terms and conditions that it would not have otherwise accepted.  The direct result of Alstom's fraudulent inducement is that WOPC has incurred millions of dollars of costs to perform its work on the Project and has been impacted in its time to perform its work on the Project.

232.    WOPC was objectively justified in relying upon the representations made by Alstom due to Alstom's superior knowledge of its own proprietary equipment and systems. WOPC's reliance was reasonable under the circumstances of the transaction because Alstom owed WOPC a duty of reasonable care, including, without limitation, in disclosing facts basic to the transaction and because of Alstom's superior knowledge. Moreover, WOPC did not possess the superior and proprietary knowledge that Alstom had, nor did it have an ability to ascertain, or a basis to believe, that the representations made by Alstom were grossly misleading, fraudulent, understated, and/or false.  WOPC would not have entered into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) for the price, schedule, and terms therein and from which its damages resulted had Alstom not made its misrepresentations or had it timely corrected same.

233.    WOPC is entitled to recover from Alstom, and Alstom is liable to pay, all of WOPC's costs, expenses, losses, and damages in excess of the amounts WOPC has been paid, including, without limitation, all of WOPC's costs of labor, material, equipment, engineering, and subcontractors to design and construct the Project, to assemble and install the STG and HRSGs, costs of disruption, delay, acceleration, and mitigation, and loss of opportunity damages, including lost profits.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Alstom Power, Inc., for all of WOPC's costs, expenses, losses, and damages in excess of the amounts WOPC has been paid, including, without limitation, all costs WOPC incurred to design and construct the Project and to erect and install the STG and HRSGs and to perform other affected work on the Project, including costs of delay damages, disruption damages, acceleration damages, liquidated damages, additional engineering costs, additional construction costs, lost opportunity costs, and all other losses and damages due to Alstom's fraudulent inducement, along with an award of pre- and post-judgment interest and any other relief that this Court deems proper or just.

## COUNT II
## FRAUD IN THE INDUCEMENT
(Against ODEC)

234.    WOPC re-alleges and incorporates by reference Paragraphs 1 through 221 above as if fully stated herein.

235.    ODEC made false, material representations to WOPC regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to erect and install the STG and HRSGs.

236.    Although ODEC had superior knowledge regarding the work required to erect and install the STG and HRSGs, ODEC concealed material facts about such work from WOPC, and/or failed to disclose information necessary to make ODEC's representations regarding the work required to erect and install the STG and HRSGs not false or misleading when it knew that WOPC would reasonably expect disclosure or correction of those representations and material facts.

237.    ODEC made its false representations, concealment, and non-disclosures relating to the work required to erect and install the STG and HRSGs throughout the solicitation of proposals for the EPC Contract, prior to the execution of the EPC Contract, and prior to the execution of the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement), including, without limitation, when it affirmatively and deliberately chose not to disclose material changes to the quantities of various components that it knew had changed as of March 4, 2014, based upon correspondence from Alstom to ODEC communicating the changes in quantities.

238.    ODEC made these representations knowing them to be false or it made them with a reckless indifference to the truth of the representations.   ODEC concealed material facts regarding the work required to erect and install the STG and HRSGs and failed to disclose information regarding the work to erect and install the STG and HRSGs even though it had a duty to disclose and/or to correct those facts and representations.   As an entity with substantial experience in conducting procurements for construction projects and as the entity conducting the procurement for the EPC Contract and having direct dealings with Alstom and B&M, ODEC possessed the necessary superior knowledge and experience to know its representations were false and/or materially misleading or were made with a reckless indifference to the truth of the representations.   ODEC also possessed the knowledge and experience to know what information should be disclosed to prevent its representations from being misleading or false.

239.   ODEC made these false representations, concealed information, and failed to disclose information with the intent, and for the purpose of, defrauding WOPC, including, without limitation, inducing WOPC to enter into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) for the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) with full knowledge that WOPC would justifiably rely upon those representations based upon ODEC's superior knowledge and ODEC's knowledge that WOPC would reasonably expect a disclosure and/or correction of those material representations and facts.

240.   WOPC, as an EPC Bidder, objectively had the right to justifiably rely on, and did rely on, ODEC's representations in the full belief of their truth in entering into the EPC Contract and Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement) for the terms and conditions in those agreements, including the price and schedule terms.

241.   WOPC justifiably relied on ODEC's representations in entering into the EPC Contract, and has a right to rely on them based upon ODEC's superior knowledge, and because ODEC was conducting the procurement of the EPC Contract and was the source of information related to the Alstom supplied STG and HRSGs, including information regarding the requirements for the work to erect and install the STG and HRSGs and the quantities of work required to erect and install the STG and HRSGs; and ODEC knew that this information was being provided to and used by the EPC Bidders to determine the price, schedule, and terms in the executed EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).

242.   ODEC's false representations were made, without limitation, through the Addenda to the RFP for the EPC Contract (including Addendum No. 3), through the omission of material information which it possessed no later than March 4, 2014 by way of correspondence from Alstom

66

to ODEC (to wit, material and significant changes in quantities of various integral components), and in the direct meetings and communications between ODEC and WOPC prior to WOPC's execution of the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).

243.    As a direct result of ODEC's fraudulent inducement, WOPC suffered damage. WOPC was induced to enter into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) having reasonably and justifiably relied upon the ODEC representations of material facts to determine, without limitation, the price, schedule, and terms of those agreements; with a schedule and price that did not reflect all of the requirements for, or the full scope of the work required to, erect and install the STG and HRSGs and to perform WOPC's other work on the Project; and with other contract terms and conditions that it would not have otherwise accepted.  The direct result of ODEC's fraudulent inducement is that WOPC has incurred millions of dollars of costs to perform its work on the Project and has been impacted in its time to perform its work on the Project.

244.    WOPC was objectively justified in relying upon the representations made by ODEC due to ODEC's superior knowledge of the Project requirements and of similar project requirements and due to the fact that ODEC asked and specifically expected the EPC Bidders, including WOPC, would rely on ODEC's representations in forming their price, schedule, and terms in the executed EPC Contract.  ODEC owed WOPC a duty of reasonable care, including, without limitation, in disclosing facts basic to the transaction which ODEC knew WOPC would reasonably expect and because of ODEC's superior knowledge. Moreover, WOPC did not possess the superior and material knowledge and information regarding the Project that ODEC had, nor did it have an ability to ascertain, or a basis to believe, that the representations made by ODEC were grossly misleading,

fraudulent, understated, and/or false. WOPC would not have entered into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) for the price, schedule, and terms therein and from which its damages resulted had Alstom not made its misrepresentations.

245.    WOPC is entitled to recover from ODEC, and ODEC is liable to pay, all of WOPC's costs, expenses, losses and damages in excess of the amounts WOPC has been paid including, but not limited to, all of WOPC's costs of labor, material, equipment, engineering, and subcontractors to design and construct the Project, to assemble and install the STG and HRSGs, costs of disruption, delay, acceleration, and mitigation, and loss of opportunity damages, including lost profits.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Old Dominion Electric Cooperative, for all of WOPC's costs, expenses, losses and damages in excess of the amounts WOPC has been paid including, without limitation, all costs WOPC incurred to design and construct the Project and to erect and install the STG and HRSGs and to perform other affected work on the Project, including costs of delay damages, disruption damages, acceleration damages, liquidated damages, additional engineering costs, additional construction costs, lost opportunity costs, and all other losses and damages due to ODEC's fraudulent inducement, along with an award of pre- and post-judgment interest and any other relief that this Court deems proper or just.

## COUNT III
## ACTUAL FRAUD
(Against Alstom)

246.    WOPC re-alleges and incorporates by reference Paragraphs 1 through 221 above as if fully stated herein.

247.    WOPC pleads this Count in the alternative to the extent it is inconsistent, in whole or in part, with any other allegations contained herein.

248.    Alstom owed WOPC a duty of care.  Alstom owed WOPC this duty because Alstom and WOPC were to be in privity and because of Alstom's superior knowledge of its proprietary equipment and systems.  Alstom and WOPC were to be in privity because they are parties to the Alstom Assignment Agreement.  By the terms of the Alstom Assignment Agreement, Alstom and WOPC are also to be in privity in the Alstom Purchase Agreement. This duty required Alstom to exercise reasonable care, including, without limitation, to disclose facts basic to the transaction when it knew WOPC reasonably expected disclosure of those material facts, to correct partial or ambiguous statements that were known to be misleading and to provide subsequently acquired or revised information that Alstom knew would make previous representations untrue or misleading.

249.    In addition, or in the alternative, Alstom owed WOPC a duty of care because Alstom and WOPC were both parties to the overall business transaction contemplated by the EPC Contract, the Alstom Purchase Agreement, and the Alstom Assignment Agreement.  Alstom's duty to exercise reasonable care in making its representations to WOPC arises from Alstom's provision of information to WOPC in the context of that business transaction, including during the solicitation of proposals for the EPC Contract.   More specifically, in the RFP (including Addendum No. 3 to the RFP) and in meetings with WOPC, Alstom made representations to WOPC regarding the work that WOPC would have to perform to erect and install the STG and HRSGs. Alstom knew its representations were being supplied to WOPC (as an EPC Bidder) for the specific purpose of enabling WOPC to determine the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement). Alstom knew WOPC was one of the EPC Bidders and would justifiably rely upon Alstom's

representations based upon Alstom's superior knowledge.  Alstom communicated with WOPC directly; and Alstom acknowledged and agreed, in the Alstom Purchase Agreement, that its representations would be provided to WOPC, and would be used by WOPC.  Alstom knew how WOPC used its representations and was able to foresee and control any risk arising from its representations to WOPC.

