IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

**Richmond Division**

| | | |
|---|---|---|
| **WHITE OAK POWER** | ) | |
| **CONSTRUCTORS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.: 3:17-cv-355-MHL** |
| **v.** | ) | |
| | ) | |
| **MITSUBISHI HITACHI POWER** | ) | |
| **SYSTEMS AMERICAS, INC.,** | ) | |
| | ) | |
| **SERVE:** | ) | |
| | ) | |
| **CT Corporation System** | ) | |
| **4701 Cox Road, Suite 285** | ) | |
| **Glen Allen VA 23060** | ) | |
| | ) | |
| **Defendant.** | | |

_____

### SECOND AMENDED COMPLAINT

Plaintiff, White Oak Power Constructors ("WOPC"), a contractual joint venture, by and through its undersigned counsel, files this Second Amended Complaint against Defendant, Mitsubishi Hitachi Power Systems Americas, Inc. ("Mitsubishi"), and alleges:

### I.    PARTIES, JURISDICTION AND VENUE

1.    This is an action for damages in excess of $75,000.00, exclusive of interest, costs and attorneys' fees.

2.    Plaintiff, WOPC, is a partnership of PCL Industrial Construction Co. ("PCL") and Sargent & Lundy, LLC ("S&L").

3.    WOPC is engaged in the business of designing and constructing power generation facilities, including the facility at issue in this action.

4.     WOPC is authorized to do business in Virginia and WOPC has its principal place of business in Maryland.

5.     WOPC's citizenship is determined by the citizenship of each of its partners.  PCL is a citizen of Colorado, the state of its incorporation.  It is also a citizen of Texas, which serves as PCL's nerve center.  S&L, as a limited liability company, has the citizenship of each of its members.  Therefore, S&L is a citizen of Illinois, Tennessee, Maryland, New York, New Jersey, and Pennsylvania.  Accordingly, WOPC is a citizen of Colorado, Texas, Illinois, Tennessee, Maryland, New York, New Jersey, and Pennsylvania.

6.     Defendant, Mitsubishi, is a Delaware corporation engaged in the business of designing, manufacturing, and/or supplying power generating equipment and providing services for the design, installation, erection, and operation of power generating equipment.  Its principal place of business is in Lake Mary, Florida.

7.     Mitsubishi is a citizen of Delaware, as its State of incorporation, and Florida, as Mitsubishi's nerve center is located in Lake Mary, Florida.  Specifically, Mitsubishi's corporate offices, Chief Executive Officer, President, Vice Presidents, Chief Financial Officer, Corporate Secretary, and several Directors are all located in Lake Mary, Florida.

8.     Venue is appropriate in the Eastern District of Virginia as Mitsubishi conducts extensive business in Virginia, the contracts at issue were negotiated and executed in Virginia, and the applicable contracts establish venue for litigation arising from the applicable contracts in the United States District Court for the Eastern District of Virginia in Richmond, Virginia.

9.     This Court properly has subject matter jurisdiction over this controversy as complete diversity exists between the parties and the amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

10.     All conditions precedent to maintaining this action have been satisfied or have been waived.

## II.     GENERAL ALLEGATIONS

### A.     The Wildcat Project

11.     This action arises from the development of the Wildcat Point Generation Facility in Rising Sun, Maryland (the "Wildcat Project" or the "Project"). The Wildcat Project is a nominal 1,000-megawatt gas-fired combined cycle power generating facility.

12.     The Project is owned by Old Dominion Electric Cooperative ("ODEC"), which is a Virginia corporation with a principal place of business in Glen Allen, Virginia.

13.     The scope of the Project includes: (i) two (2) combustion turbine units (each unit is comprised of a gas combustion turbine and a combustion turbine generator), (ii) two (2) heat recovery steam generators ("HRSGs"), (iii) one (1) steam turbine generator ("STG"), (iv) a switchyard, and (v) common facilities to support the power generation operations.

14.     The Project will generate electricity in multiple ways. First, the Wildcat Project burns natural gas to power the two (2) combustion turbines which, in turn, generate electricity through their associated generators. The burning of the natural gas generates significant amounts of heat. Instead of simply exhausting this heat, the heat is captured for re-use by the HRSGs. In the HRSGs, the heat passes over the equivalent of large coils. The HRSGs use this heat to turn water within the HRSGs to steam. The resulting steam is then piped to the STG and is used to power the STG. The STG, powered by the resulting steam, produces a secondary source of electricity. This process results in a highly efficient, two-step means of power generation.

15.     The Project is estimated to generate enough electricity to supply 390,000 homes annually.

16.     The total development cost of the Wildcat Project is projected to be over $800 million.

**B.      Development of the Wildcat Project**

17.     The development of a project the size of the Wildcat Project is a substantial undertaking.

18.     ODEC worked with its engineer, Burns & McDonnell, Inc. ("B&M"), to develop the Project requirements and to consider the various power generating technologies available in the market for use with the Project.

19.     ODEC, in cooperation with B&M, made the final decision as to the types of power generation technologies to be utilized on the Project.

20.     After ODEC chose the power generating technologies to be used on the Project.  It solicited bids from companies that design, manufacture, supply and support, among other things, gas turbines and associated generators and related equipment.  ODEC conducted this procurement through B&M.

21.     ODEC asked the gas turbine vendors to design, manufacture, and supply their gas turbine systems, and to provide services to ODEC and, eventually, to ODEC's engineering, procurement, and construction contractor ("EPC contractor") for the overall Project, including, without limitation, services for supporting the installation, erection, and operation of their gas turbine systems.  The vendors were solely responsible for designing, manufacturing, supplying and supporting their gas turbine systems.  The vendors would not develop the final design for the Project specific systems until after they were awarded contracts for the Project.  The vendors would then manufacture their gas turbine systems and deliver the same to the Project for erection and installation by an ODEC selected EPC contractor.  Throughout the design of their systems and the

EPC contractor's design of the balance of plant, the selected vendor would provide design and other services to ODEC and the EPC contractor.  Throughout the erection and installation of the gas turbine systems, the selected vendor would provide services to the EPC contractor for assistance with the erection and installation of the gas turbine systems.  The services provided by the vendor were an integral part of the vendor's scope of work.

C.    **Mitsubishi's Selection to the Wildcat Project**

22.    Mitsubishi was among the gas turbine vendors who competed for the gas turbine systems contract for the Project.

23.    Mitsubishi represents and holds itself out as a world leader in the design, engineering, manufacturing, supply, and support of power producing equipment, including gas turbine systems specifically.  Mitsubishi's proprietary systems are designed and manufactured by Mitsubishi.

24.    Mitsubishi competed in ODEC's competitive selection process for the gas turbine systems for the Wildcat Project.  Based upon the information provided by Mitsubishi regarding its experience, skills, qualifications, and equipment design and performance, including information about the scope of work that ODEC's EPC contractor would have to perform in order to install and erect the gas turbine systems, ODEC chose Mitsubishi to design, manufacture, and supply their gas turbine systems, and to provide services to ODEC and its EPC contractor, including, without limitation, services for supporting the installation, erection, and operation of its gas turbine systems.

