IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

WHITE OAK POWER
CONSTRUCTORS,
    Plaintiff,

v.

MITSUBISHI HITACHI POWER
SYSTEMS AMERICAS, INC.,
    Defendant.
_____/    Civil Action No. 3:17-cv-00355-JAG

OLD DOMINION ELECTRIC
COOPERATIVE,
    Plaintiff,

v.

WHITE OAK POWER
CONSTRUCTORS, et al.
    Defendants.
_____/

WHITE OAK POWER
CONSTRUCTORS,
    Plaintiff,

v.

ALSTOM POWER, INC., and
OLD DOMINION ELECTRIC
COOPERATIVE
    Defendants.
_____/

## OPINION

In 2014, Old Dominion Electric Cooperative ("Old Dominion") hired White Oak Power Constructors ("White Oak") to build a natural gas power plant in Rising Sun, Maryland. White Oak and Old Dominion drafted and signed the Engineer, Procure, and Construct Contract ("EPC

Contract") to govern their relationship. Over the course of construction, multiple disputes arose between Old Dominion, White Oak, and the suppliers of the power plant's different components.[1] This lawsuit followed. White Oak and Old Dominion have both moved for partial summary judgment on the interpretation of part of the EPC Contract: Section 9.2.4.3 (the "Risk of Loss Provision").

The EPC Contract provides that White Oak owes Old Dominion liquidated damages if White Oak fails to complete the power plant on time. The Risk of Loss Provision in the EPC Contract makes Old Dominion responsible for certain losses or damages to property at the plant. After delays in construction, Old Dominion assessed more than $50 million in liquidated damages against White Oak. White Oak now claims that, under the Risk of Loss Provision, Old Dominion should be liable for "delay-related losses, damages, and costs" attributable to property damage. (Dk. No. 152, at 6.) Old Dominion says that the Risk of Loss Provision only requires it to pay for losses to property and does not extend to liquidated damages for any corresponding delays.

Because the Risk of Loss Provision is unambiguous and does not require Old Dominion to pay delay-related liquidated damages, the Court will grant Old Dominion's motion and deny in part White Oak's motion.[2]

---

[1] Alstom Power, Inc., supplied two heat recovery steam generators and a steam turbine generator. Mitsubishi Hitachi Power Systems Americas, Inc., provided gas turbines for the project. Alstom and Mitsubishi are parties to this case, but are not involved in the instant motions.

[2] The Court allowed all parties to file two motions for summary judgment. Old Dominion and White Oak each have filed one motion. While Old Dominion's first summary judgment motion only addresses the Risk of Loss Provision, White Oak's motion addresses a second issue, involving whether Old Dominion should receive liquidated damages relating to the delayed installation of the Replacement Spare Transformer. In this Opinion, the Court decides the Risk of Loss Provision question ("Question 2") and reserves ruling on the Replacement Spare Transformer part of White Oak's motion ("Question 1"). (Dk. No. 172, at 4.)

2

# I. BACKGROUND

## *A. Relevant EPC Contract Language*

Section 9 of the EPC Contract, titled "Indemnities; Insurance," lists the various insurance policies that Old Dominion, White Oak, and White Oak's subcontractors needed during construction of the power plant. (Dk. No. 44-2, at 53.) Section 9.2.4 covers "Property Insurance" and first specifies what type of "All-Risk Builders' Risk Insurance" that Old Dominion must buy, and what happens in the case of a major property loss at the construction site. (*Id.* at 60-61.) In Section 9.2.4.3, titled "Risk of Loss," the EPC Contract states:

> [Old Dominion] shall be accountable and responsible for any loss or damage to any part of the Facility, the Site or *Work*, including property of any kind including, but not limited to, uninsured *Losses* and deductibles.

(*Id.* at 62) (emphasis added).[3] The parties' motions focus on the interpretation of this short paragraph.

The EPC Contract gives two separate definitions of "Work." First, it defines "Work" as "the responsibilities of [White Oak] hereunder." (*Id.* at 19.) Second, it defines "Work" as "that which is produced, constructed or built pursuant to this Agreement, where the context so requires." (*Id.*) It also defines "Losses" as "any claims, causes of action, demands, suits, proceedings, fines, penalties, liabilities, judgments, awards, losses, damages, interest, costs or expenses (including attorneys' fees, expert fees, consultant fees, other litigation costs, and court costs)." (*Id.* at 13.)

The parties agreed in the EPC Contract that White Oak would reach "Substantial Completion" of the facility by May 1, 2017. (*Id.* at 16.) Section 8 of the EPC Contract created a procedure for both parties to submit and accept "Change Orders," which could alter the deadlines

---

[3] The next paragraph of the Risk of Loss Provision requires White Oak to pay certain amounts if White Oak is at fault for the loss. The parties do not dispute the meaning of that paragraph.

3

or specifications for the construction. (*Id.* at 50.) Section 8 notes that White Oak is "entitled" to a Change Order in circumstances where Old Dominion fails "to perform its obligations" or where a "Force Majeure event will materially delay the schedule of the Work." (*Id.* at 51.) Section 12 details liquidated damages that White Oak would pay for failing to reach Substantial Completion by May 1, 2017.