250.    In addition, or in the alternative, Alstom owed WOPC a duty of care, because Alstom, in the course of its business, without exercising reasonable care or competence, supplied false information to WOPC for WOPC's guidance in its business transactions.  More particularly, Alstom did not use reasonable care or competence in making false representations to WOPC regarding the work that WOPC would have to perform to erect and install the STG and HRSGs. Alstom provided its false representations for WOPC's guidance in its business transactions including, without limitation, WOPC's use in determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).  WOPC justifiably relied on Alstom's false information because Alstom had superior knowledge of, and was the exclusive designer, manufacturer, and supplier of, the STG and HRSGs chosen for the Project; Alstom had designed and manufactured STGs and HRSGs on other projects that were similar to the Wildcat Project; and Alstom held itself out as the industry leader in such technologies.

251.    Additionally, or in the alternative, Alstom owed WOPC a duty to exercise reasonable care in disclosing material facts to WOPC because Alstom and WOPC were engaged in a business transaction or series of business transactions, including the various business transactions relating to the development of the Wildcat Project, in which Alstom had a duty to

furnish correct information to WOPC and WOPC had the right to rely on Alstom for information necessary for the business transactions.

252.    Alstom intentionally, knowingly, or recklessly made false representations to WOPC regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to erect and install the STG and HRSGs.  Alstom knew, or should have known, the falsity of those representations when made and/or failed to correct the false representations after learning of their falsity on many occasions including, without limitation, on March 4, 2014.

253.    Although Alstom had superior knowledge regarding the work required to erect and install the STG and the HRSGs, Alstom concealed material facts about such work from WOPC, and/or failed to disclose information necessary to make its representations regarding the work required to erect and install the STG and HRSGs not false or misleading

254.    Alstom intentionally, knowingly, or recklessly made its false representations relating to the work required to erect and install the STG and HRSGs throughout the solicitation of proposals for the EPC Contract, prior to the execution of the EPC Contract, and prior to the execution of the Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement).  Alstom intentionally, knowingly, or recklessly made the same or substantially similar misrepresentations, concealed the same or substantially similar material facts, and/or made the same or substantially similar non-disclosures prior to the execution of the Alstom Purchase Agreement.

255.    Alstom intentionally, knowingly, or recklessly made its representations as to the requirements of the work to erect and install the STG and the HRSGs knowing them to be false or it made them with a reckless indifference to the truth of its representations.  Alstom concealed

material facts regarding the work to erect and install the STG and HRSGs (including the quantity of work required to erect and install the STG and HRSGs) and failed to disclose information regarding the work to erect and install the STG and HRSGs even though it had a duty to disclose. As the exclusive designer and manufacturer of the STG and HRSGs for the Project, the designer of the same or substantially similar STGs and HRSGs on other projects, and the self-professed industry leader in STGs and HRSGs, Alstom possessed the necessary and superior knowledge and experience to know its representations were false and/or materially misleading or were made with a reckless indifference to the truth of the representations. It also possessed the knowledge and experience to know what information should be disclosed to prevent its misrepresentations from being misleading or false.

256. Alstom intentionally, knowingly, or recklessly made these false representations, concealed information, and failed to disclose information with the intent, and for the purpose of, defrauding WOPC, including, without limitation, inducing WOPC to enter into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) having used Alstom's misrepresentations to determine, without limitation, the price, schedule, and terms of those agreements; with a schedule and price that did not reflect the all of the requirements for, or the full scope of the work required to, erect and install the STG and HRSGs and to perform WOPC's other work on the Project; and with other contract terms and conditions that it would not have otherwise accepted. Through its fraudulent misrepresentations, Alstom gained a competitive advantage in having Alstom chosen as the STG and HRSG supplier for the Wildcat Project, retaining the contract for the Project's STG and HRSGs after the execution of the EPC Contract and the Alstom Assignment Agreement, and Alstom reduced or limited Alstom's costs of designing, manufacturing, and delivering the Project's STG and HRSGs.

257.    WOPC, as an EPC Bidder, had the right to reasonably and justifiably rely on, and did reasonably and justifiably rely on, Alstom's representations and at all relevant times believed them to be true. WOPC did not possess, nor had access to, the superior and proprietary knowledge that Alstom had, nor did WOPC have the means to ascertain, or a basis to believe, that the representations made by Alstom were grossly misleading, fraudulent, understated, and/or false. Alstom was the exclusive designer and manufacturer of the STG and HRSGs for the Project; Alstom designed the same or substantially similar STGs and HRSGs on other projects; Alstom is the self-professed industry leader in STGs and HRSGs; and Alstom was the source of the information related to the Alstom supplied STG and HRSGs.  Additionally, Alstom knew that its misrepresentations were being provided to, and would necessarily and justifiably be relied upon by, the EPC Bidders for the purpose of determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement).  Under these circumstances, Alstom owed the EPC Bidders, including WOPC, a duty to provide complete and accurate information and to not make any false representations.  Alstom also owed the EPC Bidders, including WOPC, a duty to disclose information necessary to make its representations not false or misleading.

258.    As the source of information as to the STG and HRSGs, Alstom had a duty to inform and advise WOPC (and all of the EPC Bidders) as to any errors or changes in the representations that the EPC Bidders were relying upon, including, without limitation, the revisions to the "FIELD INSTALLED QUANTITIES" which Alstom knew of no later than March 4, 2014 per correspondence from Alstom to ODEC.

259.    If Alstom had not made its misrepresentations regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to

erect and install the STG and HRSGs, engaged in concealment, and failed to disclose information necessary to make its representations not false or misleading, WOPC would not have entered into the EPC Contract and the Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement) on the terms and conditions therein, including the price, schedule, and other terms that were determined based on Alstom's representations.

260.     Alstom's misrepresentations were made, without limitation, in the Addenda to the RFP for the EPC Contract (including Addendum No. 3) and in direct meetings and communications between Alstom and WOPC.

261.     As a direct result of Alstom's fraudulent misrepresentations, concealment, and/or non-disclosures, WOPC suffered damage.  WOPC entered into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) having used the Alstom representations to determine, without limitation, the price, schedule, and terms of those agreements; with a schedule and price that did not reflect all of the requirements for, or the full scope of the work required to, erect and install the STG and HRSGs and to perform WOPC's other work on the Project; and with other contract terms and conditions that it would not have otherwise accepted.  The direct result of Alstom's fraudulent misrepresentations, concealment, and/or non-disclosures is that WOPC has incurred millions of dollars of costs to perform its work on the Project and has been impacted in its time to perform its work on the Project.

262.     WOPC is entitled to recover from Alstom, and Alstom is liable to pay, all of WOPC's losses and damages resulting from Alstom's misrepresentations, concealment, and non-disclosures including, but not limited to, all of WOPC's costs of labor, material, equipment, engineering, and subcontractors to design and construct the Project, to assemble and install the

STG and HRSGs, costs of disruption, delay, acceleration, and mitigation, and loss of opportunity damages, including lost profits.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Alstom Power, Inc., for damages including, without limitation, all additional costs WOPC incurred to design and construct the Project and to erect and install the STG and HRSGs and to perform other affected work on the Project, including costs of delay damages, disruption damages, acceleration damages, liquidated damages, additional engineering costs, additional construction costs, lost opportunity costs, and all other losses and damages due to Alstom's actual fraud, along with an award of pre- and post-judgment interest and any other relief that this Court deems proper or just.

**COUNT IV**
**ACTUAL FRAUD**
(Against ODEC)

263.    WOPC re-alleges and incorporates by reference Paragraphs 1 through 221 above as if fully stated herein.

264.    WOPC pleads this Count in the alternative to the extent it is inconsistent, in whole or in part, with any other allegations contained herein.

265.    ODEC owed WOPC a duty to exercise reasonable care, including, without limitation, to disclose facts basic to the transaction when it knew WOPC reasonably expected disclosure of those material facts, to correct partial or ambiguous statements that were known to be misleading, and to provide subsequently acquired or revised information that ODEC knew would make untrue or misleading previous representations.  ODEC owed WOPC this duty because ODEC and WOPC were to be in privity with regards to the Project and because of ODEC's

superior knowledge.  ODEC and WOPC were to be in privity because they are parties to the EPC Contract and Alstom Assignment Agreement.