25.    Accordingly, on or about September 17, 2013, ODEC and Mitsubishi entered into an Equipment Purchase Agreement ("Purchase Agreement") for the supply of two gas turbines and associated generators, and related components for the Project.  As used herein, unless

specifically stated otherwise, the term "Gas Turbine" or "Unit" shall refer to each gas turbine and its associated generator, and related components, equipment and parts, all as further described in Mitsubishi's Scope of Supply. Except as otherwise stated, the term Gas Turbines shall refer to the two gas turbines and their associated generators, and related components, equipment and parts, all as further described in Mitsubishi's Scope of Supply.

26.     The Purchase Agreement is voluminous and contains many portions that are not in dispute at the time of filing of this Second Amended Complaint. Accordingly, WOPC has attached the relevant portions of the Purchase Agreement as Exhibit "A."

**D.     Selection of the Wildcat Project's EPC Contractor**

27.     After it selected Mitsubishi and certain other OEM vendors, ODEC conducted a competitive procurement to retain its EPC contractor.

28.     WOPC submitted its proposal to serve as the Wildcat Project's EPC Contractor to ODEC on or about January 31, 2014 in the amount of $330,728,056. Based on the information provided to it, WOPC's proposed price and schedule for its work reflected the anticipated costs and time to, among other things, erect and install the Mitsubishi supplied Gas Turbines.

29.     On or about June 2, 2014, ODEC and WOPC entered into an EPC contract for WOPC "to provide design, engineering, procurement, construction, start-up and testing for the Project" (the "EPC Contract").

30.     Additionally, on or about June 2, 2014, ODEC, Mitsubishi, and WOPC entered into an Assignment, Assumption and Consent Agreement ("Assignment Agreement") whereby ODEC transferred most of its obligations and rights under the Purchase Agreement to WOPC as is more specifically provided in the Assignment Agreement. A true and correct copy of the Assignment Agreement is attached as Exhibit "B." The Assignment Agreement includes Mitsubishi's consent

to, and approval of, the assignment of the Purchase Agreement to WOPC in accordance with the terms and conditions of the Assignment Agreement.

31.    While the Assignment Agreement provides that ODEC retained certain obligations and rights that ODEC had under the Purchase Agreement, all obligations and rights related to and necessary to the present action were assigned to WOPC or were shared with WOPC.

**E.    Mitsubishi's Late Delivery of Its Design and Engineering Documents**

32.    WOPC's ability to perform its portion of the design of the Project in accordance with the EPC Contract and construction of the Project was significantly predicated on the timely receipt of certain design and engineering information from Mitsubishi.

33.    Mitsubishi's design and engineering of the Gas Turbines necessarily impacted WOPC's balance of plant design and the coordination of design and construction of Mitsubishi's Gas Turbines with the rest of the Project's equipment and systems.

34.    As a result, WOPC's ability to meet its design and engineering obligations under the EPC Contract were very much dependent on Mitsubishi timely and properly performing its design and engineering obligations under the Purchase Agreement.

35.    Section 3.1 of the Purchase Agreement provided that Mitsubishi "will, in accordance with the Document Delivery Schedule, furnish to [WOPC] the Documents as stated therein."

36.    Section 1 of the Purchase Agreement defines the "Document Delivery Schedule" to be "the schedule set forth in Appendix 486009-B of Exhibit A."

37.    The Document Delivery Schedule, in Appendix 486009-B of Exhibit A, included two drawing schedules labeled "Drawing List for GT Portion" and "Document Control List" that

provided for the delivery of certain drawings and engineering packages to be submitted to WOPC by Mitsubishi within a certain specified time.

38.     Mitsubishi failed to deliver all of the required drawings and engineering packages by the dates required by the Purchase Agreement.

39.     Under Section 3.2 of the Purchase Agreement, Mitsubishi's failure to timely deliver all of the required drawings and engineering packages obligates Mitsubishi to pay WOPC Late Document Delivery Liquidated Damages in the amount of $1,000 per day for each day that each required drawing and engineering package was delivered beyond the required date.

40.     On August 4, 2016, WOPC advised Mitsubishi of Mitsubishi's liability for the applicable Late Document Delivery Liquidated Damages.

41.     WOPC demanded payment of the Late Document Delivery Liquidated Damages.

42.     Despite Mitsubishi's contractual obligation to pay WOPC the agreed Late Document Delivery Liquidated Damages, and waiver of any right to contest the Purchase Agreement's liquidated damages provisions, Mitsubishi has unjustifiably failed and refused to pay WOPC the applicable Late Document Delivery Liquidated Damages.

**F.     Mitsubishi's Late Delivery of Its Gas Turbines and Related Equipment**

43.     Mitsubishi's obligations under the Purchase Agreement also included a duty to timely deliver the Gas Turbines, including the piping required for the Gas Turbines.

44.     In the Purchase Agreement, Mitsubishi committed to deliver the Gas Turbines by the Guaranteed Delivery Dates set forth in the Purchase Agreement.

45.     The Purchase Agreement required Mitsubishi to deliver "All Minor Components" for the gas turbine referred to as Unit 1 by August 28, 2015 and for the gas turbine referred to as

Unit 2 by September 28, 2015. It also stated other applicable delivery deadlines for other components of the Gas Turbines.

46. The Purchase Agreement provides that "All Minor Components" include all of the piping for the gas turbines.

47. The gas turbine piping is intertwined and surrounds the gas turbines within the restricted space of the gas turbine enclosure. To install this highly intertwined, complex piping system in the tight space around the gas turbine it is imperative that the installation and erection of the piping to be carefully and deliberately sequenced. Mitsubishi's own erection manual reflects the necessity of installing interior large bore pipe prior to erecting the enclosure and progressing to the work outside of the gas turbine enclosure.

48. By May 2015, Mitsubishi was already experiencing delays in delivering certain gas turbine components. To help Mitsubishi manage its delivery problems, and mitigate delay to the progress of the erection and installation of the gas turbines caused by Mitsubishi's late deliveries, WOPC reviewed Mitsubishi's delivery plan and identified certain items that could be delivered up to a month later than guaranteed. WOPC required Mitsubishi to deliver the items that were inside the enclosure or that were to be installed prior to erection of the enclosure per the Guaranteed Delivery Dates (i.e., by August 28, 2015 for Unit 1 and by September 28, 2015 for Unit 2). The items WOPC required Mitsubishi to deliver per the contract included a line item titled "Piping Inside GT Package" that was to be fabricated by "MHPSC" in "Saskatoon, SK, CA."