### *B. Delays in Construction*

Several instances of property damage delayed construction of the power plant. For example, a fire in September, 2016, destroyed one of the transformers and parts of the building around it. Freezing water caused damage to concrete foundations and windstorms destroyed rebar cages. Because of necessary repairs and cleanup, these incidents contributed to the delay of the entire construction effort. White Oak did not reach Substantial Completion by May 1, 2017. In fact, the power plant was not substantially complete until April 11, 2018. Old Dominion has assessed tens of millions of dollars in liquidated damages against White Oak because of its delay in finishing the construction.

## II. DISCUSSION[4]

### *A. Relevant Law*

In the instant motions, the parties dispute whether the Risk of Loss Provision in the EPC Contract speaks to the liquidated damages that Old Dominion has charged to White Oak. The

---

[4] Summary judgment becomes appropriate when the movant establishes that no genuine dispute of any material fact exists and the party is thereby entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant satisfies its showing for summary judgment, the burden shifts to the non-moving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). If a court finds that "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict," the court must deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

4

parties do not dispute that, pursuant to a choice of law provision in the EPC Contract, Virginia law governs this case.

When deciding a motion for summary judgment on a contractual interpretation issue, a court should first ask "whether, as a matter of law, the contract is ambiguous or unambiguous on its face." *Doral Bank PR v. Fed. Home Loan Mortg. Corp.*, 477 F. App'x 31, 36 (4th Cir. 2012) (applying Virginia law). If the contract is unambiguous, the court must enforce it as read and cannot consider evidence about its meaning beyond the text itself. *Trex Co. v. ExxonMobil Oil Corp.*, 234 F. Supp. 2d 572, 575 (E.D. Va. 2002); *Doral Bank*, 477 F. App'x at 36 ("An unambiguous contract should be construed by the Court as a matter of law, without reference to extrinsic evidence."). "[T]he mere fact that the parties dispute the meaning of the language does not itself render the contract ambiguous." *Trex Co.*, 234 F. Supp. 2d at 575.

A contract is ambiguous if "two constructions are equally possible" or "reasonable [persons] . . . may reach reasonable, but opposite, conclusions." *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 784 F. Supp. 2d 585, 592 (E.D. Va. 2011); *see also Asip v. Chesterfield Cty. Sch. Bd.*, No. 3:18-cv-261, 2019 WL 495584, at *5 (E.D. Va. Feb. 8, 2019) (Gibney, J.) ("To qualify as 'unambiguous,' the contract cannot contain more than one permissible inference as to the parties' intent."). A contract is unambiguous when it has a "plain meaning." *See Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 179, 788 S.E.2d 237, 244 (2016). Even in technical agreements with complex language and concepts, a court should not shy away from searching for the unambiguous, plain meaning of the text. *Id.* at 180, 788 S.E.2d at 244-45.

A court, however, should not analyze the meaning of snippets of the contract, but instead "construe the contract as a whole." *Id.* at 179-80, 788 S.E.2d at 244 (noting that the court would avoid emphasizing "isolated terms wrenched from the larger contractual context"). Relatedly,

5

courts should "give meaning to every clause where possible" and presume that "the parties have not used words aimlessly." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (applying Virginia law).

Virginia courts also presume that the parties "were trying to accomplish something rational," *Mount Aldie, LLC v. Land Tr. of Va., Inc.*, 293 Va. 190, 200, 796 S.E.2d 549, 555 (2017), and "will not read contracts to produce absurd results." *Levine v. Emp'rs Ins. Co. of Wausau*, 887 F.3d 623, 632 (4th Cir. 2018) (applying Virginia law). "Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." *Mount Aldie*, 293 Va. at 200, 796 S.E.2d at 555.

On the other hand, if a contract's text is ambiguous, a court moves to the next step and may "examine the extrinsic evidence, *i.e.*, the evidence outside the four corners of the contract" to determine its meaning. *Trex Co.*, 234 F. Supp. 2d at 576. A court may still grant summary judgment on an "ambiguous contract if the evidence resolves the interpretive issue." *Asip*, 2019 WL 495584, at *5. If this two-step analysis does not resolve the issue, the court must leave the question to the trier of fact. *Id.*

### *B. Application*

Applying these principles to the contract at issue, the Court must ask whether the Risk of Loss Provision is unambiguous. *See Doral Bank*, 477 F. App'x at 36. Both parties agree that the Provision requires Old Dominion to pay for property damage at the construction site. White Oak, however, says that the Risk of Loss Provision also requires Old Dominion to pay for the liquidated

damages associated with delays arising from the property damage. Old Dominion disagrees, but this disagreement alone does not create ambiguity. *See Trex Co.*, 234 F. Supp. 2d at 575.