266.    In addition, or in the alternative, ODEC owed WOPC a duty to exercise reasonable care to disclose material facts essential to the business transaction because ODEC and WOPC were parties to the overall business transaction for the development of the Project, as reflected in, without limitation, the EPC Contract, the Alstom Purchase Agreement, and the Alstom Assignment Agreement.  ODEC's duty to WOPC arises from: (i) ODEC conducting a procurement for an EPC Contractor and WOPC being a bidder for the EPC Contract in ODEC's procurement process; and (ii) ODEC's provision of information to WOPC during the solicitation of proposals for the EPC Contract.  More specifically, in the RFP (including Addendum No. 3 to the RFP) and in meetings with WOPC, ODEC made representations to WOPC regarding the work that WOPC would have to perform to erect and install the STG and HRSGs.  ODEC knew its representations were being supplied to WOPC (as an EPC Bidder) for the specific purpose of enabling WOPC to determine the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement).  ODEC knew WOPC was one of the EPC Bidders and would by necessity justifiably rely upon ODEC's representations based upon ODEC's duty of disclosure and superior knowledge.  ODEC communicated with WOPC directly; and ODEC acknowledged and agreed, in the RFP, that ODEC's representations would be provided to WOPC, and would be used by WOPC.  ODEC knew how WOPC used its representations and was able to foresee and control any risk arising from its representations to WOPC.

267.    In addition, or in the alternative, ODEC owed WOPC a duty of care, because ODEC, in the course of its business, without exercising reasonable care or competence, supplied false information to WOPC for WOPC's guidance in its business transactions.  More particularly,

ODEC did not use reasonable care or competence in making false representations to WOPC regarding the work that WOPC would have to perform to erect and install the STG and HRSGs. ODEC provided its false representations for WOPC's guidance in its business transactions including, without limitation, WOPC's use in determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement). WOPC justifiably relied on ODEC's false and material information because ODEC was conducting the procurement for the EPC Contract and was providing material information for the use of the EPC Bidders, including WOPC. Further, ODEC was providing information supplied by Alstom, the exclusive designer, manufacturer, and supplier of the STG and HRSGs chosen for the Project; Alstom had designed and manufactured STGs and HRSGs on other projects that were similar to the Wildcat Project; and Alstom held itself out as the industry leader in such technologies.

268.    Additionally, or in the alternative, ODEC owed WOPC a duty to exercise reasonable care in disclosing material facts to WOPC because ODEC and WOPC were engaged in a business transaction or series of business transactions, including the various business transactions relating to the development of the Wildcat Project, in which ODEC had a duty to furnish correct information to WOPC and WOPC had the right to rely on ODEC for information necessary for the business transactions.

269.    ODEC intentionally, knowingly, or recklessly made false representations to WOPC regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to erect and install the STG and HRSGs. ODEC knew the falsity of those representations when made and/or failed to correct the false representations after learning of their falsity, without limitation, no later than March 4, 2014, when Alstom

communicated with ODEC relaying material revisions to the "FIELD INSTALLED QUANTITIES."

270.    Although ODEC had superior knowledge regarding the work required to erect and install the STG and the HRSGs, ODEC concealed material facts about such work from WOPC, and/or failed to disclose information necessary to make its representations regarding the work required to erect and install the STG and HRSGs not false or misleading.  ODEC chose not to disclose to WOPC and deliberately and intentionally concealed from WOPC certain information that ODEC received from the OEM suppliers after WOPC submitted its proposal and before WOPC executed the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), including Alstom's information regarding changes in the quantities of work required to erect and install the STG and HRSGs, and information regarding OEM suppliers' changes, alterations, and revisions to the design of their equipment and the requirements for erecting and installing their equipment.

271.    ODEC intentionally, knowingly, or recklessly made its false representations, concealment, and non-disclosures relating to the work required to erect and install the STG and HRSGs throughout the solicitation of proposals for the EPC Contract, prior to the execution of the EPC Contract, and prior to the execution of the Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement).

272.    ODEC intentionally, knowingly, or recklessly made its representations as to the requirements of the work to erect and install the STG and the HRSGs knowing them to be false or it made them with a reckless indifference to the truth of its representations.  ODEC concealed material facts regarding the work to erect and install the STG and HRSGs (including the quantity of work required to erect and install the STG and HRSGs) and failed to disclose information

regarding the work to erect and install the STG and HRSGs even though it had a duty to disclose or correct those representations.   As an entity with substantial experience in conducting procurements for construction projects and as the entity conducting the procurement and having direct dealings with Alstom and B&M, ODEC possessed the necessary and superior knowledge and experience to know its representations were false and/or materially misleading or were made with a reckless indifference to the truth of the representations.   It also possessed the knowledge and experience to know what information should be disclosed to prevent its misrepresentations from being misleading or false.

273.   ODEC made these false representations, concealed information, and failed to disclose information with the intent, and for the purpose of, defrauding WOPC, including, without limitation, inducing WOPC to enter into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) having used ODEC's misrepresentations to determine, without limitation, the price, schedule, and terms of those agreements; with a schedule and price that did not reflect the all of the requirements for, or the full scope of the work required to, erect and install the STG and HRSGs and to perform WOPC's other work on the Project; and with other contract terms and conditions that it would not have otherwise accepted.   Through its fraud, ODEC received less expensive proposals for the EPC Contract and reduced its cost of the development of the Wildcat Project.

274.   WOPC, as an EPC Bidder, had the right to reasonably and justifiably rely on, and did reasonably and justifiably rely on, ODEC's representations and at all relevant times believed them to be true.   WOPC did not possess the superior and necessary knowledge and information that ODEC had, nor did it have the means to ascertain, or a basis to believe, that the representations made by ODEC were grossly misleading, fraudulent, understated, and/or false. ODEC was

experienced in conducting procurements for construction projects, was conducting the procurement for the EPC Contract, was having direct dealings with Alstom and B&M, and ODEC was the source of the information related to work to be performed by the EPC Contractor, including the work to erect and install the Alstom supplied STG and HRSGs. Additionally, ODEC knew that its representations were being provided to, and would necessarily and justifiably be relied upon by, the EPC Bidders for the purpose of determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement). Under these circumstances, ODEC owed the EPC Bidders, including WOPC, a duty to provide complete and accurate information and to not make any false representations. ODEC also owed the EPC Bidders, including WOPC, a duty to disclose information necessary to make its representations not false or misleading.

275. As the source of information for the procurement of the EPC Contract, including information as to the work required to erect and install the STG and HRSGs, ODEC had a duty to inform and advise WOPC (and all of the EPC Bidders) as to any errors or changes in the representations that the EPC Bidders were relying upon, including, without limitation, the revisions to the "FIELD INSTALLED QUANTITIES" which ODEC knew of no later than March 4, 2014, in correspondence from Alstom to ODEC.

276. If ODEC had not made its misrepresentations regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to erect and install the STG and HRSGs, engaged in concealment, and failed to disclose information necessary to make its representations not false or misleading, WOPC would not have entered into the EPC Contract and the Alstom Assignment Agreement (with the underlying Alstom Purchase

Agreement) on the terms and conditions therein, including the price, schedule, and other terms that were determined based on ODEC's representations.

277.   ODEC's misrepresentations were made, without limitation, in the Addenda to the RFP for the EPC Contract (including Addendum No. 3) and in direct meetings and communications between ODEC and WOPC.

278.   As a direct result of ODEC's fraudulent misrepresentations, concealment, and/or non-disclosures, WOPC suffered damage.  WOPC entered into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) having used ODEC's representations to determine, without limitation, the price, schedule, and terms of those agreements; with a schedule and price that did not reflect all of the requirements for, or the full scope of the work required to, erect and install the STG and HRSGs and to perform WOPC's other work on the Project; and with other contract terms and conditions that it would not have otherwise accepted.  ODEC knew at all material times that WOPC would reasonably and justifiably rely upon these representations in determining the price, schedule, and terms in the executed EPC Contract and the Alstom Assignment Agreement, and would reasonably expect disclosures of those material facts, or changes to them. The direct result of ODEC's fraudulent misrepresentations, concealment, and/or non-disclosures is that WOPC has incurred millions of dollars of costs to perform its work on the Project and has been impacted in its time to perform its work on the Project.

279.   WOPC is entitled to recover from ODEC, and ODEC is liable to pay, all of WOPC's losses and damages resulting from ODEC's misrepresentations, concealment, and non-disclosures including, but not limited to, all of WOPC's costs of labor, material, equipment, engineering, and subcontractors to design and construct the Project, to assemble and install the

STG and HRSGs, costs of disruption, delay, acceleration, and mitigation, and loss of opportunity damages, including lost profits.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Old Dominion Electric Cooperative, for damages including, without limitation, all additional costs WOPC incurred to design and construct the Project and to erect and install the STG and HRSGs and to perform other affected work on the Project, including costs of delay damages, disruption damages, acceleration damages, liquidated damages, additional engineering costs, additional construction costs, lost opportunity costs, and all other losses and damages due to ODEC's actual fraud, along with an award of pre- and post-judgment interest and any other relief that this Court deems proper or just.

**COUNT V**
**CONSTRUCTIVE FRAUD**
(Against Alstom)

280.    WOPC re-alleges and incorporates by reference Paragraphs 1 through 221 above as if fully stated herein.

281.    WOPC pleads this Count in the alternative to the extent it is inconsistent, in whole or in part, with any other allegations contained herein.

282.    Alstom owed WOPC a duty to exercise reasonable care, including, without limitation, to disclose facts basic to the transaction when it knew WOPC reasonably expected disclosure of those material facts, to correct partial or ambiguous statements that were known to be misleading, and to provide subsequently acquired or revised information that Alstom knew would make untrue or misleading previous representations.  Alstom owed WOPC a duty of care because Alstom and WOPC were in privity with regards to the Project, and because of Alstom's superior knowledge of its own proprietary machinery and components.  Alstom and WOPC were

in privity because they are parties to the Alstom Assignment Agreement.  By the terms of the Alstom Assignment Agreement, Alstom and WOPC are also in privity in the Alstom Purchase Agreement.