49. On July 1, 2015, Mitsubishi provided WOPC more information regarding the gas turbine pipe installation sequence. The gas turbine erection sequence described in Mitsubishi's "GAC Bleed Piping Install Sequence" was consistent with the sequence detailed in Mitsubishi's erection procedure. The GAC Bleed Piping Install Sequence indicated the following erection and

installation sequence: first, install the LP, MP, and HP bleed pipe supports; second, install fuel gas supports to compressor casing; third, install all bleed air engineered supports; fourth, install fuel gas manifold omitting spools FG-202 and FG-204 until certain pressure bleed pipes were ready for final installation; and fifth, install piping spools in Mitsubishi's suggested numerical order.

50.     The information Mitsubishi provided to WOPC included drawings showing the various piping systems and the spool numbers of the pipe comprising the systems.  It also included a spreadsheet identifying the LP, MP, and HP bleed spool numbers and the TCA spool numbers. Mitsubishi's documentation assigned each spool an "Install Sequence No."  The GAC Bleed Piping Install Sequence document identified a specific sequence for the installation of bleed air and TCA piping spools.

51.     On August 4, 2015, WOPC set Unit 1 and was ready to continue progressing the erection and installation of Unit 1.  Although WOPC was now ready to continue progressing the erection and installation of Unit 1, Mitsubishi was not.

52.     On August 21, 2015, a week before for the Guaranteed Delivery Date for Unit 1 Minor Components, Mitsubishi wrote WOPC and formally notified WOPC that it would not satisfy its obligation to timely deliver the Unit 1 Minor Components.  The items Mitsubishi said it would not deliver on time included gas turbine piping inside and outside the gas turbine enclosure. Mitsubishi's email indicated WOPC would not have any pipe to erect.  It also listed seven other categories of Minor Components that would be delivered late.

53.     On August 27, 2015, Mitsubishi and WOPC discussed Mitsubishi's failure to timely deliver its gas turbine piping.  In the discussion, Mitsubishi admitted that it was late delivering the Unit 1 Minor Components, including the turbine piping.  It also admitted the delays

were Mitsubishi's fault.  It stated that the delays resulted from Mitsubishi's problems fabricating pipe bends.

54.     Mitsubishi told WOPC it planned to deliver the gas turbine piping in a sequence and according to a schedule that would allow WOPC to install the pipe as it arrived.  Mitsubishi promised to sequence its deliveries to allow WOPC to install the pipe without further delay or disruption.  Mitsubishi promised it would be done delivering the pipe by end of November 2015.

55.     Mitsubishi also promised to assign Rodney Holliday, a Mitsubishi Technical Field Assistant ("TFA") to make sure the pipe deliveries would be in time to allow WOPC to install the piping in the proper sequence.  Mitsubishi failed, however, to timely and properly deliver the gas turbine piping and other components.  Mitsubishi's failure to timely and properly deliver its components (and then failure to comply with its unilaterally imposed delivery program) caused Mitsubishi's TFAs to be on site much longer than Mitsubishi planned.  Mitsubishi has not shown WOPC that Mitsubishi has not charged WOPC for the time that Mitsubishi's TFAs expended dealing with Mitsubishi's late delivery of the gas turbine piping or other components or other issues for which Mitsubishi is responsible.

56.     Mitsubishi's inability to deliver the gas turbine piping on time left WOPC no options.  WOPC could not procure the pipe from another vendor.  WOPC was entirely dependent on Mitsubishi.  When Mitsubishi unilaterally informed WOPC that Mitsubishi was going to deliver the gas turbine piping using its "just-in-time" approach, WOPC had no option but to take the pipe in accordance with Mitsubishi's unilaterally imposed "just-in-time" approach.

57.     On August 27, 2015, Mitsubishi provided WOPC a list of the first 53 spools that it proposed to deliver and proposed a prioritization of the spools.  For Unit 1, the proposed delivery schedule showed deliveries on site on September 21, October 5, and October 19.  For Unit 2,

11

Mitsubishi's proposed delivery schedule showed deliveries on site on October 12, October 26, and November 2. The order of spool delivery that Mitsubishi proposed differed from the order Mitsubishi specified in the erection procedure provided by Mitsubishi on July 1, 2015.

58.     Less than a day later, Mitsubishi provided WOPC an updated delivery schedule. It showed dramatic slips in the Unit 2 gas turbine piping delivery schedule. Mitsubishi's updated schedule showed Unit 2 bleed air piping deliveries on site on October 26, November 9, and November 23. Mitsubishi did not explain why the Unit 2 dates slipped. Mitsubishi also provided a bleed install sequence that Mitsubishi "recommended" to assist WOPC in planning the work and prioritizing the deliveries. The document titled "ODEC Bleed Piping Install Sequence (FINAL)" appeared to be a heavily revised version of the "GAC Bleed Piping Install Sequence" document that Mitsubishi gave WOPC on July 1, 2015. The September 2, 2015 sequence document reordered the installation sequence so that the fuel gas piping was performed later in the sequence. Mitsubishi ultimately delivered the fuel gas piping the latest. Mitsubishi appears to have changed its own "recommended" installation sequence to be consistent with whatever Mitsubishi then thought that it could deliver.

59.     WOPC set Unit 2 on September 26, 2015. WOPC was ready to erect and install the Unit 2 piping shortly after the turbine was set, but Mitsubishi's failure to timely fabricate and deliver the turbine piping meant that Unit 2 erection and installation progress was delayed by Mitsubishi.

60.     Under Mitsubishi's unilaterally implemented late pipe delivery program, Mitsubishi's first pipe spool deliveries were scheduled for September 21, 2015. As WOPC worked to plan and prepare for the deliveries, WOPC discovered errors and inconsistencies in Mitsubishi's drawings. WOPC sought assistance from Mitsubishi, but Mitsubishi was often uncooperative.

61.     At one point, Mitsubishi told WOPC that it would not expend additional engineering resources on the Project. Mitsubishi's unwillingness to devote engineering resources has been a recurring problem on the Project causing delay, disruption, and additional costs and other impacts to WOPC.

62.     Mitsubishi also refused to provide WOPC with certain Mitsubishi drawings that contained information about the piping and pipe supports that would assist WOPC in planning and performing its work. Mitsubishi refused to provide the drawings even after WOPC explained that Mitsubishi's refusal to provide the requested drawings would hinder WOPC in working under Mitsubishi's unilaterally imposed late pipe delivery program. This caused further delays to the progress of the erection and installation of the turbine piping (and the Units), further disrupted WOPC in performing its work, and led to higher costs of performing the pipe installation work and managing Mitsubishi's scope of work.

63.     Mitsubishi failed to execute its unilaterally imposed late pipe delivery program as promised to WOPC during the discussion at the end of August 2015. Mitsubishi's failure exacerbated the delays to the progress of the erection and installation of the Gas Turbines caused by Mitsubishi's failure to deliver the pipe in accordance with its contractual obligations. The three fundamental premises of Mitsubishi's late pipe delivery program were that Mitsubishi would deliver the piping spools that were needed to support WOPC's work on a current basis; Mitsubishi would deliver the spools in sequence with the installation work in the field; and Mitsubishi would deliver the complete sequences needed to allow for efficient installation of the piping.