White Oak argues that the plain meaning of the Risk of Loss Provision and the EPC Contract's definitions of "Work" and "Losses" support its interpretation. The Risk of Loss Provision provides that "[Old Dominion] shall be accountable and responsible for any loss or damage to any part of the Facility, the Site or Work." (Dk. No. 44-2, at 62.) White Oak claims that the first definition of "Work" in the EPC contract applies to the Provision. Under that definition, "Work" means "the responsibilities of [White Oak] hereunder." (*Id.* at 19.) Because the EPC Contract required White Oak to finish construction on schedule, White Oak argues that delays caused by property damage interfered with its "responsibilities," making Old Dominion liable for those damages under the Provision. (*Id.*)

This argument, however, ignores the second definition of "Work" that the EPC Contract says should apply when "context so requires." (*Id.*) Under the second definition, "Work" means "that which is produced, constructed or built pursuant to [the EPC Contract]." (*Id.*) The Court concludes that the "context . . . requires" the second definition of "Work" to apply to the Risk of Loss Provision. (*Id.*)

Section 9.2.4 is titled "Property Insurance" and its subsections, which include the Risk of Loss Provision, deal with how the parties should protect against and manage property damage. (*Id.* at 60.) The Court must apply the definition of "Work" that accounts for the full context of the EPC Contract. *See Babcock*, 292 Va. at 179-80, 788 S.E.2d at 244 (reviewing a contract "as a whole"). "[W]ords or terms should be understood by reference to those that accompany them." *Res. Bank v. Progressive Cas. Ins. Co.*, 503 F. Supp. 2d 789, 796 (E.D. Va. 2007) (invoking the *noscitur a sociis* canon of interpretation). Moreover, when specific words are followed by a word

of "general import," a court should construe the general word to have a similar meaning to the specific items listed. *Suffolk Lodging Partners, LLC v. Eastguard Ins. Co.*, No. 2:12-cv-546, 2013 WL 12131747, at *9 (E.D. Va. Aug. 23, 2013) (explaining the doctrine of *ejusdem generis*). Here, "Work" follows "Facility" and "Site," two words that indicate that the Risk of Loss Provision governs physical damage. (Dk. No. 44-2, at 62.) For these reasons, the second definition of "Work" must apply to the Provision.

Second, White Oak argues that the Risk of Loss Provision makes Old Dominion responsible for "uninsured Losses and deductibles." (*Id.*) "Losses" are defined as "any claims, causes of action, demands, suits, proceedings, fines, penalties, liabilities, judgments, awards, losses, damages, interest, costs or expenses." (*Id.* at 13.) Surely, White Oak says, the liquidated damages that it owes because of property damage delays fall under this extensive list. This interpretation, however, would invalidate other parts of the EPC contract and lead to absurd results. *See Hitachi*, 166 F.3d at 624 (noting that courts should give meaning to every clause in a contract).

For example, Section 8 outlines the procedures for Change Orders. Without the possibility of liquidated damages, White Oak would have no reason to request a Change Order if it missed a deadline due to property damage. More specifically, Section 8 creates a procedure for "Force Majeure" events beyond the parties' control. (Dk. No. 44-2, at 51.) That language would become superfluous under White Oak's interpretation. If Old Dominion had to pay liquidated damages for delays due to "Force Majeure" events that caused property damage, White Oak would not need a Change Order for those events. The Court cannot interpret the Risk of Loss Provision in a way that makes other parts of the EPC Contract meaningless. *See Hitachi*, 166 F.3d at 624.

White Oak's reading of the Risk of Loss Provision would also conflict with Section 12, which assesses liquidated damages against White Oak for failing to timely achieve Substantial

Completion, regardless of why a delay occurred. The parties could have included an exception in Section 12 for delays caused by property damage, but they did not.

Finally, White Oak's proposed interpretation leads to the absurd result that Old Dominion would become liable to itself for liquidated damages attributable to delays in construction caused by property damage. It would be irrational for the EPC Contract to charge White Oak with delay-related liquidated damages, only to then make Old Dominion ultimately liable for them under the Risk of Loss Provision. The Court cannot read a contract to have such absurd results. *See Levine*, 887 F.3d at 632.

There is only one reasonable interpretation of the Risk of Loss Provision: that Old Dominion's liability for property damage under the Risk of Loss Provision does not include corresponding "delay-related losses, damages, and costs." (Dk. No. 152, at 6.) Accordingly, the Provision is unambiguous, and the Court may enforce its interpretation as a matter of law. *See SunTrust*, 784 F. Supp. 2d at 592 (concluding that a contract is ambiguous only if two *reasonable* interpretations exist). Because the language of the contract is unambiguous, the Court does not need to consider extrinsic evidence. *See Trex Co.*, 234 F. Supp. 2d at 575-76.

### III. CONCLUSION

For these reasons, the Court will grant Old Dominion's motion for partial summary judgment and will deny in part White Oak's motion for partial summary judgment. The Court reserves ruling on the Replacement Spare Transformer question in White Oak's motion.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 8 August 2019
Richmond, VA

/s/ John A. Gibney, Jr.
United States District Judge