283.    In addition, or in the alternative, Alstom owed WOPC a duty of care because Alstom and WOPC were both parties to the overall business transaction necessitated by the two-step procurement phase and construction of the Project.  Alstom's duty to exercise reasonable care in disclosing the representations recited in ¶ 258, *supra*,  to WOPC arises from Alstom's provision of information to WOPC during the solicitation of proposals for the EPC Contract.  More specifically, in the RFP (including Addendum No. 3 to the RFP) and in meetings with WOPC, Alstom made representations to WOPC regarding the work that WOPC would have to perform to erect and install the STG and HRSGs.  Alstom knew its representations were being supplied to WOPC (as an EPC Bidder) for the specific purpose of enabling WOPC to determine the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).  Alstom knew WOPC was one of the EPC Bidders and would justifiably rely upon Alstom's representations based upon Alstom's superior knowledge. Alstom communicated with WOPC directly; and Alstom acknowledged and agreed, in the Alstom Purchase Agreement, that its representations would be provided to WOPC, and would be used by WOPC.  Alstom knew how WOPC used its representations and was able to foresee and control any risk arising from its representations to WOPC.

284.    In addition, or in the alternative, Alstom owed WOPC a duty of care, because Alstom, in the course of its business, without exercising reasonable care or competence, supplied false information to WOPC for WOPC's guidance in its business transactions.  More particularly, Alstom did not use reasonable care or competence in making false representations to WOPC

regarding the work that WOPC would have to perform to erect and install the STG and HRSGs. Alstom provided its false representations for WOPC's guidance in its business transactions including, without limitation, WOPC's use in determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).  WOPC justifiably relied on Alstom's false information because Alstom had superior knowledge of, and was the exclusive designer, manufacturer, and supplier of the STG and HRSGs chosen for the Project; Alstom had designed and manufactured STGs and HRSGs on other projects that were similar to the Wildcat Project; and Alstom held itself out as the industry leader in such technologies.

285.    Additionally, or in the alternative, Alstom owed WOPC a duty to exercise reasonable care in disclosing material facts to WOPC because Alstom and WOPC were engaged in a business transaction or series of business transactions, including the various business transactions relating to the development of the Wildcat Project, in which Alstom had a duty to furnish correct information to WOPC and WOPC had the right to rely on Alstom for information necessary for the business transactions.

286.    Alstom, owing its duty of care to WOPC, innocently or negligently asserted false statements to WOPC regarding the work required to erect and install the STG and the HRSGs, including the requirements for the quantities of work required to erect and install the STG and the HRSGs.

287.    Alstom intended for WOPC to act on Alstom's statements.

288.    Alstom knew WOPC would justifiably and reasonably rely on Alstom's statements. Alstom knew WOPC would rely on Alstom's statements in determining the price, schedule, and terms in the executed EPC Contract and the Alstom Assignment Agreement because Alstom was

84

the exclusive designer, manufacturer, and supplier of the STG and HRSGs chosen for the Project; Alstom was the exclusive source of knowledge related to the same; Alstom held itself out as the industry leader in such systems; Alstom provided its representations to be given to WOPC (and the other EPC Bidders); and Alstom made its representations directly to WOPC in meetings with WOPC during the EPC contractor procurement process.   Further, in the Alstom Purchase Agreement, Alstom acknowledged and agreed that its representations would be provided to WOPC (and the other EPC Bidders).

289.   Alstom knew that if its statements were wrong, WOPC would suffer loss or injury. Alstom knew the EPC contractor was entering into a firm, lump-sum EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) for the work that included the work to erect and install the STG and HRSGs.   Alstom knew the EPC Bidders, including WOPC, would necessarily and justifiably use Alstom's representations regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to erect and install the STG and HRSGs, to determine the price, schedule, and terms in the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).   Accordingly, Alstom knew that WOPC, as the selected EPC contractor, would be harmed by errors in Alstom's representations because errors in Alstom's representations would cause WOPC to enter into a firm, lump-sum EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) for a price and with a schedule that did not reflect all of the requirements for, or the full scope of the work required to, erect and install the STG and the HRSGs and to perform WOPC's other work on the Project and with other contract terms and conditions that it would not have otherwise accepted.   To the extent the Alstom provided information proved to be incorrect, Alstom knew that WOPC would incur

significant additional costs to perform its work on the Project, including the erection and installation of the STG and HRSGs and the performance of its other work on the Project.  It also knew that errors in its representations would cause the erection and installation of the STG and HRSGs and the performance of other work to take longer than planned.

290.    WOPC justifiably and reasonably relied on Alstom's false statements because Alstom was the exclusive designer, manufacturer, and supplier of the STG and HRSGs chosen for the Project; Alstom was the exclusive source of knowledge related to the same; Alstom held itself out as the industry leader in such systems; Alstom provided its representations to be given to, and used by, WOPC (and the other EPC Bidders); and Alstom made its representations directly to WOPC in meetings with WOPC during the EPC contractor procurement process.  Further, in the Alstom Purchase Agreement, Alstom acknowledged and agreed that its representations would be provided to WOPC (and the other EPC Bidders). WOPC did not possess the superior and proprietary knowledge that Alstom had, nor did it have the means to ascertain, or a basis to believe, that the representations made by Alstom were misleading, understated, and/or false.

291.    In reasonable justifiable reliance on Alstom's false statements, WOPC entered into the EPC Contract and the Alstom Assignment Agreement to WOPC's detriment for a price and with a schedule that does not reflect all of the requirements for, or the full scope of the work required to, erect and install the STGs and HRSGs and to perform WOPC's other work on the Project and with other terms and conditions that it would not have otherwise accepted and caused WOPC to complete millions of dollars of extra work on the Project.

292.    Alstom's innocent or negligent assertion of its false statements has proximately caused WOPC millions of dollars of costs to perform its work on the Project and caused WOPC's work to take substantially longer than planned.

293.    WOPC is entitled to recover from Alstom, and Alstom is liable to pay, all of WOPC's losses and damages resulting from Alstom's negligence including, but not limited to, all of WOPC's costs of labor, material, equipment, engineering, and subcontractors to design and construct the Project, to assemble and install the STG and HRSGs, and WOPC's costs of disruption, delay, acceleration, and mitigation, and loss of opportunity damages, including lost profits.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Alstom Power, Inc., for damages including, without limitation, all additional costs WOPC incurred to design and construct the Project and to erect and install the STG and HRSGs and to perform other affected work on the Project, including costs of delay damages, disruption damages, acceleration damages, liquidated damages, additional engineering costs, additional construction costs, lost opportunity costs, and all other losses and damages due to Alstom's constructive fraud, along with an award of pre- and post-judgment interest and any other relief that this Court deems proper or just.

## COUNT VI
## CONSTRUCTIVE FRAUD
(Against ODEC)

294.    WOPC re-alleges and incorporates by reference Paragraphs 1 through 221 above as if fully stated herein.

295.    WOPC pleads this Count in the alternative to the extent it is inconsistent, in whole or in part, with any other allegations contained herein.

296.    ODEC owed WOPC a duty to exercise reasonable care including, without limitation, to disclose facts basic to the transaction when it knew WOPC reasonably expected disclosure of those material facts, to correct partial or ambiguous statements that were known to

be misleading, and to provide subsequently acquired or revised information that ODEC knew would make untrue or misleading previous representations.  ODEC owed WOPC a duty of care because ODEC and WOPC were to be in privity with regards to the Project and because of ODEC's superior knowledge of the Project requirements.  ODEC and WOPC were in privity because they are parties to the EPC Contract and Alstom Assignment Agreement.

297.    In addition, or in the alternative, ODEC owed WOPC a duty of care because ODEC and WOPC were both parties to the overall business transaction of the construction of the Project. ODEC's duty to exercise reasonable care in disclosing the representations recited in ¶275, *supra*, to WOPC's arises from: (i) ODEC conducting a procurement for an EPC Contractor and WOPC being a bidder for the EPC Contract in ODEC's procurement process; and (ii) ODEC's provision of information to WOPC during the solicitation of proposals for the EPC Contract.  More specifically, in the RFP (including Addendum No. 3 to the RFP) and in meetings with WOPC, ODEC made representations to WOPC regarding the work that WOPC would have to perform to erect and install the STG and HRSGs.  ODEC knew its representations were being supplied to WOPC (as an EPC Bidder) for the specific purpose of enabling WOPC to determine the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement).  ODEC knew WOPC was one of the EPC Bidders and would justifiably rely upon ODEC's representations based upon ODEC's superior knowledge of those representations and the Project requirements.  ODEC communicated with WOPC directly; and ODEC acknowledged and agreed, in the RFP, that ODEC's representations would be provided to WOPC, and would be used by WOPC.  ODEC knew how WOPC used its representations and was able to foresee and control any risk arising from its representations to WOPC.