64.     Mitsubishi wholly failed to execute its unilaterally imposed late pipe delivery program in accordance with these premises.

13

65.     Mitsubishi did not deliver the spools in sequence with the work in the field.  Instead, Mitsubishi delivered whatever was fabricated as it was fabricated.  Pipe spools were not delivered to support WOPC's planned operations.  Mitsubishi did not deliver complete sequences.

66.     Mitsubishi's haphazard delivery of piping spools meant WOPC regularly lacked all of the piping spools needed to support the work.  As materials were delivered out of sequence, WOPC was also prevented from advancing the piping (and the progress of the Gas Turbine erection and installation) in an organized and efficient manner.  WOPC was forced to constantly plan and re-plan its work to mitigate the gaps and defects in Mitsubishi's deliveries.

67.     Mitsubishi could not overcome its fabrication problems.  On August 27, 2015, Mitsubishi told WOPC that it would have the pipe deliveries completed by the end of November 2015.  In mid-November 2015, Mitsubishi was not close to completing delivery of the gas turbine piping and could not give WOPC an updated schedule for spool fabrication and delivery. Mitsubishi's response to WOPC's request for an updated schedule indicated Mitsubishi did not know its subcontractor's fabrication and delivery plans.

68.     In late November 2015, WOPC again asked for an updated schedule for fabrication and delivery.  In requesting the update, WOPC again informed Mitsubishi that Mitsubishi's failure to timely deliver its pipe as required by the Purchase Agreement and failure to execute its unilaterally imposed late delivery program were impacting and damaging WOPC.

69.     Mitsubishi's fabrication issues also began to impact the Project in other ways in late November 2015.  On November 24, 2015, Mitsubishi notified WOPC that its factory identified a group of flanges that might be defective.  Mitsubishi required WOPC to test certain flanges at the site and to perform any required remediation of the potentially defective flanges.  The notice of potential defects in the flanges, and request to test and repair defective flanges increased the

delay and disruption to WOPC's work. This issue lingered for almost a month affecting execution of the work until it was resolved.

70.     Mitsubishi's delivery of pipe with an improperly diluted corrosion inhibitor also had substantial impacts on WOPC's work. Mitsubishi required WOPC to perform certain additional work to correct the corrosion inhibitor defect, including disassembling, cleaning, and re-assembling pipe that had already been delivered late. Mitsubishi's failure to properly apply corrosion inhibitor and requiring WOPC to perform additional work to correct the defect caused WOPC to incur additional costs, including additional costs of delay and disruption. Mitsubishi's TFAs were also involved in correcting the corrosion inhibitor. Mitsubishi has not shown WOPC that Mitsubishi did not charge WOPC for the Mitsubishi TFA hours relating to the corrosion inhibitor issue.

71.     On November 25, 2015, WOPC asked Mitsubishi for an executive level meeting to talk about the numerous problems with Mitsubishi's performance, including Mitsubishi's failure to timely deliver the gas turbine piping, Mitsubishi's liability for liquidated damages for the late delivery of piping, and credits due to WOPC for Mitsubishi TFAs.

72.     In December 2015, Mitsubishi's failure to timely deliver the gas turbine piping continued to delay and disrupt the progress of the erection and installation of Unit 1 and Unit 2. Mitsubishi's late delivery of drain spools required WOPC to ask for an alternative testing program to mitigate the lack of drain spools.

73.     Mitsubishi also remained incapable of providing WOPC a schedule of what piping Mitsubishi would be able to deliver and when.

74.     On December 10, 2015, Mitsubishi provided WOPC an updated pipe spool delivery report. The December 10, 2015 report **showed deliveries stretching out into February 2016 for**

**Unit 1 and March 2016 for Unit 2.** More specifically, Mitsubishi's schedule showed 35 Unit 1 fuel gas spools shipping in February 2016 and 81 Unit 2 fuel gas spools shipping in March 2016. On August 27, 2015, Mitsubishi said that its unilaterally imposed late pipe delivery program would complete the piping deliveries by the end of November 2015. Mitsubishi was now proposing a schedule that would end months later.

75.     On December 11, 2015, Mitsubishi responded to WOPC's comments on Mitsubishi's schedule showing deliveries into February and March 2016. In its response, Mitsubishi acknowledged that the problems were originating from its Saskatoon manufacturing facility. Mitsubishi's statements indicated Mitsubishi's Saskatoon facility could not meet pipe fabrication deadlines. Mitsubishi stated that it was "actively pursuing" "recovery plans" for the fuel gas spools.

76.     On December 14, 2015, WOPC wrote Mitsubishi and reiterated that WOPC was reserving its right to assess Late Equipment Delivery Liquidated Damages due to Mitsubishi's failure to comply with the Guaranteed Delivery Dates. WOPC again advised Mitsubishi that its late delivery of the piping, including its failure to perform in accordance with its unilaterally imposed late pipe delivery program, had impacted (and was continuing to impact) WOPC.

77.     After WOPC's December 14, 2015 letter, Mitsubishi continued to deliver whatever pipe it had fabricated without regard to the impacts on the progress of WOPC's erection and installation of the gas turbines and performance of other work.

78.     In January and February 2016, Mitsubishi continued to deliver pipe spools. During this time period, WOPC's progress of the installation and erection of Units 1 and 2 continued to be delayed while WOPC waited for Mitsubishi to deliver pipe spools.

79.   In the Purchase Agreement, Mitsubishi agreed to deliver the Unit 1 Minor Components no later than August 28, 2015; however, Mitsubishi did not deliver the last of the Unit 1 Minor Components **until June 2016**. The late delivered Unit 1 gas turbine piping included pipe to be installed inside the gas turbine enclosure. Mitsubishi delivered pipe spools to be installed inside the gas turbine enclosure throughout the period from October 2015 through February 2016. Mitsubishi delivered nearly 50 spools of Unit 1 fuel gas pipe in January 2016 and more than 30 internal fuel gas and water piping spools in February 2016. Mitsubishi did not deliver the last Unit 1 fuel gas spool until February 22, 2016, and the last major shipment of Unit 1 spools was made on February 27, 2016. This protracted and delayed delivery schedule delayed WOPC in the progress of erecting and installing Unit 1.

80.   Similarly, in the Purchase Agreement, Mitsubishi agreed to deliver the Unit 2 Minor Components no later than September 28, 2015; however, Mitsubishi delivered the Unit 2 pipe spools even later than the Unit 1 pipe spools. Mitsubishi delivered Unit 2 pipe spools throughout the period from October 2015 to February 2016 and also in June 2016. As on Unit 1, the latest deliveries included deliveries of piping to be installed inside the Unit 2 gas turbine enclosure. Mitsubishi did not deliver many Unit 2 spools in January 2016. It delivered some 225 pipe spools in February 2016. Mitsubishi's February 2016 deliveries included air, water, pressure and drain, fuel gas, and oil piping spools to be installed inside the Unit 2 enclosure. As on Unit 1, Mitsubishi's failure to timely deliver the Unit 2 pipe spools delayed WOPC in the progress of erecting and installing Unit 2.