298.    In addition, or in the alternative, ODEC owed WOPC a duty of care, because ODEC, in the course of its business, without exercising reasonable care or competence, supplied false information to WOPC for WOPC's guidance in its business transactions.  More particularly, ODEC did not use reasonable care or competence in making false representations to WOPC regarding the work that WOPC would have to perform to erect and install the STG and HRSGs. ODEC provided its false representations for WOPC's guidance in its business transactions including, without limitation, WOPC's use in determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).   WOPC justifiably relied on ODEC's false information because ODEC was conducting the procurement for the EPC Contract and was providing its superior knowledge and information for the use of the EPC Bidders, including WOPC.  Further, ODEC was providing information supplied by Alstom, the exclusive designer, manufacturer, and supplier of the STG and HRSGs chosen for the Project; Alstom had designed and manufactured STGs and HRSGs on other projects that were similar to the Wildcat Project; and Alstom held itself out as the industry leader in such technologies.

299.    Additionally, or in the alternative, ODEC owed WOPC a duty of care because ODEC and WOPC were engaged in a business transaction or series of business transactions, including the various business transactions relating to the development of the Wildcat Project, in which ODEC had a duty to furnish correct information to WOPC and to correct misleading information previously furnished, and WOPC had the right to justifiably rely on ODEC for information necessary for the business transactions.

300.    ODEC, owing its duty of care to WOPC, innocently or negligently asserted false statements to WOPC regarding the work required to erect and install the STG and the HRSGs,

including the requirements for the quantities of work required to erect and install the STG and the HRSGs.

301.    ODEC intended for WOPC to act on ODEC's statements.

302.    ODEC knew WOPC would by necessity justifiably and reasonably rely on ODEC's statements.  ODEC knew WOPC would necessarily rely on ODEC's statements in determining the price, schedule, and terms in the executed EPC Contract and the Alstom Assignment Agreement because of ODEC's superior knowledge regarding the Project requirements; because ODEC has substantial experience conducting procurements for construction contracts; ODEC was conducting the procurement for the EPC Contract; ODEC had direct communications with Alstom and B&M; ODEC was the source of the information related to work to be performed by the EPC Contractor, including the work to erect and install the STG and HRSGs; and ODEC made its representations directly to WOPC in the RFP and in meetings with WOPC during the EPC contractor procurement process.

303.    ODEC knew that if its statements were wrong, WOPC would suffer loss or injury. ODEC knew the EPC contractor was entering into a firm, lump-sum EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement) for the work that included the erection and installation of the STG and HRSGs.  ODEC knew the EPC Bidders, including WOPC, would justifiably and reasonably rely upon ODEC's representations regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to erect and install the STG and HRSGs, to determine the price, schedule, and terms in the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement).  Accordingly, ODEC knew that WOPC, as the selected EPC contractor, would be harmed by errors in ODEC's representations because errors in ODEC's

representations would cause WOPC to enter into a firm, lump-sum EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) for a price and with a schedule that did not reflect all of the requirements for, or the full scope of the work required to, erect and install the STG and the HRSGs and to perform WOPC's other work on the Project and with other contract terms that it would not have otherwise accepted.  To the extent the ODEC provided information proved to be incorrect, Alstom knew that WOPC would incur significant additional costs to perform its work on the Project, including the erection and installation of the STG and HRSGs and the performance of its other work on the Project.  ODEC also knew that errors in its representations would cause the erection and installation of the STG and HRSGs and the performance of other work to take longer than planned.

304.    WOPC reasonably and justifiably relied on ODEC's false statements because ODEC was conducting the procurement for the EPC Contractor; ODEC was very experienced in conducting competitive procurements; ODEC was directly communicating with Alstom and B&M; and ODEC made its representations directly to WOPC in the RFP and in meetings with WOPC during the EPC contractor procurement process.  Further, in the RFP, ODEC acknowledged that its representations would be provided to WOPC (and the other EPC Bidders). WOPC did not possess the superior and necessary knowledge that ODEC had regarding the Project requirements, nor did WOPC have the means to ascertain, or a basis to believe, that the representations made by ODEC were misleading, fraudulent, understated, and/or false.

305.    In justifiable and reasonable reliance on ODEC's false statements, WOPC entered into the EPC Contract and the Alstom Assignment Agreement to WOPC's detriment for a price and with a schedule that does not reflect all of the requirements for, or the full scope of the work

required to, erect and install the STGs and HRSGs and to perform WOPC's other work on the Project and with other terms that it would not have otherwise accepted.

306.    ODEC's innocent or negligent assertion of its false statements has proximately caused WOPC millions of dollars of costs to perform its work on the Project and caused WOPC's work to take substantially longer than planned.

307.    WOPC is entitled to recover from ODEC, and ODEC is liable to pay, all of WOPC's losses and damages resulting from ODEC's negligence including, but not limited to, all of WOPC's costs of labor, material, equipment, engineering, and subcontractors to design and construct the Project, to assemble and install the STG and HRSGs, and WOPC's costs of disruption, delay, acceleration, and mitigation, and loss of opportunity damages, including lost profits.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Old Dominion Electric Cooperative, for damages including, without limitation, all additional costs WOPC incurred to design and construct the Project and to erect and install the STG and HRSGs and to perform other affected work on the Project, including costs of delay damages, disruption damages, acceleration damages, liquidated damages, additional engineering costs, additional construction costs, lost opportunity costs, and all other losses and damages due to ODEC's constructive fraud, along with an award of pre- and post-judgment interest and any other relief that this Court deems proper or just.

## COUNT VII
## CONCEALMENT
(Against Alstom)

308.    WOPC re-alleges and incorporates by reference Paragraphs 1 through 221 above as if fully stated herein.

309. WOPC pleads this Count in the alternative to the extent it is inconsistent, in whole or in part, with any other allegations contained herein.

310. Alstom owed WOPC a duty of care. Alstom owed WOPC this duty because Alstom and WOPC were to be in privity and because of Alstom's superior knowledge of its proprietary equipment and systems. Alstom and WOPC were to be in privity because they are parties to the Alstom Assignment Agreement. By the terms of the Alstom Assignment Agreement, Alstom and WOPC are also to be in privity in the Alstom Purchase Agreement. This duty required Alstom to exercise reasonable care, including, without limitation, to disclose facts basic to the transaction when it knew WOPC reasonably expected disclosure of those material facts, to correct partial or ambiguous statements that were known to be misleading and to provide subsequently acquired or revised information that Alstom knew would make previous representations untrue or misleading.

311. In addition, or in the alternative, Alstom owed WOPC a duty of care because Alstom and WOPC were both parties to the overall business transaction contemplated by the Purchase Agreement. Alstom's duty to exercise reasonable care in disclosing the representations recited in ¶¶ 283-286, supra, arises from Alstom's provision of information to WOPC during the solicitation of proposals for the EPC Contract. More specifically, in the RFP (including Addendum No. 3 to the RFP) and in meetings with WOPC, Alstom made representations to WOPC regarding the work that WOPC would have to perform to erect and install the STG and HRSGs. Alstom knew its representations were being supplied to WOPC (as an EPC Bidder) for the specific purpose of enabling WOPC to determine the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement). Alstom knew WOPC was one of the EPC Bidders and would justifiably rely upon Alstom's representations based upon Alstom's superior knowledge of those representations. Alstom

communicated with WOPC directly; and Alstom acknowledged and agreed, in the Alstom Purchase Agreement, that its representations would be provided to WOPC, and would be used by WOPC.  Alstom knew how WOPC used its representations and was able to foresee and control any risk arising from its representations to WOPC.

312.    In addition, or in the alternative, Alstom owed WOPC a duty of care, because Alstom, in the course of its business, without exercising reasonable care or competence, supplied false information to WOPC for WOPC's guidance in its business transactions.  More particularly, Alstom did not use reasonable care or competence in making false representations to WOPC regarding the work that WOPC would have to perform to erect and install the STG and HRSGs. Alstom provided its false representations for WOPC's guidance in its business transactions including, without limitation, WOPC's use in determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).  WOPC reasonable and justifiably relied on Alstom's false information because Alstom had superior knowledge of, and was the exclusive designer, manufacturer, and supplier of, the STG and HRSGs chosen for the Project; Alstom had designed and manufactured STGs and HRSGs on other projects that were similar to the Wildcat Project; and Alstom held itself out as the industry leader in such technologies.

313.    Additionally, or in the alternative, Alstom owed WOPC a duty to exercise reasonable care in disclosing material facts to WOPC because Alstom and WOPC were engaged in a business transaction or series of business transactions, including the various business transactions relating to the development of the Wildcat Project, in which Alstom had a duty to furnish correct information to WOPC and WOPC had the right to rely on Alstom for information necessary for the business transactions.

314.    Alstom deliberately concealed material facts from WOPC regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to erect and install the STG and HRSGs to prevent WOPC from learning the truth about the quantities of work required.

315.    Although Alstom had superior knowledge regarding the work required to erect and install the STG and the HRSGs, Alstom concealed material facts about such work from WOPC, and/or failed to disclose information necessary to make its representations regarding the work required to erect and install the STG and HRSGs not false or misleading

316.    Alstom intentionally and knowingly concealed facts relating to the work required to erect and install the STG and HRSGs throughout the solicitation of proposals for the EPC Contract, prior to the execution of the EPC Contract, and prior to the execution of the Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement).  Alstom intentionally and knowingly concealed the same or substantially similar material facts prior to the execution of the Alstom Purchase Agreement.