81.   On April 15, 2016, Mitsubishi admitted that it failed to timely deliver the All Minor Components group. Mitsubishi stated, "MHPSA does agree that the Minor Component

Guaranteed Delivery Date was fulfilled late." It also acknowledged that "the late Delivery resulted in some rework."

82.     On August 4, 2016, WOPC demanded that Mitsubishi pay WOPC $15,500,000 of Late Equipment Delivery Liquidated Damages for Mitsubishi's admitted late delivery of the gas turbine piping. Mitsubishi delivered the Unit 1 gas turbine piping, a part of the Unit 1 All Minor Components group, **more than 180 days past the Unit 1 Minor Component Guaranteed Delivery Date**. Mitsubishi delivered the Unit 2 gas turbine piping, a part of the Unit 2 All Minor Components group, **more than 149 days after the Unit 2 All Minor Component Guaranteed Delivery Date**.

83.     Mitsubishi's failure to timely deliver the gas turbine piping was typical of Mitsubishi's failure to timely deliver its equipment. Mitsubishi delivered 67% of its equipment late. Mitsubishi delivered an item of Unit 1 inlet air filter components 490 days late. Mitsubishi's failure to timely deliver its components caused substantial delay and disruption to WOPC.

84.     Under Section 6.2.1 of the Purchase Agreement, Mitsubishi's failure to timely deliver all of the required components of the Gas Turbines, including the gas turbine piping, by the contractually required dates obligates Mitsubishi to pay WOPC Late Equipment Delivery Liquidated Damages in the amounts specified in the Purchase Agreement. Mitsubishi contractually agreed that the Late Equipment Delivery Liquidated Damages are reasonable liquidated damages and are not a penalty. It also contractually agreed that the liquidated damages are a fair and reasonable estimate of the losses that might be reasonably anticipated from Mitsubishi's failure to timely deliver the Gas Turbines.

85.     Mitsubishi contractually agreed that the Late Equipment Delivery Liquidated Damages will be applicable without regard to the actual losses sustained. Therefore, Mitsubishi

waived any ability to dispute or contest the enforceability of the liquidated damages assessable under the Purchase Agreement, including the Late Equipment Delivery Liquidated Damages.

86.     Despite Mitsubishi's contractual obligation to pay WOPC the agreed Late Equipment Delivery Liquidated Damages, admission that it failed to timely deliver the Minor Components, and waiver of any right to contest the Purchase Agreement's liquidated damages provisions, Mitsubishi has unjustifiably failed and refused to pay WOPC the applicable Late Equipment Delivery Liquidated Damages.

87.     Under Section 6.2.2(c) of the Purchase Agreement, Mitsubishi was required to pay the Late Equipment Delivery Liquidated Damages within thirty (30) days of WOPC's demand for the Late Equipment Delivery Liquidated Damages.  Despite this obligation and WOPC's demand for the Late Equipment Delivery Liquidated Damages, Mitsubishi has failed and refused to pay WOPC for the Late Equipment Delivery Liquidated Damages.

88.     Mitsubishi also failed to cooperate with WOPC, including cooperating with WOPC in scheduling Mitsubishi's deliveries of the piping and coordinating its supply and design activities with WOPC as required by Section 2.6 of the Purchase Agreement.

**G.     Defective Equipment Deliveries**

89.     In addition to its obligations to timely submit certain design and engineering information to WOPC and to timely deliver the components of the Gas Turbines to WOPC, Mitsubishi had the contractual obligation to provide all equipment and materials to the Project free from defects.

90.     Section 9.1.1 of the Purchase Agreement provides that:

> [Mitsubishi] warrants that the equipment constituting each unit will be (i) new, unused and undamaged when first delivered . . . (iii) free from defects in materials or workmanship, and (iv) provided in accordance with the requirements of this Agreement . . . .

91.     Mitsubishi also had the obligation to perform its Services with the highest degree of skill and care and in accordance with the Purchase Agreement.  Section 9.3.1 of the Purchase Agreement provides, in part, that:

> Supplier warrants that the Services performed hereunder, including the advice and recommendations of its Personnel will be (a) performed in a professional, prudent and workmanlike manner that is free from defects, and with the highest degree of skill and care that is utilized by nationally-recognized professionals in the United States in the same field under the same or similar circumstances; and (b) performed strictly in accordance with (i) the terms of this Agreement, (ii) all Applicable Laws, and (iii) all Applicable Permits that apply to the performance of the Work . . . .

92.     Section 4.1 of the Purchase Agreement also required Mitsubishi to "provide and maintain a quality control system during the performance of Work under this Agreement."

93.     Mitsubishi failed to supply its Work free from defects and in accordance with the requirements of the Purchase Agreement, and failed to perform its Services with the required degree of skill and care and in accordance with the Purchase Agreement and applicable law.  It also failed to maintain a sufficient quality control system to ensure compliance of its Work with the Purchase Agreement.

94.     For example, Mitsubishi supplied components with defective flanges.

95.     As another example, portions of Mitsubishi's turbine piping were delivered with an anti-corrosion inhibitor that had been applied by Mitsubishi or a Mitsubishi subcontractor in contravention of the corrosion inhibitor's manufacturer's recommended installation procedures.

96.     Mitsubishi's improper application of the anti-corrosion inhibitor resulted in the piping supplied by Mitsubishi being damaged, unfit for the purpose of generating electric power, defective, and not in compliance with the requirements of the Purchase Agreement (the "Defective Piping").

97.     Mitsubishi initially corrected some of the Defective Piping. Mitsubishi's correction of Defective Piping required extensive involvement by WOPC forces, including hand-cleaning of pipe while the cause had not yet been determined, setting up a containment area, removing affected pipe, moving affected pipe, and re-installation of pipe after cleaning.

98.     WOPC incurred the cost to assist in correcting the Defective Pipe, and to correct other defective Mitsubishi work.  WOPC's costs incurred due to defective Mitsubishi work include, without limitation, costs of delay, mitigation, and disruption due to the defective Mitsubishi work.  Mitsubishi is legally and contractually responsible for the impacts of its provision of Defective Pipe, the correction of its Defective Pipe, and other defective and deficient performance of its work.

**H.     3D Model and Other Errors, Defects, and Deficiencies in Mitsubishi's Work**

99.     The Purchase Agreement obligated Mitsubishi to supply a 3D model for the Gas Turbines, including the Auxiliary enclosure, piping external to the gas turbine enclosure, all piping termination points, and all equipment external to the gas turbines and Auxiliary enclosure as a part of Mitsubishi's scope of work (collectively the "3D Model").

100.     The first submission of the 3D Model was to be made 20 weeks after the "notice to proceed" being issued to Mitsubishi.  This first submission of the 3D Model was to be approximately 30% complete.