317.    Alstom intentionally and knowingly concealed facts as to the requirements of the work to erect and install the STG and the HRSGs knowing WOPC would and did rely on the assumption that the concealed facts did not exist.  Alstom concealed material facts regarding the work to erect and install the STG and HRSGs (including the quantity of work required to erect and install the STG and HRSGs) and failed to disclose information regarding the work to erect and install the STG and HRSGs even though it had a duty to disclose.  As the exclusive designer and manufacturer of the STG and HRSGs for the Project, the designer of the same or substantially similar STGs and HRSGs on other projects, and the self-professed industry leader in STGs and HRSGs, Alstom possessed the necessary and superior concealed facts.  It also possessed the

knowledge and experience to know what information should be disclosed to prevent its misrepresentations from being misleading and false.

318.    Alstom intentionally and knowingly concealed information these facts with the intent, and for the purpose of, defrauding WOPC, including, without limitation, inducing WOPC to enter into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) having used Alstom's misrepresentations to determine, without limitation, the price, schedule, and terms of those agreements; with a schedule and price that did not reflect the all of the requirements for, or the full scope of the work required to, erect and install the STG and HRSGs and to perform WOPC's other work on the Project; and with other contract terms and conditions that it would not have otherwise accepted.  Through its concealment, Alstom gained a competitive advantage in having Alstom chosen as the STG and HRSG supplier for the Wildcat Project, retaining the contract for the Project's STG and HRSGs after the execution of the EPC Contract and the Alstom Assignment Agreement, and Alstom reduced or limited Alstom's costs of designing, manufacturing, and delivering the Project's STG and HRSGs.

319.    WOPC, as an EPC Bidder, had the right to reasonably and justifiably rely on, and did reasonably and justifiably rely on, Alstom's representations and at all relevant times believed them to be true. WOPC did not possess, nor had access to, the superior and proprietary knowledge that Alstom had, nor did WOPC have the means to ascertain, or a basis to believe, that the representations made by Alstom were grossly misleading, fraudulent, understated, and/or false or less than complete. Alstom was the exclusive designer and manufacturer of the STG and HRSGs for the Project; Alstom designed the same or substantially similar STGs and HRSGs on other projects; Alstom is the self-professed industry leader in STGs and HRSGs; and Alstom was the source of the information related to the Alstom supplied STG and HRSGs.  Additionally, Alstom

knew that its misrepresentations were being provided to, and would necessarily and justifiably be relied upon by, the EPC Bidders for the purpose of determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement).   Under these circumstances, Alstom owed the EPC Bidders, including WOPC, a duty to provide complete and accurate information and to not make any false representations.   Alstom also owed the EPC Bidders, including WOPC, a duty to disclose information necessary to make its representations not false or misleading.

320.   As the source of information as to the STG and HRSGs, Alstom had a duty to inform and advise WOPC (and all of the EPC Bidders) as to any errors or changes in the representations that the EPC Bidders were relying upon, including, without limitation, the revisions to the "FIELD INSTALLED QUANTITIES" which Alstom knew of no later than March 4, 2014 per correspondence from Alstom to ODEC.

321.   If Alstom had not concealed facts regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to erect and install the STG and HRSGs and failed to disclose information necessary to make its representations not false or misleading, WOPC would not have entered into the EPC Contract and the Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement) on the terms and conditions therein, including the price, schedule, and other terms that were determined based on Alstom's representations.

322.   As a direct result of Alstom's concealment, WOPC suffered damage.   WOPC entered into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) having used the Alstom representations to determine, without limitation, the price, schedule, and terms of those agreements; with a schedule and price that did not reflect all of

the requirements for, or the full scope of the work required to, erect and install the STG and HRSGs and to perform WOPC's other work on the Project; and with other contract terms and conditions that it would not have otherwise accepted.  The direct result of Alstom's concealment and/or non-disclosures is that WOPC has incurred millions of dollars of costs to perform its work on the Project and has been impacted in its time to perform its work on the Project.

323.    WOPC is entitled to recover from Alstom, and Alstom is liable to pay, all of WOPC's losses and damages resulting from Alstom's concealment and non-disclosures including, but not limited to, all of WOPC's costs of labor, material, equipment, engineering, and subcontractors to design and construct the Project, to assemble and install the STG and HRSGs, costs of disruption, delay, acceleration, and mitigation, and loss of opportunity damages, including lost profits.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Alstom Power, Inc., for damages including, without limitation, all additional costs WOPC incurred to design and construct the Project and to erect and install the STG and HRSGs and to perform other affected work on the Project, including costs of delay damages, disruption damages, acceleration damages, liquidated damages, additional engineering costs, additional construction costs, lost opportunity costs, and all other losses and damages due to Alstom's concealment, along with an award of pre- and post-judgment interest and any other relief that this Court deems proper or just.

## COUNT VIII
### CONCEALMENT
(Against ODEC)

324.    WOPC re-alleges and incorporates by reference Paragraphs 1 through 221 above as if fully stated herein.

325.     WOPC pleads this Count in the alternative to the extent it is inconsistent, in whole or in part, with any other allegations contained herein.

326.     ODEC owed WOPC a duty to exercise reasonable care, including, without limitation, to disclose facts basic to the transaction when it knew WOPC reasonably expected disclosure of those material facts, to correct partial or ambiguous statements that were known to be misleading, and to provide subsequently acquired or revised information that ODEC knew would make untrue or misleading previous representations.  ODEC owed WOPC this duty because ODEC and WOPC were to be in privity with regards to the Project and because of ODEC's superior knowledge.  ODEC and WOPC were to be in privity because they are parties to the EPC Contract and Alstom Assignment Agreement.

327.     In addition, or in the alternative, ODEC owed WOPC a duty to exercise reasonable care to disclose material facts essential to the business transaction because ODEC and WOPC were parties to the overall business transaction inherent in the two-step procurement phase and construction of the Project.  ODEC's duty to WOPC recited in ¶¶ 296-300, supra, arises from: (i) ODEC conducting a procurement for an EPC Contractor and WOPC being a bidder for the EPC Contract in ODEC's procurement process; and (ii) ODEC's provision of information to WOPC during the solicitation of proposals for the EPC Contract.  More specifically, in the RFP (including Addendum No. 3 to the RFP) and in meetings with WOPC, ODEC made representations to WOPC regarding the work that WOPC would have to perform to erect and install the STG and HRSGs. ODEC knew its representations were being supplied to WOPC (as an EPC Bidder) for the specific purpose of enabling WOPC to determine the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement). ODEC knew WOPC was one of the EPC Bidders and would by necessity justifiably rely upon

ODEC's representations based upon ODEC's duty of disclosure and superior knowledge of the Project requirements.  ODEC communicated with WOPC directly; and ODEC acknowledged and agreed, in the RFP, that ODEC's representations would be provided to WOPC, and would be used by WOPC.  ODEC knew how WOPC used its representations and was able to foresee and control any risk arising from its representations to WOPC.

328.    In addition, or in the alternative, ODEC owed WOPC a duty of care, because ODEC, in the course of its business, without exercising reasonable care or competence, supplied false information to WOPC for WOPC's guidance in its business transactions.  More particularly, ODEC did not use reasonable care or competence in making false representations to WOPC regarding the work that WOPC would have to perform to erect and install the STG and HRSGs. ODEC provided its false representations for WOPC's guidance in its business transactions including, without limitation, WOPC's use in determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement).  WOPC justifiably relied on ODEC's false and material information because ODEC was conducting the procurement for the EPC Contract and was providing material information for the use of the EPC Bidders, including WOPC.  Further, ODEC was providing information supplied by Alstom, the exclusive designer, manufacturer, and supplier of the STG and HRSGs chosen for the Project; Alstom had designed and manufactured STGs and HRSGs on other projects that were similar to the Wildcat Project; and Alstom held itself out as the industry leader in such technologies.

329.    Additionally, or in the alternative, ODEC owed WOPC a duty to exercise reasonable care in disclosing material facts to WOPC because ODEC and WOPC were engaged in a business transaction or series of business transactions, including the various business

transactions relating to the development of the Wildcat Project, in which ODEC had a duty to furnish correct information to WOPC and WOPC had the right to rely on ODEC for information necessary for the business transactions.

330. ODEC intentionally and knowingly concealed facts regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to erect and install the STG and HRSGs. ODEC knew the falsity of prior representations when made and/or failed to correct the false representations after learning of their falsity, without limitation, no later than March 4, 2014, when Alstom communicated with ODEC relaying material revisions to the "FIELD INSTALLED QUANTITIES."

331. Although ODEC had superior knowledge regarding the work required to erect and install the STG and the HRSGs, ODEC concealed material facts about such work from WOPC, and/or failed to disclose information necessary to make its representations regarding the work required to erect and install the STG and HRSGs not false or misleading. ODEC chose not to disclose to WOPC and deliberately and intentionally concealed from WOPC certain information that ODEC received from the OEM suppliers after WOPC submitted its proposal and before WOPC executed the EPC Contract and the Alstom Assignment Agreement (and its underlying Alstom Purchase Agreement), including Alstom's information regarding changes in the quantities of work required to erect and install the STG and HRSGs, and information regarding OEM suppliers' changes, alterations, and revisions to the design of their equipment and the requirements for erecting and installing their equipment.