101.     Mitsubishi was then to provide a "terminal point design freeze" of the 3D Model within 32 weeks after being issued the "notice to proceed."

102.     The next submission of the 3D Model was to be made at 48 weeks after the "notice to proceed" being issued and was to be 90% complete.

103.    After reaching the 90% completion level, the 3D Model was then to be updated and shared on a monthly basis until the final submission of the 3D Model.

104.    The 3D Model was intended to provide WOPC with the necessary information for WOPC to continue designing and engineering the Project overall, to plan the installation of the Gas Turbines, and to direct the installation of the Gas Turbines.

105.    Mitsubishi failed to provide submissions of the 3D Model by the required submission dates and, when the submissions were made, Mitsubishi's 3D Models did not contain the level of detail or completeness required by the Purchase Agreement.  Mitsubishi failed to perform its work relating to the 3D model in a professional, prudent and workmanlike manner that was free from defects, and with the highest degree of skill and care.

106.    Mitsubishi's failure to provide the 3D Model submissions on a timely basis and with the required level of detail, completeness, and skill and care caused WOPC to expend additional costs to revise WOPC designs and engineering that had been completed by WOPC in reliance on Mitsubishi's prior submissions of the 3D Model, to revise installations completed in accordance with Mitsubishi's prior submission of the 3D Model, and to alter and revise WOPC's plan to install Mitsubishi related equipment due to Mitsubishi's revisions to previous 3D Model submissions.

107.    Mitsubishi's work also contained numerous other errors, defects, deficiencies, and failures to perform in accordance with the Purchase Agreement and the Assignment Agreement including, without limitation, errors in termination information, pipe line lists, cable lists, and conflicting wiring diagrams.  Mitsubishi failed to perform its work in a professional, prudent and workmanlike manner that was free from defects, and with the highest degree of skill and care.

108.     Mitsubishi failed to perform its design responsibility in accordance with the Purchase Agreement's and the Assignment Agreement's requirements, including the requirements to perform the work in a professional, prudent and workmanlike manner that was free from defects, and with the highest degree of skill and care.  Mitsubishi failed to submit required documents or to submit complete documents, including the pipeline list, piping isometrics, wiring diagrams, schematics, instrument details, equipment general arrangements, support details, and structural steel piece mark details.  As of late May 2017, well after the Project's planned substantial completion date, Mitsubishi still had not submitted a comprehensive cable list, valve list, and pipeline list that incorporated the entire generator and turbine scope as required by the Purchase Agreement.  Mitsubishi ignored requests to provide the required submittals or responded by submitting late, incomplete, and/or low-quality submittals.

109.     When Mitsubishi made its submittals, the submittals were exceedingly poor quality, deficient, and defective.  Mitsubishi's design quality problems included incomplete and deficient design documents with missing pages, duplications, incorrect revision numbers, incomplete details, and missing tag numbers.  From almost the very beginning of Mitsubishi's work, WOPC has had to ask Mitsubishi to provide required information such as electrical termination points, dimensions on piping isometrics, details for in-line piping devices, and location plans.  Although Mitsubishi often developed such information for its internal use, Mitsubishi failed and refused to provide that information to WOPC.

110.     Mitsubishi's failure to prepare its design in a timely, proper, and correct manner, meeting all requirements of the Purchase Agreement and the Assignment Agreement, including the requirement to perform its work in a professional, prudent and workmanlike manner that was free from defects, and with the highest degree of skill and care, created significant problems for

WOPC, including problems in design interface, construction, and commissioning. Mitsubishi's failure to properly perform its design responsibility caused WOPC to incur significant additional costs of performing its work, including additional costs of WOPC engineering, construction, and commissioning.

111.    Other Mitsubishi failures to perform in accordance with the Purchase Agreement and the Assignment Agreement including the requirement to perform its work in a professional, prudent and workmanlike manner that was free from defects, and with the highest degree of skill and care, include Mitsubishi's addition of requirements for TCA FC Valves; changes to TCA pumps criteria; addition of a recirculating line to the condenser on the TCA pumps; failure to provide sufficient generator piping isometrics; failure to provide sufficient gas turbine piping isometrics; pipe fabrication deficiencies; failure to design control package platforms and gas turbine platforms in accordance with applicable codes, with sufficient quality, and without resolving clashes; non-compliant delivery notifications; air filter component shortages, including wiring, conduit, and flex connectors; failure to timely respond to inquiries about the air filter pulse timers being out of sequence; incorrect wiring for the air filters; multiple, late revisions to LE-00149 cable list and LI-00334 wiring diagrams; changes to the firefighting design after cables were pulled; incorrect wiring diagrams; electrical drawings that do not match termination points; defects and deficiencies in the SFC and excitation cubicle wiring diagrams; errors in the inlet air filter support steel elevation and issues with the bolting; failure to properly size the terminal boxes for the 5KV feeders from the GCB to SFC to allow cable installation; and added conduit requirements for the turning gear; changes to wire for the evaporation cooler and late delivery of the changed wire; replacement of the gas turbine vanes; and other issues detailed on WOPC's FCN log for Mitsubishi.

112.    WOPC has corrected, worked around, managed and/or mitigated the 3D Model Errors and other, incomplete, erroneous, deficient and/or defective Mitsubishi work, and Mitsubishi's failures to perform its work in a professional, prudent and workmanlike manner that was free from defects, and with the highest degree of skill and care on Mitsubishi's behalf, incurring additional costs to correct these errors, omissions, defects, and deficiencies, including costs of delay, mitigation, and disruption due to the errors, omissions, defects, and deficiencies in Mitsubishi's work, and was otherwise impacted in the performance of its Work on the Project by Mitsubishi's errors, omissions, defects, and deficiencies in its work.  Mitsubishi is legally and contractually responsible for the impacts of its incomplete, erroneous, deficient, and defective work and failures to perform its work in a professional, prudent and workmanlike manner that was free from defects, and with the highest degree of skill and care.  Mitsubishi's errors, omissions, incomplete, deficient, and defective work and failure to perform its work in a professional, prudent and workmanlike manner that was free from defects, and with the highest degree of skill and care impacted WOPC's work on the Gas Turbines and on WOPC's other work throughout the Project. WOPC has experienced losses of efficiency in its engineering, construction, and commissioning work due to Mitsubishi's failure to properly and timely perform its work.

113.    Throughout the Project, WOPC has notified Mitsubishi of its incomplete, erroneous, defective, and deficient work and required Mitsubishi to take appropriate corrective action.  Despite the Purchase Agreement's requirement for Mitsubishi to perform its work in a professional, prudent and workmanlike manner that was free from defects, and with the highest degree of skill and care, Mitsubishi routinely refused to dedicate engineering resources to the correction of its errors, omissions, defects and deficiencies.  Instead, it often referred WOPC to Mitsubishi's TFAs to resolve the issues encountered.  Mitsubishi has not shown WOPC that

Mitsubishi has not charged WOPC for TFA time expended to correct Mitsubishi's own errors, omissions, defects, and deficiencies.