332. ODEC intentionally and knowingly concealed facts relating to the work required to erect and install the STG and HRSGs throughout the solicitation of proposals for the EPC Contract,

prior to the execution of the EPC Contract, and prior to the execution of the Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement).

333.    ODEC intentionally and knowingly made its representations as to the requirements of the work to erect and install the STG and the HRSGs knowing them to be false or it made them with a reckless indifference to the truth of its representations.   ODEC concealed material facts regarding the work to erect and install the STG and HRSGs (including the quantity of work required to erect and install the STG and HRSGs) and failed to disclose information regarding the work to erect and install the STG and HRSGs even though it had a duty to disclose or correct those representations.    As an entity with substantial experience in conducting procurements for construction projects and as the entity conducting the procurement and having direct dealings with Alstom and B&M, ODEC possessed the necessary and superior knowledge and experience to know its representations were false and/or materially misleading or were made with a reckless indifference to the truth of the representations.   It also possessed the knowledge and experience to know what information should be disclosed to prevent its misrepresentations from being misleading or false.

334.    ODEC made concealed these facts with the intent, and for the purpose of, defrauding WOPC, including, without limitation, inducing WOPC to enter into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) having used ODEC's misrepresentations to determine, without limitation, the price, schedule, and terms of those agreements; with a schedule and price that did not reflect the all of the requirements for, or the full scope of the work required to, erect and install the STG and HRSGs and to perform WOPC's other work on the Project; and with other contract terms and conditions that it would not

have otherwise accepted.  Through its concealment, ODEC received less expensive proposals for the EPC Contract and reduced its cost of the development of the Wildcat Project.

335.    WOPC, as an EPC Bidder, had the right to reasonably and justifiably rely on, and did reasonably and justifiably rely on, ODEC's representations and at all relevant times believed them to be true.  WOPC did not possess the superior and necessary knowledge and information that ODEC had, nor did it have the means to ascertain, or a basis to believe, that the representations made by ODEC were grossly misleading, fraudulent, understated, and/or false or incomplete. ODEC was experienced in conducting procurements for construction projects, was conducting the procurement for the EPC Contract, was having direct dealings with Alstom and B&M, and ODEC was the source of the information related to work to be performed by the EPC Contractor, including the work to erect and install the Alstom supplied STG and HRSGs.  Additionally, ODEC knew that its representations were being provided to, and would necessarily and justifiably be relied upon by, the EPC Bidders for the purpose of determining the price, schedule, and terms in the executed EPC Contract and Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement).  Under these circumstances, ODEC owed the EPC Bidders, including WOPC, a duty to provide complete and accurate information and to not make any false representations.  ODEC also owed the EPC Bidders, including WOPC, a duty to disclose information necessary to make its representations not false or misleading.

336.    As the source of information for the procurement of the EPC Contract, including information as to the work required to erect and install the STG and HRSGs, ODEC had a duty to inform and advise WOPC (and all of the EPC Bidders) as to any errors or changes in the representations that the EPC Bidders were relying upon, including, without limitation, the

revisions to the "FIELD INSTALLED QUANTITIES" which ODEC knew of no later than March 4, 2014, in correspondence from Alstom to ODEC.

337.    If ODEC had not concealed facts regarding the work required to erect and install the STG and HRSGs, including the requirements for the quantities of work required to erect and install the STG and HRSGs and failed to disclose information necessary to make its representations not false or misleading, WOPC would not have entered into the EPC Contract and the Alstom Assignment Agreement (with the underlying Alstom Purchase Agreement) on the terms and conditions therein, including the price, schedule, and other terms that were determined based on ODEC's representations.

338.    ODEC's misrepresentations were made, without limitation, in the Addenda to the RFP for the EPC Contract (including Addendum No. 3) and in direct meetings and communications between ODEC and WOPC.

339.    As a direct result of ODEC's concealment and/or non-disclosures, WOPC suffered damage.  WOPC entered into the EPC Contract and the Alstom Assignment Agreement (with its underlying Alstom Purchase Agreement) having used ODEC's representations to determine, without limitation, the price, schedule, and terms of those agreements; with a schedule and price that did not reflect all of the requirements for, or the full scope of the work required to, erect and install the STG and HRSGs and to perform WOPC's other work on the Project; and with other contract terms and conditions that it would not have otherwise accepted.  ODEC knew at all material times that WOPC would reasonably and justifiably rely upon these representations, and would reasonably expect disclosures of those material facts, or changes to them. The direct result of ODEC's fraudulent misrepresentations, concealment, and/or non-disclosures is that WOPC has

incurred millions of dollars of costs to perform its work on the Project and has been impacted in its time to perform its work on the Project.

340.   WOPC is entitled to recover from ODEC, and ODEC is liable to pay, all of WOPC's losses and damages resulting from ODEC's concealment and non-disclosures including, but not limited to, all of WOPC's costs of labor, material, equipment, engineering, and subcontractors to design and construct the Project, to assemble and install the STG and HRSGs, costs of disruption, delay, acceleration, and mitigation, and loss of opportunity damages, including lost profits.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Old Dominion Electric Cooperative, for damages including, without limitation, all additional costs WOPC incurred to design and construct the Project and to erect and install the STG and HRSGs and to perform other affected work on the Project, including costs of delay damages, disruption damages, acceleration damages, liquidated damages, additional engineering costs, additional construction costs, lost opportunity costs, and all other losses and damages due to ODEC's concealment, along with an award of pre- and post-judgment interest and any other relief that this Court deems proper or just.

**COUNT IX**
**BREACH OF CONTRACT**
(Against Alstom)

341.   WOPC re-alleges and incorporates by reference Paragraphs 1 through 221 above as if fully stated herein.

342.   WOPC pleads this Count in the alternative to the extent it is inconsistent, in whole or in part, with any other allegations contained herein.

343.    WOPC has fully, faithfully and timely performed all obligations under the Alstom Purchase Agreement and the Alstom Assignment Agreement.

344.    Alstom materially breached the terms and conditions of the Alstom Purchase Agreement and the Alstom Assignment Agreement by, without limitation:

a.      Failing to timely submit all design and engineering information in accordance with the Alstom Purchase Agreement's requirements;

b.      Failing to pay to WOPC the Late Document Delivery Liquidated Damages for Alstom's failure to timely submit all its design and engineering information in accordance with the Alstom Purchase Agreement's requirements;

c.      Failing to pay to WOPC the Late Substantial Completion Liquidated Damages for Alstom's failure to cause Substantial Completion to be achieved by the Scheduled Substantial Completion Date;

d.      Failing to deliver the STG and HRSGs, including all of the components of the STG and HRSGs, in accordance with the Alstom Purchase Agreement's requirements;

e.      Failing to pay WOPC the applicable Late Equipment Delivery Liquidated Damages for Alstom's failure to timely deliver the STG and HRSGs, including all of the components of the STG and HRSGs, in accordance with the Alstom Purchase Agreement's requirement;

f.      Failing to design and engineer the STG and HRSGs, and their related components in compliance with the Alstom Purchase Agreement;

g.    Failing to fabricate its components at the shop to the extent required by the Alstom Purchase Agreement;

h.    Failing to deliver pipe support and hanger components in accordance with the requirements of the Alstom Purchase Agreement;

i.    Failing to deliver all equipment and materials in accordance with the requirements of the Alstom Purchase Agreement;

j.    Failing to perform all services in accordance with the requirements of the Alstom Purchase Agreement;

k.    Failing to deliver all software in accordance with the requirements of the Alstom Purchase Agreement;

l.    Failure to perform all warranty work and/or to correct all equipment, services, and software that did not comply with the requirements of the Alstom Purchase Agreement;

m.    Failing to cooperate with WOPC as required by Section 2.6 of the EPC Contract;

n.    Failing to perform its work so that it was not riddled with errors, defects, and/or omissions that caused impacts to WOPC's performance of its work;

o.    Failing to perform its services in a professional, prudent and workmanlike manner that is free from material defects, errors and omissions, and with the degree of skill and care that is utilized by nationally-recognized professionals in the United States in the same field under the same or similar circumstances, and strictly in accordance with the terms of the Alstom Purchase Agreement;

> p.     Failing to timely and properly resolve WOPC's claims against Alstom and Project disputes;
>
> q.     Improperly charging WOPC for, and demanding payment for, TFA services that were the result of delays and alleged WOPC caused delays; and
>
> r.     Improperly charging WOPC for, and demanding payment for, TFA services that were performed by Alstom TFAs due to issues for which Alstom is responsible, including software malfunctions, HRSG fin corrosion, and the defective low-pressure piping system design.

345.    Alstom has acted in bad faith in each of these enumerated breaches. Alstom failed to conduct its discretion and actions in a manner consistent with the duty of good faith and fair dealing implied in every contract. More specifically, but not exclusively, Alstom exercised discretion vested in Alstom by way of the EPC Contract or the Alstom Assignment Agreement in an arbitrary, capricious, and punitive manner.

346.    As a direct and proximate result of Alstom's breaches of the Alstom Purchase Agreement and the Alstom Assignment Agreement, WOPC has incurred damages in excess of $75,000.00.