## I.   Improper Charges for Technical Field Assistance Due to Mitsubishi's Failures

114.   Under Section 2.5 of the Purchase Agreement, Mitsubishi agreed to assign personnel to the Project who would provide "Technical Field Assistance in relation to installation, commissioning and testing" of the Gas Turbines. Mitsubishi's contract price included a certain base number of TFA hours and provided for payment to Mitsubishi if Mitsubishi provided TFA services in addition to the base TFA hours. Mitsubishi could not earn base TFA hours or claim additional TFA hours for its TFAs' work on issues attributable to Mitsubishi, such as TFA hours incurred fixing Mitsubishi's own errors, omissions, defects, and deficiencies in its work.

115.   Many of the hours Mitsubishi's TFAs have worked on the Project have been attributable to Mitsubishi because the hours were expended to resolve or address Mitsubishi's own errors, omissions, defects, and deficiencies, including Mitsubishi's late pipe delivery, improperly applied corrosion inhibitor, and the many other Mitsubishi performance issues.

116.   Mitsubishi asserted that it has worked additional TFA hours on the Project and is entitled to additional compensation for the allegedly additional TFA hours.

117.   WOPC asked Mitsubishi to account for the TFA hours attributable to Mitsubishi's own errors, omissions, defects, and deficiencies in its work. Mitsubishi has failed and refused to provide the required, detailed information accounting for the TFA hours it claims to have incurred on the Project for its own account and the TFA hours that it claims are additional.

118.   Despite its refusal to provide the required detailed accounting for TFA hours and WOPC's agreement to pay for properly supported, verifiable additional TFA hours, Mitsubishi threatened to abandon the Project if WOPC did not pay Mitsubishi for alleged additional TFA

hours. Mitsubishi also failed and refused to provide a detailed accounting for its "base scope" TFA hours.

119. WOPC has paid, and is paying, Mitsubishi for certain TFA hours that Mitsubishi claims are additional TFA hours. WOPC is making such payments under protest and with a full reservation of WOPC's rights. WOPC is entitled to a full, complete, and detailed accounting for the TFA hours purportedly expended by Mitsubishi's TFAs, including TFA hours claimed by Mitsubishi toward the base contract hours, the hours attributable to Mitsubishi's own issues, and the alleged additional hours. Mitsubishi is not entitled to payment for, and/or WOPC is due a credit for, any TFA hours that Mitsubishi expended to correct, cure, or otherwise address any of Mitsubishi's errors, omissions, defects, and deficiencies in its work to the extent Mitsubishi has charged WOPC for those TFA hours.

**J.      Mitsubishi's Failure to Timely Achieve Mitsubishi's Substantial Completion**

120. The Purchase Agreement required Mitsubishi to achieve Substantial Completion of Mitsubishi's work by the Guaranteed Substantial Completion Date, May 1, 2017.

121. Mitsubishi failed to achieve Substantial Completion of Mitsubishi's work by May 1, 2017. Mitsubishi did not request an extension of time to perform its work.

122. The period between First Fire and April 11, 2018 is referred to herein as the "Commissioning Period."

123. Mitsubishi's failure to achieve Substantial Completion of its work by May 1, 2017 resulted, in whole or in part, from, without limitation, defects, faults or deficiencies in a Unit or Mitsubishi's acts or omissions prior to and during the Commissioning Period.

124. The defects, faults or deficiencies in a Unit or Mitsubishi acts or omissions that delayed Mitsubishi in achieving Substantial Completion prior to and during the Commissioning

Period, included, without limitation (a) the fuel gas excursion issues, (b) Mitsubishi's re-tuning of the Units to accommodate variations in methane levels in the fuel gas, and (c) the defects, faults or deficiencies in a Unit or Mitsubishi acts or omissions that were observed or occurred in the thirty (30) days prior to April 11, 2018, including the unresolved emissions issues.

125.    Under Section 8.2.1 of the Purchase Agreement, Mitsubishi is obligated to pay WOPC Late Substantial Completion Liquidated Damages if defects, faults or deficiencies in a Unit or Mitsubishi's acts or omissions delay Mitsubishi's achievement of Substantial Completion beyond May 1, 2017. The amounts of the Late Substantial Completion Liquidated Damages owed to WOPC for each day of delay are stated in the Purchase Agreement.

126.    By letter dated November 29, 2018, WOPC notified Mitsubishi of the events and conditions that occurred in the Commissioning Period and are defects, faults or deficiencies in a Unit or are acts or omissions of Mitsubishi that delayed Mitsubishi in achieving Substantial Completion under the Purchase Agreement.   Although WOPC demanded payment of Late Substantial Completion Liquidated Damages owed under the Purchase Agreement, Mitsubishi informed WOPC, on December 10, 2018, that Mitsubishi refused to pay the amounts owed for Late Substantial Completion Liquidated Damages.

127.    Mitsubishi contractually agreed that the Late Substantial Completion Liquidated Damages are reasonable liquidated damages and are not a penalty. It also contractually agreed that the Late Substantial Completion Liquidated Damages are a fair and reasonable estimate of certain losses that might be reasonably anticipated from Mitsubishi's failure to timely achieve Mitsubishi's Substantial Completion.

128.    Mitsubishi contractually agreed that the Late Substantial Completion Liquidated Damages will be applicable without regard to the actual losses sustained due to Mitsubishi's failure

to achieve Mitsubishi's Substantial Completion.   Therefore, Mitsubishi waived any ability to dispute or contest the enforceability of the Late Substantial Completion Liquidated Damages assessable under the Purchase Agreement for Mitsubishi's failure to timely achieve Mitsubishi's Substantial Completion.

129.   The acts and omissions for which Mitsubishi is responsible have delayed WOPC in WOPC's achievement of Substantial Completion of WOPC's work under the EPC Contract. Mitsubishi is responsible for all losses or damages incurred by WOPC as a result of Mitsubishi's acts and omissions, including all of WOPC's losses and damages caused by the delay in WOPC's achievement of Substantial Completion of WOPC's work under the EPC Contract that was caused by Mitsubishi's acts and omissions.   The losses and damages for which Mitsubishi is responsible include, without limitation, liquidated damages that may be assessed against WOPC by ODEC and other damages incurred by WOPC due to Mitsubishi caused delay in WOPC's achievement of Substantial Completion under the EPC Contract.