347.    WOPC is entitled to recover from Alstom, and Alstom is liable to pay, all of WOPC's damages flowing from Alstom's breaches of the Alstom Purchase Agreement and the Alstom Assignment Agreement including, but not limited to, Late Document Delivery Liquidated Damages, Late Equipment Delivery Liquidated Damages, costs of design and construction of the Project, delay damages, disruption damages, additional engineering costs, and interest.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Alstom Power, Inc., for damages resulting from

Alstom's breach of the Alstom Purchase Agreement and the Alstom Assignment Agreement including, without limitation, Late Document Delivery Liquidated Damages, Late Equipment Delivery Liquidated Damages, costs WOPC incurred to design and construct the Project, to erect and install the STG and HRSGs and to perform other affected work on the Project, delay damages, disruption damages, acceleration damages, liquidated damages, additional engineering costs, and all other losses and damages due to Alstom's breaches of contract, along with an award of pre- and post-judgment interest and any other relief that this Court deems proper or just.

## COUNT X
## BREACH OF CONTRACT
(Against ODEC)

348.    WOPC re-alleges and incorporates by reference Paragraphs 1 through 221 above as if fully stated herein.

349.    WOPC pleads this Count in the alternative to the extent it is inconsistent, in whole or in part, with any other allegations contained herein.

350.    WOPC has fully, faithfully and timely performed all obligations under the EPC Contract and the Alstom Assignment Agreement.

351.    ODEC materially breached the terms and conditions of the EPC Contract and the Alstom Assignment Agreement by, without limitation:

      a.     Failing to issue Change Orders, including Change Orders for differing site conditions, force majeure events, and changes to the work;

      b.     Failing to grant WOPC time extensions due to WOPC under the EPC Contract;

      c.     Failing to pay WOPC additional compensation due to WOPC under the EPC Contract;

d.      Failing to properly administer the EPC Contract and the Alstom Assignment Agreement;

e.      Failing to provide relief due to WOPC under the risk of loss provision;

f.      Improperly assessing liquidated damages against WOPC;

g.      Improperly withholding payment from WOPC for liquidated damages and/or improperly setting-off liquidated damages against amounts due WOPC for work performed;

h.      Improperly demanding payment from WOPC for improperly assessed liquidated damages;

i.      Failing to timely and properly resolve WOPC's claims against ODEC and Project disputes;

j.      Failing to provide a fail close ESD on the lines supplying gas to the Project and failing to timely and properly issue WOPC an appropriate Change Order for the work required by ODEC's failure to provide a fail close ESD on the line supplying gas to the Project; and

352.    Requiring WOPC to perform changes to the work and extra work without providing WOPC Change Orders, additional compensation, or extensions of time due to WOPC under the EPC Contract and applicable law.   ODEC has acted in bad faith in each of these enumerated breaches. ODEC failed to conduct its discretion and actions in a manner consistent with the duty of good faith and fair dealing implied in every contract. More specifically, but not exclusively, ODEC exercised discretion vested in ODEC by way of the EPC Contract or the Alstom Assignment Agreement in an arbitrary, capricious, and punitive manner.

353.     As a direct and proximate result of ODEC's breaches of the EPC Contract and the Alstom Assignment Agreement, WOPC has incurred damages in excess of $75,000.00.

354.     WOPC is entitled to recover from ODEC, and ODEC is liable to pay, all of WOPC's damages flowing from ODEC's breaches of the EPC Contract and the Alstom Assignment Agreement including, but not limited to, Late Document Delivery Liquidated Damages, Late Equipment Delivery Liquidated Damages, costs of design and construction of the Project, delay damages, disruption damages, additional engineering costs, and interest.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Old Dominion Electric Cooperative, for damages resulting from ODEC's breach of the EPC Contract and the Alstom Assignment Agreement including, without limitation, Late Document Delivery Liquidated Damages, Late Equipment Delivery Liquidated Damages, costs WOPC incurred to design and construct the Project, to erect and install the STG and HRSGs and to perform other affected work on the Project, delay damages, disruption damages, acceleration damages, liquidated damages, additional engineering costs, and all other losses and damages due to ODEC's breaches of contract, along with an award of pre- and post-judgment interest and any other relief that this Court deems proper or just.

## COUNT XI
## QUANTUM MERUIT
(Against ODEC)

355.     WOPC re-alleges and incorporates by reference Paragraphs 1 through 221 above as if fully stated herein.

356.     WOPC pleads this Count in the alternative to the extent it is inconsistent, in whole or in part, with any other allegations contained herein.

357.    ODEC procured the EPC Contract by fraud and misrepresentations.  ODEC's fraud negates the formation of the EPC Contract leaving the Parties without a valid, express written contract. Alternatively, or in addition, substantial and additional work outside the scope of the EPC Contract and Alstom Assignment Agreement has been necessitated by events outside the control of WOPC. Said additional and substantial work was not included within the EPC Contract, nor contemplated by the parties at the execution of same, and constitutes a fundamental change to the material terms and costs of same. This additional work includes, without limitation:

    a.    Installation of 1,000% more 8" to 12" large bore chrome pipe;

    b.    Total amount of piping WOPC was required to install grew 250%;

    c.    The amount of welding of small bore pipes doubled;

    d.    The size of the ammonia skid grew 2.7 times causing the size of HRSG portions of the Project to grow;

    e.    The number and size of ancillary pieces of equipment grew requiring larger buildings to house them;

    f.    More space for the STG and HRSG equipment and piping causing the overall size of the Project to grow;

    g.    The concrete pedestal on which the STG was to be placed grew 30% wider; and

    h.    Delays caused by ODEC-selected OEMs, uncompensated *force majeure* events, and late/non-compliant deliveries by the ODEC-selected OEMs.

358.    WOPC conferred a substantial, valuable benefit upon ODEC in the form of the Project.  The Project is a substantial and valuable asset built upon property owned by ODEC and will be capable of generating billions of dollars in revenue during the Project's life span.

359.    ODEC specifically requested and/or demanded, knew, appreciated, and accepted the benefit that WOPC has bestowed upon it.  ODEC will receive a Project worth hundreds of millions of dollars more than what ODEC paid and has been an active participant in the design and

construction of the Project.  ODEC accepted and retained these benefits with full knowledge that WOPC expected to be compensated for these valuable, extra-contractual benefits which WOPC was forced to confer.

360.    ODEC's fraud and misrepresentations will result in ODEC accepting and retaining the benefit conferred upon it by WOPC (the Project), for far less than the Project's value.

361.    This results in an inequitable situation.  WOPC was to design and construct the Project and ODEC was to pay for the fair value of the Project.  However, ODEC has received far more value than for which ODEC has paid.

362.    WOPC is entitled to restitution for the value of the benefit that it has bestowed on ODEC.  WOPC is entitled to recover all of its costs in designing and constructing the Project that have not been paid by ODEC.  This represents the reasonable value that WOPC has bestowed on ODEC and the amount that ODEC was to pay.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Old Dominion Electric Cooperative, for damages including, without limitation, all additional costs WOPC incurred to design and construct the Project, including costs of delay damages, disruption damages, acceleration damages, liquidated damages, additional engineering costs, additional construction costs, lost opportunity costs, and all other losses and damages, less any amounts ODEC has paid WOPC, as restitution for the value of the benefit conferred upon ODEC along with an award of pre- and post-judgment interest, and any other relief that this Court deems proper or just.

Dated: December 15, 2017                    Respectfully submitted,

                                            WHITE OAK POWER CONSTRUCTORS

                                            By Counsel:

                                            _____/s/_____

                                            Robert M. Moore (VSB 22455)
                                            Robert D. Windus (VSB 81570)
                                            Thomas L. Wilson (VSB 85512)
                                            MOORE & LEE, LLP
                                            1751 Pinnacle Drive, Suite 1100
                                            McLean, Virginia 22102
                                            Telephone: (703) 506-2050
                                            Facsimile: (703) 506-2051
                                            Email:  r.moore@mooreandlee.com
                                                    r.windus@mooreandlee.com
                                                    t.wilson@mooreandlee.com

                                            and

                                            Mark O. Masterson (VSB 91728)
                                            Moye, O'Brien, Pickert & Dillon, LLP
                                            800 South Orlando Avenue
                                            Maitland, Florida 32751
                                            Telephone: (407) 622-5250
                                            Facsimile: (407) 622-5450
                                            Email:  mmasterson@moopd.com

                                            Of Counsel:
                                            James E. Moye
                                            Moye, O'Brien, Pickert & Dillon, LLP
                                            800 South Orlando Avenue
                                            Maitland, Florida 32751
                                            Telephone: (407) 622-5250
                                            Facsimile: (407) 622-5450
                                            Email:  jmoye@moopd.com

                                            *Counsel for White Oak Power Constructors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of December, 2017, I will electronically file the

foregoing Second Amended Complaint using the CM/ECF system, which will then send a

notification of such filing to all counsel of record.

/s/ Thomas L. Wilson
Thomas L. Wilson (VSB 85512)
MOORE & LEE, LLP
1751 Pinnacle Drive, Suite 1100
McLean, Virginia 22102
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
Email: t.wilson@mooreandlee.com