130.   Mitsubishi is contractually obligated to pay WOPC all of the liquidated damages, including Late Substantial Completion Liquidated Damages that are due to WOPC under the contract and to deal with WOPC fairly and in good faith in the performance of its contractual obligations, including its obligation to pay liquidated damages. Mitsubishi has failed and refused to pay the Late Substantial Completion Liquidated Damages (and all other liquidated damages and damages) despite its contractual obligation to pay them. Under Section 5.1.3 of the Purchase Agreement, Mitsubishi's failure and refusal to pay the Late Substantial Completion Liquidated Damages (and all of the other damages and liquidated damages owed to WOPC under the Purchase Agreement) is a breach of the Purchase Agreement, a breach of the duty of good faith and fair dealing, and entitles WOPC to withhold payment from Mitsubishi for the liquidated damages (even

disputed liquidated damages) that WOPC believes it is due.  WOPC "withheld" payment from Mitsubishi for Mitsubishi's failure to pay WOPC the liquidated damages that WOPC is owed under the Purchase Agreement by objecting to Mitsubishi's request for payment of Mitsubishi's Substantial Completion milestone payment.

131.    Under Section 8.4.1(c) of the Purchase Agreement, Mitsubishi must pay WOPC all of the liquidated damages that WOPC is owed by Mitsubishi, including the Late Substantial Completion Liquidated Damages, to achieve Final Completion.  As of the filing of this Second Amended Complaint, Mitsubishi has not paid WOPC all of the liquidated damages that Mitsubishi owes WOPC, including the Late Substantial Completion Liquidated Damages.  Consequently, Mitsubishi has not achieved Final Completion and is not entitled to payment of its Final Completion milestone payment.

## FIRST CAUSE OF ACTION - BREACH OF CONTRACT

132.    WOPC re-alleges and incorporates by reference Paragraphs 1 through 131 above as if fully stated herein.

133.    WOPC has fully, faithfully and timely performed all obligations under the Purchase Agreement and the Assignment Agreement.

134.    Mitsubishi materially breached the terms and conditions of the Purchase Agreement and the Assignment Agreement by, without limitation:

a.    Failing to timely submit all design and engineering information in accordance with the Purchase Agreement's requirements;

b.    Failing to pay to WOPC the Late Document Delivery Liquidated Damages for Mitsubishi's failure to timely submit all of its design and engineering information in accordance with the Purchase Agreement's requirements;

30

c.       Failing to deliver the Gas Turbines, including the gas turbine piping and other components of the Gas Turbines in accordance with the Purchase Agreement's requirements;

d.       Failing to timely pay WOPC the applicable Late Equipment Delivery Liquidated Damages for Mitsubishi's failure to timely deliver the Gas Turbines, including the gas turbine piping and other components of the Gas Turbines, in accordance with the Purchase Agreement's requirements;

e.       Failing to pay WOPC the Late Substantial Completion Liquidated Damages for Mitsubishi's failure to cause Substantial Completion to be achieved by the Guaranteed Substantial Completion Date;

f.       Failing to deliver all designs, equipment, and materials in accordance with the requirements of the Purchase Agreement;

g.       Failing to cooperate with WOPC as required by Section 2.6 of the Purchase Agreement;

h.       Failing to provide and maintain a quality control system during the performance of Mitsubishi's work under the Purchase Agreement;

i.       Failing to adhere to any quality control systems or requirements applicable to Mitsubishi's performance of its work under the Purchase Agreement;

j.       Failing to deliver the 3D Model in a timely fashion and in accordance with the requirements of the Purchase Agreement;

k.       Failing to perform its work in accordance with the requirements of the Purchase Agreement and the Assignment Agreement;

l.     Failing to perform its work in a professional, prudent and workmanlike manner that was free from defects, and with the highest degree of skill and care;

m.    Failing to perform its work so that it was not riddled with errors, defects, deficiencies, and/or omissions that caused impacts to WOPC's performance of its work;

n.    Improperly threatening to stop work on the Project;

o.    Failing to provide WOPC with a proper accounting for the TFA hours purportedly worked by Mitsubishi; and

p.    Failing to provide WOPC a proper and sufficient credit for any TFA hours expended by Mitsubishi to correct Mitsubishi's own errors, omissions, defects, and deficiencies in its work.

135.   As a direct and proximate result of Mitsubishi's breaches of the Purchase Agreement and the Assignment Agreement WOPC has incurred damages in excess of $75,000.00.

136.   WOPC is entitled to recover from Mitsubishi, and Mitsubishi is liable to pay, all of WOPC's damages flowing from Mitsubishi's breaches of the Purchase Agreement and the Assignment Agreement including, but not limited to, Late Document Delivery Liquidated Damages, Late Equipment Delivery Liquidated Damages, Late Substantial Completion Liquidated Damages, delay damages, disruption damages, additional engineering costs, additional construction costs, additional commissioning costs and interest.

WHEREFORE, Plaintiff, White Oak Power Constructors, respectfully requests judgment be entered in its favor and against Defendant, Mitsubishi Hitachi Power Systems Americas, Inc., for damages resulting from Mitsubishi's breaches of the Purchase Agreement and the Assignment

Agreement, including, without limitation, Late Document Delivery Liquidated Damages, Late Equipment Delivery Liquidated Damages, Late Substantial Completion Liquidated Damages, delay damages, disruption damages, acceleration damages, additional engineering costs, additional construction costs, additional commissioning costs, and all other losses and damages due to Mitsubishi's breaches of contract, along with an award of pre- and post-judgment interest and any other relief that this Court deems proper or just.

Dated: January 25, 2019                        Respectfully submitted,

By: _____/s/_____
James E. Moye (VA Bar No. 91976)
Mark O. Masterson (VA Bar No. 91728)
Moye, O'Brien, Pickert & Dillon, LLP
800 South Orlando Avenue
Maitland, Florida 32751
Telephone: (407) 622-5250
Facsimile: (407) 622-5450
Email: jmoye@moopd.com
mmasterson@moopd.com

and

Robert M. Moore (VA Bar No.22455)
Robert D. Windus (VA Bar No. 81570)
Thomas L. Wilson (VA Bar No. 85512)
MOORE & LEE, LLP
1751 Pinnacle Drive, Suite 1100
McLean, Virginia 22102
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
Email: r.moore@mooreandlee.com
r.windus@mooreandlee.com
t.wilson@mooreandlee.com

*Counsel for White Oak Power Constructors*

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2019, I will electronically file the foregoing using the

CM/ECF system, which will send a notification of such filing to all counsel of record.

By: _____/s/_____
James E. Moye (VA Bar No. 91976)
Mark O. Masterson (VA Bar No. 91728)
Moye, O'Brien, Pickert & Dillon, LLP
800 South Orlando Avenue
Maitland, Florida 32751
Telephone: (407) 622-5250
Facsimile: (407) 622-5450
Email: jmoye@moopd.com
Email: mmasterson@moopd.com

and

Robert M. Moore (VA Bar No.22455)
Robert D. Windus (VA Bar No. 81570)
Thomas L. Wilson (VA Bar No. 85512)
MOORE & LEE, LLP
1751 Pinnacle Drive, Suite 1100
McLean, Virginia 22102
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
Email: r.moore@mooreandlee.com
r.windus@mooreandlee.com
t.wilson@mooreandlee.com

*Counsel for White Oak Power Constructors*